

FILED
June 24, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003588448

**11 PAGES**

1

2  Gregory C. Nuti (CSBN 151754)
   gnuti@schnader.com

3  Kevin W. Coleman (CSBN 168538)
   kcoleman@schnader.com

4  Melissa S. Lor (CSBN 245515)
   mlor@schnader.com

5  SCHNADER HARRISON SEGAL & LEWIS LLP
   One Montgomery Street, Suite 2200

6  San Francisco, California  94104-5501
   Telephone: 415-364-6700

7  Facsimile: 415-364-6785

8  Attorneys for Chapter 11 Trustee, Bradley D. Sharp

9              UNITED STATES BANKRUPTCY COURT

10             EASTERN DISTRICT OF CALIFORNIA

11                  SACRAMENTO DIVISION

12                                     Adv: 11-2550-D

13 In re:                          ) Case No. 09-29162-D-11
                                   )
14 SK FOODS, L.P., a California limited  ) Chapter 11
   partnership,                    )
15                                 ) **DCN: SH-112**
              Debtor.             )
16                                 ) **MOTION AUTHORIZING TURNOVER**
                                   ) **OF PROCEEDS OF SALE OF CERTAIN**
17                                 ) **REAL PROPERTY LOCATED AT 4000**
                                   ) **WESTLAKE BOULEVARD, #14,**
18                                 ) **HOMEWOOD, CALIFORNIA 96141**
                                   ) **FREE AND CLEAR OF ANY CLAIMS**
19                                 ) **OR INTERESTS OF THE SALYER**
                                   ) **DAUGHTER'S TRUSTS**
20                                 )
                                   ) Date:   July 27, 2011
21                                 ) Time:   10:00 a.m.
                                   ) Place:  Courtroom 34
22                                 )         501 I Street, 6th Floor
                                   )         Sacramento, CA  95814
23                                 ) Judge:  Hon. Robert S. Bardwil
                                   )
24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3403619_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee (the *"Trustee"*) in

2 the case of SK Foods, L.P. and RHM Industrial Specialty Foods, Inc. d/b/a Colusa County

3 Canning Co. (collectively, the *"Debtors"*), hereby files this Motion Authorizing the Turnover

4 of Proceeds of Sale of Certain Real Property Located at 4000 Westlake Boulevard, #14,

5 Homewood, California 96141 Free and Clear of Any Claims or Interests of the Salyer

6 Daughters' Trusts (the *"Motion"*) and respectfully states as follows:

7                                              **SUMMARY**

8    By this Motion, the Trustee seeks an order authorizing him to turnover approximately

9 $3.0 million in proceeds of the sale of certain real property located at 4000 Westlake

10 Boulevard, #14, Homewood, California 96141 (the *"Tahoe Property"*) to the Bank of

11 Montreal, as Administrative Agent for the lender parties (the *"Secured Lenders"*) pursuant to

12 that certain Amended and Restated Credit Agreement dated as of September 27, 2008 (*"BMO"*

13 or the *"Agent"*), free and clear of any claim or interest that may be asserted in such proceeds

14 by Stephanie Salyer, Caroline Salyer, or Robert J. Pruett, who is represented to be the trustee

15 of the Stefanie Ann Salyer 2007 Trust and the Carolyn Gazelle Salyer 2007 Trust (together, the

16 *"Salyer Daughters' Trusts"*).  BMO held a perfected security interest in the Tahoe Property,

17 and the Court permitted the Tahoe Property to be sold in 2009.  The Salyer Daughters' Trusts

18 filed an objection to the sale, claiming that the Salyer Daughters' Trusts had an "equitable

19 claim" to the property by virtue of certain unspecified acts of duress.  However, after the

20 Trustee pointed out the frivolous nature of the objection and informed the Salyer Daughters'

21 Trusts that he would seek sanctions under Federal Bankruptcy Rule 9011, the objection was

22 withdrawn.  Rather than imperil the sale, the Trustee and BMO permitted the sale to close with

23 BMO's lien and any claims of the Salyer Daughters' Trusts to attach to the proceeds in the

24 same priority as they had previously been in the Tahoe Property, so that the claim of the Salyer

25 Daughters' Trusts did not interfere with the sale. The proceeds of the sale are being held

26 pending further Order of this Court.

27    Counsel for the Salyer Daughters' Trusts stated in their objection that they would

28 promptly bring an equitable action to assert their "claims" of an interest in the property

PHDATA 3403619_1

TURNOVER MOTION

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  [Docket No. 1114]. *See* Request for Judicial Notice (*"RJN"*), Exh. 4. However, since the entry

2  of the Tahoe Sale Order, defined below, in late 2009, the Salyer Daughters' Trusts have taken

3  no action to assert their purported equitable claims. The Trustee now brings this Motion

4  seeking turnover of the proceeds of the sale being held pending further Order of this Court

5  because:   1) Section 544(a)(3) confers upon the Trustee "the rights and powers of" a

6  hypothetical bona fide purchaser of real property as of the commencement date, and because

7  the Salyer Daughters' Trusts "equitable claim" was not recorded, the Trustee's title to the

8  Tahoe Property (and its proceeds) is free and clear of any "equitable" interest of the Salyer

9  Daughters' Trusts; 2) the Cash Collateral Order, defined below (to which the Salyer

10  Daughters' Trusts did not object), forecloses any claim to the proceeds by anyone other than

11  BMO; 3) BMO's settlement with the estate made BMO the party entitled to the proceeds; and

12  4) any equitable claims of the Salyer Daughters' Trusts would be barred by the doctrines of

13  waiver, laches, or estoppel.

14  **BACKGROUND**

15  1.   On March 29, 2009, in order to secure a line of credit extended to the Debtors

16  pre-petition in the amount of $125,000,00, of which over $28,000,000 were drawn between

17  February 2009 and May 5, 2009 (*see* RJN, Exh. 8 (Declaration of Stan Speer in Support of the

18  Motion for Approval of Settlement between the Chapter 11 Trustee and the Agent (the *"BMO*

19  *Settlement"*) [Docket No. 2349])), BMO recorded a deed of trust against the Tahoe Property

20  that had been pledged to the Agent.

21  2.   On May 7, 2009, the Debtors filed a voluntary petition for relief under

22  Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.*

23  3.   The Trustee subsequently listed the Tahoe Property for sale.

24  4.   BMO has a security interest and lien in both pre-petition and post-petition

25  property of the Debtors (the *"BMO Lien"*) including, but not limited to, the Tahoe Property

26  and proceeds thereof, confirmed pursuant to the rulings and findings of the Bankruptcy Court

27  in the Final Order of June 22, 2009 (1) Authorizing the Debtors to Use Secured Lenders' Cash

28  Collateral and (2) Granting Adequate Protection to the Secured Lenders Pursuant to 11 U.S.C.

PHDATA 3403619_1

– 2 –

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   §§ 361, 362 and 363 (*"Cash Collateral Order"*) and the Lien Determination of the pre-petition

2   lien of BMO (as defined by the Cash Collateral Order) thereunder [Docket No. 384].  RJN,

3   Exh. 1.  Further, BMO has provided the use of Cash Collateral (as that term is defined in the

4   Cash Collateral Order) for the payment of the costs and expenses of the administration of the

5   Debtors' bankruptcy estates based upon, in part, its interest in the Tahoe Property.  Neither the

6   Trustee for the Salyer Daughters' Trusts nor Stefanie Ann Salyer or Carolyn Gazelle Salyer

7   (the *"Salyer Daughters"*), pursuant to the terms of the Cash Collateral Order, have contested

8   the lien and security interests of BMO granted thereunder in any accounts receivable or

9   property or proceeds thereof, including the Tahoe Property.

10          5.      After extensive marketing, on or about September 30, 2009, the Trustee

11  identified a buyer for the Tahoe Property.

12          6.      On November 17, 2009, the Trustee filed a motion to approve the sale of the

13  Tahoe Property (the *"Sale Motion"*) [Docket No. 1037].  RJN, Exh. 2.  In conjunction with the

14  Sale Motion, the Trustee, by affidavit, submitted that certain Title Report dated September 21,

15  2009, a copy of which is attached as Exhibit 3 to the RJN, which disclosed two deeds of trust

16  held by SK Foods, L.P., as well as the BMO Lien.

17          7.      In order to consummate the sale of the Tahoe Property, pursuant to the Sale

18  Motion, the Trustee proposed to execute a reconveyance of the two liens of SK Foods, L.P.,

19  which left the BMO Lien as the only interest of record in the Tahoe Property and proceeds.

20  See RJN, Exh. 2 (Declaration of Bradley D. Sharp in Support of the Sale Motion [Docket No.

21  1039]).

22          8.      On December 2, 2009, Robert Pruett in his capacity as trustee for the Salyer

23  Daughters' Trusts filed an objection to the Motion, asserting they had "equitable title" to the

24  Tahoe Property due to unspecified misrepresentations and acts of duress [Docket No. 1114], a

25  copy of which is attached as Exhibit 4 to the RJN.  However, after the Trustee pointed out the

26  frivolous nature of the objection and informed the Salyer Daughters' Trusts that he would seek

27  sanctions under Federal Bankruptcy Rule 9011 for having filed the objection, the Salyer

28

PHDATA 3403619_1

1  Daughters' Trusts withdrew the objection [Docket No. 1155], a copy of which is attached as
2  Exhibit 5 to the RJN.

3        9.     On December 16, 2009, the Court entered that certain Order Approving Sale
4  and Overbid Procedures for Real Property Commonly Known as 4000 Westlake Boulevard,
5  Unit #14, Homewood California, Free and Clear of Lien of Bank of Montreal (the *"Tahoe Sale*
6  *Order"*) [Docket No. 1228].  A copy of the Tahoe Sale Order is attached as Exhibit 6 to the
7  RJN.

8        10.    Subsequent to the entry of the Tahoe Sale Order, the sale of the Tahoe
9  Property was consummated and yielded approximately $3.2 million of net proceeds (the
10  *"Tahoe Sale Proceeds"*).

11        11.    Pursuant to the Tahoe Sale Order, the Court ruled that the BMO Lien, as well as
12  any equitable claims raised by the Salyer Daughters' Trusts, be attached to the Tahoe Sale
13  Proceeds to be held pending further Order of Court.

14        12.    However, since the entry of the Tahoe Sale Order in late 2009, the Salyer
15  Daughters' Trusts have taken no action to assert any "equitable claims" to the Tahoe Sale
16  Proceeds or otherwise assert any rights or claims in this matter.

17        13.    On September 29, 2010, the Trustee filed a motion seeking approval for a
18  compromise of controversy with BMO [Docket No. 2347], a copy of which is attached as
19  Exhibit 7 to the RJN.  Among other things, the compromise with BMO provided that the
20  Trustee would turn over the Tahoe Sale Proceeds to BMO.  The Salyer Daughters' Trusts did
21  not object to the BMO compromise.[1]  On December 13, 2010, this Court entered an order
22  approving the BMO compromise [Docket No. 2639], a copy of which is attached as Exhibit 9
23  to the RJN.

24        14.    On May 9, 2011, BMO wrote to counsel for the Salyer Daughters' Trusts
25  requesting its consent to the Trustee's turnover of the Tahoe Sale Proceeds to BMO, in view of

---

[1]  Scott Salyer, his revocable trust, and other affiliated Salyer-controlled entities objected to the BMO compromise [Docket No. 2368], but that objection was not filed on behalf of or joined by Caroline or Stephanie Salyer, or their respective trusts.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

TURNOVER MOTION

PHDATA 3403619_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1 the fact that any claim held by the Salyer Daughters' Trusts was barred by 11 U.S.C. § 544(a),

2 BMO was granted a senior lien on the Tahoe Property in any event pursuant to the Cash

3 Collateral Order, and they had taken no action in the eighteen (18) months since the Tahoe

4 Property was sold to assert any claim to the sale proceeds. A true and correct copy of the letter

5 is attached as Exhibit A to the Declaration of James Heiser in Support of the Motion

6 concurrently filed herewith ("*Heiser Decl.*"). The Salyer Daughters' Trusts have not

7 responded to BMO's May 9 letter. Heiser Decl, ¶ 3. As such, the Trustee now brings this

8 Motion to obtain final turnover of the Tahoe Proceeds.

9                                    **JURISDICTION**

10          15.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

11 1334; 11 U.S.C. §§ 363(b) and (f); Federal Rule of Bankruptcy Procedure 6004; and the

12 reference to this Court by the United States District Court for the Eastern District of California.

13          16.      Venue is proper in this Court under 28 U.S.C. § 1409.

14                                    **ARGUMENT**

15      **THE SALYER DAUGHTERS' CLAIMS ARE DEFEATED BY § 544(A)**

16          17.      The Bankruptcy Code vests the Trustee with the rights of a *bona fide* purchaser

17 of real property for value as of the petition date, and it also permits the invalidation of interests

18 in real property which, although enforceable between the parties, are not properly perfected at

19 the commencement of the case because the creditor has failed to fully comply with applicable

20 state recording laws. 11 U.S.C.A. § 544(a)(3) ("The trustee shall have, as of the

21 commencement of the case, and without regard to any knowledge of the trustee or any

22 creditors, the rights and powers of, *or* may avoid any transfer of property of the debtor or any

23 obligation incurred by the debtor that is voidable by . . . a bona fide purchaser of real property .

24 . . "). As the Ninth Circuit has noted:

25          The strong arm clause enables the trustee to avoid an unrecorded lien as if
            he were "a bona fide purchaser of real property, other than fixtures, from
26          the debtor, against whom applicable law permits such transfer to be
            perfected, that obtains the status of a bona fide purchaser and has
27          perfected such transfer at the time of the commencement of the case." 11
            U.S.C. § 544(a)(3). That means that we are to deem the trustee not only to
28          have purchased the property for value without notice of the unrecorded

lien, but also to have recorded his deed when the petition was filed. It is as though he were shopping for a place to live, saw a classified ad, bought the condo after doing a title search, and recorded the deed, all at the instant the petition was filed.

*In re Deuel*, 594 F.3d 1073, 1079 (9th Cir. 2010). The trustee's status as a hypothetical *bona fide* purchaser is therefore paramount to the rights of a holder of an unperfected interest. 11 U.S.C.A. § 544(a)(3); 5 Collier on Bankruptcy, ¶ 544.05 (16th ed.).

18.    Under California Civil Code Section 1214, any conveyance of an interest in real property is void as against a bona fide purchaser that records its interest prior to recordation of the earlier conveyance. CAL. CIV. CODE § 1214.[2] In this case, the Trustee obtained a Title Report dated September 21, 2009, which was more than four months after the Petition Date. *See*, RJN, Exh. 3. However, the Title Report did not reflect any interest of record recorded by the Salyer Daughters' Trusts. *Id.* Rather, the only lien disclosed (other than the Debtors' liens, which have been waived) related to BMO's deed of trust. As such, the Salyer Daughters' Trusts have only at best an unrecorded "equitable" claim.

19.    Importantly, CIVIL CODE SECTION 1214 does not say that unrecorded interests are *voidable* by a bona fide purchaser, it decrees that such unrecorded interests are *void*. As interpreted by courts in California, CIVIL CODE SECTION 1214 allows a good faith purchaser or encumbrancer who records first to takes its interest in the real property *free and clear* of any prior but unrecorded interests. *First Fidelity Thrift & Loan Ass'n v. Alliance Bank*, 71 Cal.Rptr.2d 295, 300, 60 Cal.App.4th 1433, 1441 (1998) ("A good faith encumbrancer for value who first records takes its interest in the real property free and clear of unrecorded

---

[2]    CAL. CIV. CODE Section 1214 provides:

Every conveyance of real property or an estate for years therein, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for valuable consideration, whose conveyance is first duly recorded, and as against any judgment affecting title, unless the conveyance shall have been duly recorded prior to the record of notice of action.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3403619_1

TURNOVER MOTION

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  interests."). *See also Deuel*, 594 F.3d at 1079 (noting that an unrecorded mortgage is void as a

2  against a bona fide purchaser).

3       20.    Accordingly, by dint of the rights conferred upon him under 11 U.S.C. §

4  544(a)(3), the Trustee took title to the Tahoe Property <u>free and clear</u> of any equitable or other

5  claim that could be asserted by the Salyer Daughters' Trusts because any such claim was not of

6  record when the Debtors filed their bankruptcy petitions.  It is therefore incumbent upon the

7  Salyer Daughters Trusts to establish that their asserted interest is somehow valid and

8  enforceable against the Trustee, not the other way around. *See First Fidelity*, 71 Cal.Rptr.2d at

9  301 ("If the prior party claims an equitable rather than a legal title, however, the burden of

10  proof is upon the person asserting that title.").[3]

11       21.    The Trustee's status as a *bona fide* purchaser is not simply a legal technicality.

12  It serves "one of the strongest policies behind the bankruptcy laws" -- the policy of ratable

13  distribution among all creditors. *In re Seaway Exp. Corp.*, 912 F.2d 1125, 1129 (9th Cir. 1990)

14  (citation omitted) (avoiding creditor's inchoate equitable interest in real property when creditor

15  had taken no steps to provide actual or constructive notice to subsequent *bona fide* purchasers).

16  A creditor holding a valid and perfected lien is entitled to preferential treatment, and granting

17  such treatment to an unperfected lien would come "at the expense of other creditors" and

18  would be unjust. *In re Tleel*, 876 F.2d 769, 771 (9th Cir. 1989) (*quoting In re North American*

19  *Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985), *cert. denied sub nom. Torres v.*

20  *Eastlick*, 475 U.S. 1083 (1986)).

[3] While it is certainly true that the Trustee *could* commence an action seeking to avoid the Salyer Daughters' Trusts asserted equitable claim, the language of Section 544(a) is stated in the disjunctive.  It grants the Trustee "the rights and powers of" of a bona fide purchaser *as well as* the power to avoid a debtor's property.  11 U.S.C. § 544(a) ("The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or any creditors, the rights and powers of, *or* may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a bona fide purchaser of real property.").  In this case, the Salyer Daughters' Trusts do not contend that the Debtors "transferred" an interest in the Tahoe Property to them, and so the Trustee need not act to "avoid" any such transfer.  It is therefore sufficient for him to rely on his rights as a bona fide purchaser under California Civil Code Section 1214, which as noted above, entitles him to take title to the Tahoe Property free and clear of any equitable claim the Salyer Daughters may have.

TURNOVER MOTION

Here, the Salyer Daughters' Trusts cannot defeat the Trustee's statutory strong arm power based on equitable claims of any nature. The Salyer Daughters' Trusts did not record their purported interest so the Trustee did not have constructive notice of its lien. Under California law, a conveyance is "void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, whose conveyance is first duly recorded." CAL. CIV. CODE § 1214.   Thus, any purported interest of the Salyer Daughters' Trusts not of record as of the petition date is void. Accordingly, since the Salyer Daughters' Trusts have not asserted any equitable claim, and they in any event will be unable to assert a successful claim to the Tahoe Property, the Trustee should be authorized to immediately turn over the proceeds to BMO, the secured party free and clear of any claim or interest by the Salyer Daughters' Trust.

## BMO HAS A RIGHT TO THE PROCEEDS PURSUANT TO THE CASH COLLATERAL ORDER

22.   Additionally, pursuant to the Cash Collateral Order, BMO has a valid, perfected, post-petition first-priority lien on the Debtors' cash, including the Tahoe Sale Proceeds. *See* RJN, Exh. 1. The Cash Collateral Order was not objected to or appealed by the Salyer Daughters' Trusts. As such, even if, for the sake of argument, some equitable claim to the proceeds existed at one time, or some argument existed that the Tahoe Property was transferred by the Salyer Daughters' Trusts under duress, any claim by the Salyer Daughters' Trusts or the Salyer Daughters to the Debtors' cash has been waived. The Tahoe Sale Proceeds properly belong to the Agent pursuant to the terms of the Cash Collateral Order, and the Court should order a turnover.

## BMO'S SETTLEMENT WITH THE ESTATE REQUIRES A TURNOVER OF THE PROCEEDS

23.   As a result of the Order approving the Motion to Approve the Compromise Between Trustee and Bank of Montreal as Agent for the Secured Lenders Pursuant to Bankruptcy Rule 9019 (the *"BMO Settlement Order"*), RJN, Exh. 9 [Docket No. 2639], the terms of the accompanying settlement agreement (the *"Settlement Agreement"*) providing for

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3403619_1

TURNOVER MOTION

the transfer of the proceeds of the Tahoe Sales Proceeds to BMO has been confirmed. The Salyer Daughters' Trust did not object to the BMO compromise, nor did it appeal the BMO Settlement Order. While Scott Salyer and other affiliates did object to the BMO compromise, that objection did not assert that the Tahoe Sales Proceeds should not be paid to BMO. For this additional reason, the Salyer Daughters Trusts (and indeed, Salyer) waived any objection to the propriety of paying the Tahoe Sales Proceeds over to BMO. *Batlan v. Bledsoe (In re Bledsoe)*, 569 F.3d 1106, 1113 (9th Cir. 2009) (arguments not raised before the bankruptcy court are waived). Accordingly, an order should be entered providing that the Tahoe Sale Proceeds should be turned over free and clear of any claim by the Salyer Daughters' Trusts.

### ASSUMING ARGUENDO THAT THEY HAD ANY RIGHTS TO THE TAHOE PROPERTY, THE SALYER DAUGHTERS' TRUSTS ARE NOW BARRED FROM ASSERTING SUCH

24.     If the Salyer Daughters' Trusts had any claims to the property, it would also be inequitable to allow them to pursue them at this late date. In their objection to the Tahoe Sale Motion, they promised to file a complaint to quiet title based on this unspecified duress before the Tahoe Sale Hearing. While the Tahoe Sale Order may have implicitly given the Salyer Daughters' Trusts a reasonable window of time to assert any claims, allowing them to bring such a motion almost two years hence would be inequitable.

25.     To the extent that any such equitable claims exist, they are now barred by the doctrines of waiver, estoppel and laches. A key element of the BMO Settlement in this case was an adjudication of BMO's right to the Tahoe Sale Proceeds. As has been noted, the Salyer Daughters' Trusts did not object to the BMO Settlement on this basis. Similarly, BMO's perfected interest in the Debtors' cash was an essential element of the Cash Collateral Order. As such, BMO has materially changed positions based on its entitlement to the Tahoe Sale Proceeds and could suffer meaningful prejudice due to the unavailability of evidence to defend itself in any subsequent action relating to alleged "duress" or "misrepresentations" by the Debtors to the Salyer Daughters' Trusts or the Salyer Daughters, which purportedly arose in the winter or spring of 2009. By not objecting to the Final Cash Collateral Order or the BMO

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3403619_1

TURNOVER MOTION

1  Settlement, and waiting for almost two years without taking action, the Salyer Daughters'

2  Trusts or the Salyer Daughters have lost any claim to the Tahoe Sale Proceeds.

3                                    **CONCLUSION**

4        At all relevant times, BMO has had a valid, perfected pre-petition and post-petition

5  security interest in the Tahoe Property, which has attached by Orders of this Court to the Tahoe

6  Sale Proceeds.  Any and all equitable claims of the Salyer Daughters' Trusts are foreclosed by

7  Section 544 of the Bankruptcy Code, prior rulings of this Court with respect to Cash Collateral

8  and the BMO Settlement, the doctrine of waiver, and general principles of equity.  The Salyer

9  Daughters' Trusts have taken no action to assert any equitable claims to the Tahoe Sale

10 Proceeds, and the Motion should be granted.

11       WHEREFORE, the Trustee requests that the Court enter an order providing that the

12 Chapter 11 Trustee turn over the Tahoe Sale Proceeds to BMO free and clear of all right, title

13 and interest of Caroline Salyer, Stephanie Salyer, and the Salyer Daughters Trusts and that the

14 Court grant such other and further relief as this Court deems just and equitable.

15

16 Dated: June 24, 2011                 SCHNADER HARRISON SEGAL &
                                       LEWIS LLP
17

18

19                                     /s/    Kevin W. Coleman
                                       _____
20                                          KEVIN W. COLEMAN
                                       Attorneys for Chapter 11 Trustee,
                                            Bradley D. Sharp
21

22

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

TURNOVER MOTION

PHDATA 3403619_1

FILED

June 24, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003588451

**3 PAGES**

Gregory C. Nuti (CSBN 151754)
    gnuti@schnader.com
Kevin W. Coleman (CSBN168538)
    kcoleman@schnader.com
Melissa S. Lor (CSBN 245515)
    mlor@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California  94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for Bradley D. Sharp,
Chapter 11 Trustee

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., a California limited partnership, | Chapter 11 |
| | **DCN: SH-112** |
| Debtor. | **NOTICE OF HEARING ON MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTERS' TRUSTS** |
| | Date:     July 27, 2011 |
| | Time:     10:00 a.m. |
| | Place:    Courtroom 34 |
| | 501 I Street, 6th Floor |
| | Sacramento, CA  95814 |
| | Judge:    Hon. Robert S. Bardwil |

**TO:  STEPHANIE SALYER
      CAROLINE SALYER,
      ROBERT J. PRUETT, AS TRUSTEE OF THE STEFANIE ANN
      SALYER 2007    TRUST AND THE CAROLYN GAZELLE SALYER
      2007 TRUST (collectively the "Salyer Daughters' Trusts")**

NOTICE OF HEARING

PHDATA 3403626_1

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

1    **PLEASE TAKE NOTICE** that on **July 27, 2011 at 10:00 a.m., in the courtroom of**

2    **the Hon. Robert S. Bardwil, United States Bankruptcy Court, 501 I Street, 6th Floor,**

3    **Sacramento, California,** the Court will hear and consider the motion (the *"Motion"*) of

4    Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee (the *"Trustee"*) in the case

5    of SK Foods, L.P. and RHM Industrial Specialty Foods, Inc. d/b/a Colusa County Canning Co.

6    (collectively, the *"Debtors"*), authorizing the turnover of proceeds of sale of certain real

7    property located at 4000 Westlake Boulevard, #14, Homewood, California 96141 ("Tahoe Sale

8    Proceeds") to the Bank of Montreal, the agent for the Debtors' pre-petition secured lenders

9    ("BMO") free and clear of any claims or interests of Caroline Salyer, Stephanie Salyer, and/or

10   the Salyer Daughters' Trusts.  That is, if the relief requested in the Motion is granted, you will be

11   barred from asserting any claim to the Tahoe Sale Proceeds against the Debtors' estate or BMO,

12   including a claim based upon your prior allegations that you conveyed your interest in the 4000

13   Westlake Boulevard, #14, Homewood, California property under duress. *If you believe you have*

14   *a claim to or interest in the Tahoe Sale Proceeds, you must file an objection to this Motion.  If*

15   *you fail to file an objection and the Bankruptcy Court grants the Motion, any rights or claims*

16   *you may have with respect to the Tahoe Sale Proceeds will be extinguished.*

17       **PLEASE TAKE FURTHER NOTICE** that, in connection with this matter, the Trustee

18   intends to rely on this Notice, the Motion, the memorandum of points and authorities within the

19   Motion, the Declaration of James Heiser filed in support of the Motion, the Request for Judicial

20   Notice filed in support of the Motion; and all papers and pleadings on file herein; and such other

21   evidence that may be presented to the Court.

22       **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Rule 9014-1(f)(1) of

23   the Local Rules of Practice for the United States Bankruptcy Court for the Eastern District of

24   California, this Motion is filed twenty-eight (28) days prior to the hearing date.  Opposition, if

25   any, shall be served and filed with the court at least fourteen (14) calendar days preceding the

26   hearing date (i.e., July 13, 2011).  Opposition shall be accompanied by evidence establishing

27   its factual allegations.  Without good cause, no party shall be heard in opposition to the Motion

28   at oral argument if written opposition to the Motion has not been timely filed.  Failure to timely

2

PHDATA 3403626_1

file written opposition may be deemed a waiver of any opposition to the granting of the Motion

or may result in the imposition of sanctions.  The moving party may, at least seven (7) days

prior to the date of hearing, serve and file with the Court a written reply to any written

opposition filed by a responding party.  *See* Local Rule 9014(f)(1)(i)-(iii).

Dated: June 24, 2011                          SCHNADER HARRISON SEGAL & LEWIS LLP


                                              By: */s/ Kevin W. Coleman*_____
                                                      Kevin W. Coleman
                                              Attorney for Bradley D. Sharp,
                                              Chapter 11 Trustee

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

NOTICE OF HEARING

PHDATA 3403626_1

FILED

June 24, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003588450

**6 PAGES**

Gregory C. Nuti (CSBN 151754)
  gnuti@schnader.com
Kevin W. Coleman (CSBN168538)
  kcoleman@schnader.com
Melissa S. Lor (CSBN 245515)
  mlor@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for Bradley D. Sharp,
Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., a California limited partnership, | Chapter 11 |
| Debtor. | **DCN: SH-112** |
| | **DECLARATION OF JAMES HEISER IN SUPPORT OF MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTERS' TRUSTS** |
| | Date: July 27, 2011 |
| | Time: 10:00 a.m. |
| | Place: Courtroom 34 |
| | 501 I Street, 6th Floor |
| | Sacramento, CA 95814 |
| | Judge: Hon. Robert S. Bardwil |

I, James Heiser, declare as follows:

1.    I am an attorney at law and duly licensed to practice in Illinois and New York. I am an associate with the law firm of Chapman and Cutler LLP, counsel to Bank of Montreal, as Administrative Agent ("BMO" or the "Agent"), successor by assignment to Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee for the estate of SK Foods, L.P., a California

DECL. OF JAMES HEISER

PHDATA 3403621_1

1   limited partnership ("SK Foods") and RHM Industrial/Specialty Foods, Inc. ("RHM", and
2   collectively with SK Foods, the "Debtors"). I have personal knowledge of the facts set forth in
3   this declaration, and, if called as a witness, could and would testify competently to such facts
4   under oath.

5       2.    On May 9, 2011, I wrote a letter to Richard S. E. Johns, whom I understand to be
6   counsel for Robert Pruett in his capacity as trustee for the Stefanie Ann Salyer 2007 Trust and
7   Caroline Gazelle Salyer 2007 Trust in the above-reference matter (the "Salyer Daughters'
8   Trusts"). A true and correct copy of the letter is attached hereto as <u>Exhibit A</u>.

9       3.    To date, the Salyer Daughters' Trusts have not responded to my letter.

10      I declare under penalty of perjury under the laws of the United States of America and the
11  State of California that the foregoing is true and correct to the best of my knowledge and belief.
12  Executed this 23rd day of June, 2011, at Chicago, Illinois.

13
14                          /s/    *James Heiser*
                                   James Heiser
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

DECL. OF JAMES HEISER

# EXHIBIT A

# Chapman and Cutler LLP

Attorneys at Law · Focused on Finance®

James Heiser

111 W. Monroe Street
Chicago, Illinois 60603-4080

T 312.845.3000
D 312.845.3877
F 312.516.1477
heiser@chapman.com

May 9, 2011

<u>VIA OVERNIGHT MAIL</u>

Richard S. E. Johns, Esq.
57 Post Street
Suite 604
San Francisco, California 94104

Re:    Notice of Demand for Recovery of Tahoe Sale Proceeds
       *In re SK Foods, L.P., et. al., (09-29162) (Bankr.E.D.Cal.)*

Dear Mr. Johns:

We are counsel to Bank of Montreal, as Administrative Agent ("*BMO*" or the "*Agent*"), successor by assignment to Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee in the above-referenced matter. We understand that you are counsel for Robert Pruett in his capacity as trustee for the Stefanie Ann Salyer 2007 Trust and Caroline Gazelle Salyer 2007 Trust (collectively, the "*Trust Claimants*") in the above-referenced matter, *inter alia*, with respect to the proceeds of the sale of certain real property located at 4000 Westlake Boulevard, Unit 14, Homewood, California (the "*Tahoe Property*"). If you do not represent the Trust Claimants with respect to this dispute, please let us know.

As you know, on May 5, 2009, an involuntary bankruptcy petition was filed with respect to SK Foods, L.P., a California limited partnership ("*SK Foods*") and RHM Industrial Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. ("*RHM*") (collectively, the "*Debtors*") in the United States Bankruptcy Court for the Eastern District of California. On May 7, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "*Bankruptcy Code*"). Subsequently, the Court found and ordered that the date of the petitions was May 5, 2009 (the "*Petition Date*").

On November 17, 2009, Bradley D. Sharp, as Chapter 11 Trustee (the "*Trustee*") filed that certain Motion to Approve Sale (the "*Motion*") relating to the Tahoe Property. On December 2, 2009, the Trust Claimants filed an objection to the Motion, asserting that the Trust Claimants had "equitable title" to the Tahoe Property due to unspecified misrepresentations and acts of duress.



3002395.01.03.doc

Chapman and Cutler LLP

Richard S. E. Johns, Esq.
May 9, 2011
Page 2

At the hearing on the Motion, the Court approved the sale, but due to certain issues regarding notice which the Court raised *sua sponte*, the proceeds have been held in escrow pending any competing claims to the proceeds. In the Trust Claimants' objection, they indicated that an adversary proceeding relating to their claims of "equitable title" would be filed, but to date, we have not been served with any such proceeding. As you know, given that the Trust Claimants' interest was not of record as of the Petition Date, it is void under 11 U.S.C. §544(a). Given the amount of time that has elapsed, the doctrines of waiver, estoppel and laches would also appear to bar the institution of any such proceeding.

Additionally, pursuant to the Final Cash Collateral Order, the Bank of Montreal, as Administrative Agent, was granted a Post-Petition Lien on all of the assets of the Debtors, which, in relevant part, was subject only to any recorded senior mortgages on the Lake Tahoe property. The Final Cash Collateral Order was not objected to by the Trust Claimants, nor were any objections made to the Pre-Petition Liens of Bank of Montreal, as Agent for the Secured Lenders on the Tahoe Property by your clients or any creditor. Therefore, any such objections have been waived.

Accordingly, there is no basis for the Salyer daughters or the Trust Claimants to legitimately claim an interest in the Tahoe property, and any such claims appear to raise Bankruptcy Rule 9011 issues. The Trust Claimants have no recorded interest in the property. Therefore, the Trust Claimants do not appear to have any valid claim to the proceeds of the sale. As such, we are writing to attempt to resolve this matter and to inquire as to whether you intend to object to a turnover of the proceeds to the Agent.

The foregoing may not be an exhaustive summary of the Agent's claims that exist regarding the Tahoe Property, and nothing contained herein shall be construed as a waiver of any rights, remedies, claims, causes of action or defenses of the Agent, the estate, or any creditor or claimant in the above-referenced matter.

Without limiting the generality of the foregoing, the Agent expressly reserves its right to seek any additional damages which may be available to it on account of the Trust Claimants' unjustifiable refusal to consent to the turnover or pursuit of any adverse claims to the proceeds which are not well-grounded in fact and in law. This letter is provided for settlement purposes and nothing contained herein should be construed as an admission of fact or law by the Agent.

Kindly indicate whether you and the Trust Claimants will stipulate and agree to a turnover order of the sale proceeds to the Agent by return letter or email. Although the Agent wishes to achieve an amicable resolution of this matter, if we do not receive your agreement before the close of business on Monday, May 16, 2011, the Agent intends to commence a

Chapman and Cutler LLP

Richard S. E. Johns, Esq.
May 9, 2011
Page 3

proceeding for turnover of the proceeds of the sale of the Tahoe Property and to seek appropriate remedies for any and all damages suffered due to the claims asserted by the Trust Claimants.

If you have any questions regarding the above, please contact James E. Spiotto at (312) 845-3763. Thank you for your attention to this matter.

Very truly yours,

CHAPMAN AND CUTLER LLP

By _James Heiser_____
                James Heiser

cc:    Robert Pruett (via overnight mail)
       Jamie Dreher, Esq. (via overnight mail)
       Gregory Nuti, Esq. (via overnight mail)

FILED
June 24, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003588449

**153 PAGES**

Gregory C. Nuti (CSBN 151754)
  gnuti@schnader.com
Kevin W. Coleman (CSBN168538)
  kcoleman@schnader.com
Melissa S. Lor (CSBN 245515)
  mlor@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California  94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for Bradley D. Sharp,
Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California limited partnership,<br><br>Debtor. | Case No. 09-29162-D-11<br><br>Chapter 11<br><br>**DCN: SH-112**<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTERS' TRUSTS**<br><br>Date:      July 27, 2011<br>Time:     10:00 a.m.<br>Place:    Courtroom 34<br>            501 I Street, 6th Floor<br>            Sacramento, CA  95814<br>Judge:   Hon. Robert S. Bardwil |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

REQUEST FOR JUDICIAL NOTICE

PHDATA 3403508_1

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

1    Pursuant to Rule 201 of the Federal Rules of Evidence, Bradley D. Sharp, the duly

2 appointed and acting Chapter 11 Trustee (the *"Trustee"*) in the case of SK Foods, L.P. and RHM

3 Industrial Specialty Foods, Inc. d/b/a Colusa County Canning Co. (collectively, the *"Debtors"*),

4 hereby requests that this Court take judicial notice of the following documents in support of his

5 Motion Authorizing Turnover of Proceeds of Sale of Certain Real Property Located at 4000

6 Westlake Boulevard, #14, Homewood, California  96141 Free and Clear of Any Claims or

7 Interests of the Salyer Daughters' Trusts:

8    1.    Final Order (1) Authorizing the Debtors to Use Secured Lenders' Cash Collateral

9 and (2) Granting Adequate Protection to the Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362

10 and 363 (*"Cash Collateral Order"*), entered June 22, 2009 [Docket No. 384].  A true and correct

11 copy of the Cash Collateral Order is attached hereto as **Exhibit 1**.

12    2.    Motion to Approve Sale of Real Property Commonly Known as 4000 Westlake

13 Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal (the *"Sale*

14 *Motion"*) [Docket No. 1037] and the Declaration Bradley D. Sharp in Support of the Sale Motion

15 [Docket No. 1039], filed November 17, 2009.  True and correct copies of the Sale Motion and

16 the Declaration of Bradley D. Sharp in Support of the Sale Motion are attached hereto as **Exhibit**

17 **2**.

18    3.    Preliminary Title Report, dated September 21, 2009, a true and correct copy of

19 which is attached hereto as **Exhibit 3**.

20    4.    Objection by Robert J. Pruett, Trustee of the Stefanie Ann Salyer 2007 Trust and

21 the Carolyn Gezelle Salyer 2007 Trust to Motion to Approve Sale and Overbid Procedures for

22 Real Property Commonly Known as 4000 Westlake Blvd., Unit #14, Homewood, California,

23 Free and Clear of Lien of Bank of Montreal, filed December 2, 2009 [Docket No. 1114], a true

24 and correct copy of which is attached hereto as **Exhibit 4**.

25

26

27

28

REQUEST FOR JUDICIAL NOTICE

PHDATA 3403508_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700
FAX: (415) 364-6785

5.    Withdrawal of Objection by Robert J. Pruett, Trustee of the Stefanie Ann Salyer 2007 Trust and the Carolyn Gezelle Salyer 2007 Trust to Motion to Approve Sale and Overbid Procedures for Real Property Commonly Known as 4000 Westlake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal, filed December 9, 2009 [Docket No. 1155], a true and correct copy of which is attached hereto as **Exhibit 5**.

6.    Order Approving Sale and Overbid Procedures for Real Property Commonly Known as 4000 Westlake Boulevard, Unit #14, Homewood California, Free and Clear of Lien of Bank of Montreal (the *"Tahoe Sale Order"*), filed December 16, 2009 [Docket No. 1228].  A true and correct copy of the Tahoe Sale Order is attached hereto as **Exhibit 6**.

7.    Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019, filed September 29, 2010 [Docket No. 2347], a true and correct copy of which is attached hereto as **Exhibit 7**.

8.    Declaration of Stan Speer in Support of the Motion for Approval of Settlement Between the Chapter 11 Trustee and the Agent, filed September 29, 2010 [Docket No. 2349], a true and correct copy of which is attached hereto as **Exhibit 8**.

9.    Order approving Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019 and approving the BMO compromise [Docket No. 2639], entered December 13, 2010, a true and correct copy of which is attached hereto as **Exhibit 9**.

Dated: June 24, 2011                    SCHNADER HARRISON SEGAL & LEWIS LLP


By: *ls/ Kevin W. Coleman*
      Kevin W. Coleman
      Attorney for Bradley D. Sharp,
      Chapter 11 Trustee

REQUEST FOR JUDICIAL NOTICE                    PHDATA 3403508_1

# EXHIBIT 1

2009-29162
FILED
June 22, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001906956

**21 Pages**

Gregory C. Nuti (CSBN 151753)
Kevin W. Coleman (CSBN 168538)
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501
Telephone:    415-364-6700
Facsimile:    415-364-6785

Proposed Attorneys for Bradley Sharp,
Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California limited partnership,<br><br>　　　　　　Debtor. | **Case No. 09-29162-D-11**<br><br>Chapter 11<br><br>**DC No. RAL-17** |
| In re :<br><br>RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co.<br><br>　　　　　　Debtor. | **Case No. 09-29161-D-11**<br><br>Chapter 11<br><br>**FINAL ORDER (I) AUTHORIZING DEBTORS TO USE THE SECURED LENDERS' CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION TO THE SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363** |

RECEIVED
June 19, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001906956

1

PHDATA 3204854_1

1    Upon the motion (the "Motion"), dated May 8, 2009 of the above-captioned Debtors in the

2    above captioned bankruptcy cases, (a) seeking this Court's authorization (i) pursuant to Section 363

3    of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the Bankruptcy Code), to use

4    the Cash Collateral (as defined below) of the Secured Lenders (also as defined below) and (ii)

5    pursuant to Sections 361, 362 and 363 of the Bankruptcy Code, to provide adequate protection to the

6    Secured Lenders with respect to any diminution in the value of the Secured Lenders' interests in the

7    Prepetition Collateral (as defined below), whether from the use of the Cash Collateral, the use, sale,

8    lease or other diminution in value of the Prepetition Collateral other than the Cash Collateral, and the

9    imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code; and (b)

10    requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in

11    respect of the Final Hearing be established by this Court to consider entry of a final order (the "Final

12    Order") authorizing on a final basis the Debtors' continued use of the Cash Collateral; and the

13    Preliminary Hearing on the Motion having been held before this Court on Tuesday, May 12, 2009

14    ("Interim Hearing"); and an interim order was entered on that date (the "Interim Order") granting, on

15    an interim basis, the relief sought in the Motion and scheduling the Final Hearing. The Court,

16    having completed a Final Hearing on the Motion as provided for in Bankruptcy Code Section 364(d)

17    and Bankruptcy Rule 4001; the Court having considered the arguments of counsel and having

18    considered all relevant matters thereto and being fully advised in the premises; and upon the record

19    of the Chapter 11 Cases and the record of the Final Hearing, good and sufficient cause appearing

20    therefore, and it appearing to be in the best interests of the Debtors' estates and creditors;

21        THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

22    CONCLUSIONS OF LAW:

23        A.    On May 7, 2009 (the "Petition Date"), the Debtors filed petitions for relief pursuant to

24    Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of

25    California, Sacramento Division (the "Chapter 11 Cases").

26        B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28

27    U.S.C. §§ 157(b) and 1334. Consideration of this Motion constitutes a core proceeding as defined in

28    28 U.S.C. § 157(b)(2).

2

1      C.      Pursuant to that certain Amended and Restated Credit Agreement dated as of

2    September 27, 2008 (as heretofore amended, the "Credit Agreement"), among the Debtors, Bank of

3    Montreal as Prepetition Agent (the "Prepetition Agent") the lenders party thereto (collectively, the

4    "Secured Lenders" with each being a "Secured Lender"), the Secured Lenders made loans and other

5    financial accommodations to or for the benefit of the Debtors in an amount in excess of

6    $193,000,000 (inclusive of accrued but unpaid interest) as of the Petition Date.[1]

7      D.     The Debtors have granted to the Prepetition Agent and the Secured Lenders, in order

8    to secure the Debtors' obligations under the Prepetition Loan Documents, a lien upon and in the

9    Collateral, as defined in the Credit Agreement, accessions and additions to, and substitutions and

10   replacements of, any and all of the foregoing; and, proceeds and products of the foregoing, and all

11   insurance of the foregoing and proceeds thereof (collectively, the "Prepetition Collateral").  The

12   Secured Lenders assert that all of the Debtors' cash, including without limitation, all cash and other

13   amounts on deposit or maintained in any accounts or Bank Accounts (as defined in the Cash

14   Management Order) by the Debtors, and any amounts generated by the collection of accounts

15   receivable, sale of inventory or other disposition of the Prepetition Collateral constitute proceeds of

16   the Prepetition Collateral and, therefore, are cash collateral of the Secured Lenders within the

17   meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral").  The Secured Lenders

18   are entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of

19   their interest in the Prepetition Collateral to the extent of the diminution in value thereof, including

20   for the use of the Cash Collateral, the use, sale, lease or other diminution in value of the Prepetition

21   Collateral other than the Cash Collateral, and the imposition of the automatic stay.

22      E.      Good cause has been shown for the entry of this Order.  Other than Cash Collateral,

23   the Debtors do not have sufficient available sources of working capital and financing to continue

24   operating.  The entry of this Interim Order pending a final hearing (the "Final Hearing") will enable

25   the Debtors to continue operating, avoid immediate and irreparable harm to the Debtors' estate and

26   otherwise is in the best interests of the Debtors, their creditors and their respective estates.  Among

27   other things, entry of this Order will minimize disruption caused by the cessation of the Debtors'

28

---

[1]    Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Motion.

3

1  business operations and permit them to pay operating expenses and expenses relating to the

2  contemplated orderly sale of the businesses. The use of the Cash Collateral is, therefore, of the

3  utmost significance and importance to the preservation of the value of the Debtors' assets pending

4  consummation of an orderly sale, and will enhance the prospects for the Debtors to confirm a sale

5  pursuant to Section 363 of the Bankruptcy Code and to confirm a liquidating Chapter 11 plan.

6        F.     The Prepetition Agent and the Secured Lenders have agreed to allow the Debtors' use

7  of the Cash Collateral in accordance with the Budget, defined below. The Prepetition Agent and the

8  Secured Lenders have agreed to permit the Debtors to use the Cash Collateral subject to the terms

9  and conditions set forth in this Order.

10        G.    Notice of the Preliminary Hearing and the relief requested in the Motion has been

11  given to (i) the Office of the United States Trustee, (ii) the Prepetition Agent and (iii) the Debtors'

12  twenty (20) largest unsecured creditors. In view of the urgency of the relief requested, such notice

13  of the Preliminary Hearing complies with Sections 102(1) and 363 of the Bankruptcy Code,

14  Bankruptcy Rules 2002 and 4001(b), and Local Rule B-4001-2.

15        H.    Based on the record presented to this Court at the Preliminary Hearing, the Debtors

16  have an immediate need to use Cash Collateral prior to the Final Hearing, and the terms of the

17  Debtors' use of the Cash Collateral appear to be fair and reasonable and are in the best interests of

18  the Debtors.

19        I.      The Debtors have requested immediate entry of this Order pursuant to Bankruptcy

20  Rule 4001(b)(2). The permission granted herein to use the Cash Collateral is necessary to avoid

21  immediate and irreparable harm to the Debtors, their creditors and their estates. This Court

22  concludes that entry of this Order is in the best interest of the Debtors' estates and creditors.

23        Based upon the foregoing findings and conclusions, and upon the record made before this

24  Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

25        IT IS HEREBY ORDERED that:

26        1.      The Motion is granted on an interim basis.

27        2.      The Debtors are hereby authorized to use the Cash Collateral during the period from

28  the Petition Date through and including the Termination Date for general corporate purposes during

PHDATA 3204854_1

1   the Chapter 11 Case in accordance with the terms and conditions of this Order and of the Budget (as

2   defined below).

3          3.       The Debtors shall only use the Cash Collateral for working capital purposes, the

4   payment of certain obligations in accordance with the relief authorized by the Court and conduct of

5   the Chapter 11 Case as set forth in a budget acceptable to the Prepetition Agent, the "Budget"). A

6   copy of the Budget for the time period from May 8, 2009 to June 28, 2009 is attached hereto as

7   **Exhibit A**. The Budget may be updated and modified by: (i) consensual agreement between the

8   Debtors and the Prepetition Agent or (ii) by further order of the Court. Except as expressly set forth

9   herein, this Order does not address the disposition of any Prepetition Collateral outside the ordinary

10  course of business or the Debtors' use of the Cash Collateral resulting therefrom.

11         4.       (a) As adequate protection for, and to the extent of, any diminution in the value of

12  the Secured Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash

13  Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease or other

14  diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to Section

15  363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to Section

16  362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as

17  the "Adequate Protection Obligations"), subject to the Carve-Out (as defined below) the Prepetition

18  Agent and the Secured Lenders are hereby granted (effective as of the Petition Date and without the

19  necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements,

20  financing statements or otherwise), valid and perfected, replacement security interests in and liens

21  (the "Replacement Liens") on all prepetition and postpetition assets and properties (tangible,

22  intangible, real, personal and mixed) of the Debtors of any kind or nature, whether now existing or

23  newly acquired or arising, and wherever located, including, without limitation, all accounts, accounts

24  receivable, chattel paper, electronic chattel paper, inventory, machinery, equipment, contract rights,

25  documents, goods, fixtures, intellectual property and other general intangibles, investment property,

26  owned and leased real property, vehicles, instruments, letters of credit, letter of credit rights,

27  commercial tort claims, causes of action, cash, deposit accounts, securities, securities accounts,

28  books and records and all proceeds and products of the foregoing (collectively, the "Postpetition

5

1  Collateral"). Said Replacement Liens shall be (i) a first priority perfected lien upon all of the

2  Postpetition Collateral that is not otherwise encumbered by a validly perfected, non-avoidable

3  security interest or lien on the Petition Date, (ii) a first priority, senior, priming and perfected lien

4  upon Postpetition Collateral that is subject to a lien of the Prepetition Agent securing the Prepetition

5  Obligations and (iii) a second priority, junior perfected lien upon all Postpetition Collateral (other

6  than the portion described in the preceding clause (ii)), which is subject to a validly perfected first

7  priority lien as of the Petition Date.  The Replacement Liens shall be subject and subordinate to (i)

8  the lien and security interest of the Prepetition Agent and Prepetition Lenders on all cash held in

9  each of the Bank Accounts as defined in the Cash Management Order and (ii) the Carve-Out

10  (defined below) and the lien and claim of Harris N.A. as Cash Management Bank under the Order

11  Authorizing Maintenance of Existing Cash Management System and Certain Prepetition Bank

12  Accounts and Related Relief.  The Pre-Petition Agent and Pre-Petition Lenders reserve the right to

13  assert all of their rights, claims and causes of action to recover from any person or entity any

14  improper or wrongful transfer or conveyance or other disposition of the Pre-Petition Collateral or

15  proceeds thereof including, but not limited to, any causes of action arising under Chapter 5 of the

16  Bankruptcy Code that relate directly or indirectly to the proceeds of Pre-Petition Collateral and the

17  Trustee reserves its right to claim such are the property of the Estate and the Trustee reserves its

18  right to claim any such claims or causes of action are property of the Estate.

19          (b)      As further adequate protection hereunder, the Debtors shall provide the

20  following reports to the Prepetition Agent and the Secured Lenders (the "Reporting Requirements"),

21  each in form reasonably satisfactory to the Prepetition Agent:  (i) commencing on Friday, June 5,

22  2009, and every Friday thereafter, (A) thirteen-week rolling cash flow projections for the Debtors,

23  showing on a weekly basis for the current week and the succeeding twelve weeks (x) beginning and

24  ending liquidity, (y) weekly receipts by significant category and (z) weekly disbursements by

25  significant category, and (B) a comparison of actual weekly cash flows for the week preceding the

26  week in which such comparison is being delivered to the projected cash flows for such week as

27  shown in the most recent thirteen-week rolling cash flow projections delivered to the Prepetition

28  Agent and the Secured Lenders, together, in the case of each of the foregoing clauses (A) and (B),

6

1  with a certification of the Debtors' Chapter 11 Trustee confirming such Chapter 11 Trustee's review

2  of such projections or comparison, as applicable; and (ii) within 30 days after the end of every

3  month, monthly financial statements prepared by the Debtors, which shall include such financial

4  statements for such month and for the portion of such fiscal year through the end of such month.  In

5  addition, the Debtors shall permit representatives, agents and/or employees of the Prepetition Agent

6  or any of the Secured Lenders to have reasonable access to its premises and non-privileged records

7  during normal business hours (without unreasonable interference with the proper operation of the

8  Debtors' business) and shall cooperate, consult with and provide to such persons all such non-

9  privileged information as they may reasonably request from time to time.  Further, any budgeted

10  production costs contained in the Budget can only be disbursed after the Trustee requests the

11  expenditure and obtains approval of the Agent.

12      (c)    As additional adequate protection, the Debtors are authorized and directed to

13  pay $2,000,000 as an adequate protection payment to the Prepetition Agent on the 15th day of each

14  month, (commencing May 15, 2009, which deferred May 15, 2009 and June 15, 2009 payments will

15  be made upon the entry of this Order) for the account of the Secured Lenders pursuant to the terms

16  of the Credit Agreement, and the Prepetition Agent in its sole discretion may defer any payment as it

17  may deem necessary and the Trustee reserves its rights to object or disagree with the calculation and

18  application of the payments to the obligations owed to Pre-Petition Agent and Pre-Petition Lenders.

19      (d)    Based solely upon the Secured Lenders' consent, the adequate protection

20  provided herein is reasonable under the circumstances to protect the interests of the Secured

21  Lenders.  Notwithstanding any other provision hereof, the grant of adequate protection to the

22  Prepetition Agent and the Secured Lenders pursuant hereto is without prejudice to the right of the

23  Secured Lenders to seek modification of the grant of adequate protection provided hereby so as to

24  provide different or additional adequate protection, and without prejudice to the right of the Debtor

25  or any other party in interest to contest any such modification.

26      (e)    Granting the relief sought herein will not prejudice the rights of Perishable

27  Agricultural Commodities Act, 7 U.S.C. § 499, *et seq.* ("PACA") lienholders, lienholders under the

28  California Food & Agricultural Code § 55631 *et seq.* ("California Producers"), Chase Equipment

7

1   Finance, Inc. and its affiliates ("Chase Equipment"), or any other secured party with respect to their

2   prior, valid, perfected, non-avoidable existing security interests.  Notwithstanding any other

3   provisions of this Order, holders of valid, perfected, non-avoidable PACA or California Producers'

4   Lien claims shall retain their trust and lien rights, if any, to the extent provided by law against all

5   prepetition and postpetition assets of the applicable Debtor and its estate.  The Trustee and Agent

6   shall take $2,000,000 from collections of Cash Collateral (which, with the consent of the Agent, may

7   be $2,000,000 held by the Agent at Harris N.A. in the Agent's Cash Collateral Account) and deposit

8   that $2,000,000 in an account at Harris N.A. subject to the lien of the Agent pursuant hereto for the

9   payment of valid and enforceable Pre-Petition PACA and California Producers' lien claims

10  determined to be valid by this Court or stipulated and agreed to by the Trustee, Agent and relevant

11  lien holder to be valid and so ordered by this Court pursuant to a PACA and California Producers'

12  Lien procedure Order acceptable to the Trustee and Agent to be presented to this Court or pursuant

13  to such further Order of this Court after notice and hearing ("PACA and California Producers Lien

14  Account").  Upon the Bankruptcy Court's entry of an Order determining the extent of the validity

15  and enforceability of the liens of the PACA and California Producers' Lien Claimants, and that such

16  liens which are determined to be valid and enforceable are to be funded by the $2,000,000 deposited

17  in the PACA and California Producers' Lien Account referenced above, the respective Plaintiffs in

18  the case of *Calchili Corporation, Winchester Grain Company and Ed Curry d/b/a Curry Farms vs.*

19  *Bank of Montreal et al.*, originally filed in the Superiour Court of the State of California in and for

20  the County of Monterey, now removed to and pending in the United States Bankruptcy Court for the

21  Northern District of California (San Jose) as adversary proceeding #09-05141, those respective

22  Plaintiffs shall dismiss their lawsuit against the Defendants with prejudice, all parties to bear their

23  own costs.

24       5.       Subject to the Carve-Out, the Adequate Protection Obligations shall constitute

25  expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the

26  "507(b) Claims") with priority in payment over any and all administrative expenses of the kinds

27  specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation,

28  Sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the

8

1    rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Case or any

2    subsequent proceedings under the Bankruptcy Code.  No cost or expense of administration under

3    Sections 503(b) or 507(b) or otherwise, including those resulting from the conversion of the Chapter

4    11 Case pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the

5    507(b) Claims of the Secured Lenders arising out of the Adequate Protection Obligations.

6         6.    Except as expressly set forth in this Order, the Replacement Liens granted pursuant to

7    this Order shall not be (i) subject to any lien that is avoided and preserved for the benefit of the

8    Debtors' estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari

9    passu with any other lien under Sections 363 and 364 of the Bankruptcy Code.  The Replacement

10   Liens shall be prior and senior to all liens and encumbrances of all other secured creditors in and to

11   any postpetition collateral granted or arising after the Petition Date, including, without limitation,

12   liens and security interests, if any, granted in favor of any federal, state, municipal or other

13   governmental unit, commission, board or court for any liability of the Debtors).  The Replacement

14   Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and

15   liens, and the Prepetition Agent and the Secured Lenders shall not be required to file or serve

16   financing statements, notices of lien or similar instruments which otherwise may be required under

17   federal or state law in any jurisdiction or take any action, including taking possession, to validate and

18   perfect such security interests and liens; and the failure by the Debtors to execute any documentation

19   relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such

20   Replacement Liens.  If, however, the Prepetition Agent, in its sole discretion, shall determine to file

21   or serve any such financing statements, notices of lien or similar instruments, or to otherwise

22   confirm perfection of such Replacement Liens, the Debtors are directed to cooperate with and assist

23   in such process, the stay imposed by Section 362(a) of the Bankruptcy Code is hereby lifted to allow

24   the filing and recording of a certified copy of this Order or any such financing statements, notices of

25   lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at

26   the time of and on the date of this Order.

27        7.    Notwithstanding any contrary provision of this Order, the liens and super-priority

28   claims granted to the Secured Lenders shall be subject and subordinate to, following the occurrence

9

1    and during the pendency of a Carve-Out Event (as defined below), (a) a carve out consisting of up to

2    $400,000 in the aggregate (net of any retainer on the Termination Date), for the allowed fees and

3    expenses of the Chapter 11 Trustee, Debtors' professionals retained prior to the Termination Date

4    (as defined below) pursuant to Bankruptcy Code §§ 327 or 328 by the Debtors and for the allowed

5    fees and expenses of the committee appointed by U.S. Trustee under § 1102 of the Bankruptcy Code

6    ("Committee") and the Committee's professionals retained prior to the Termination Date pursuant to

7    Bankruptcy Code §§ 1103 or 328 by the Committee; (b) quarterly fees required to be paid pursuant

8    to 28 U.S.C. § 1930(a)(6); and (c) any fees payable to the Clerk of the Bankruptcy Court and any

9    agent thereof, plus all fees and expenses of the kind described in the foregoing clauses (a), (b) and

10   (c) of this paragraph incurred prior to a Carve-Out Event (as defined below) but not yet paid to the

11   extent such fees and expenses are in accordance with the Budget, approved by the Bankruptcy Court

12   (collectively, the "Carve-Out") subject to the right of the Secured Lenders, the U.S. Trustee and any

13   other party in interest to object to the award of any such fees and expenses.

14        8.      Prior to the Termination Date (as defined below), the Debtors shall be permitted to

15   pay compensation and reimbursement of expenses authorized to be paid under Bankruptcy Code

16   §§ 330 and 331 or otherwise pursuant to an order of this Court, as the same may be due and payable,

17   and such payments shall not reduce the Carve-Out subject to the rights of the Secured Lenders, the

18   U.S. Trustee, and any other party in interest to object to such payments.  Upon the Termination Date

19   and notice by the Secured Lenders to the Debtors (the "Carve-Out Event Notice"), the right of the

20   Debtors to pay professional fees outside the Carve-Out shall terminate (a "Carve-Out Event"), and,

21   upon such occurrence, the Debtors, after receipt of the Carve-Out Event Notice from the Secured

22   Lenders, shall provide immediate notice by facsimile to all professionals in the case informing them

23   that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay

24   professionals is subject to the Carve-Out.

25        9.      The Debtors' right to use the Cash Collateral pursuant to this Order shall terminate

26   (the date of any such termination, the "Termination Date") on the earliest to occur of (x) June 28,

27   2009 (or such later date if the Secured Lenders consent, which extension thereof shall be effective

28   without further Court approval) or (y) upon three (3) business days' written notice to the Debtors

PHDATA 3204854_1

1    (with a copy to counsel for any statutory committee appointed in the Chapter 11 Case and the United

2    States Trustee) after the occurrence and continuance of any of the following events (unless waived

3    by the Secured Lenders, "Events of Default") beyond any applicable grace period set forth below:

4            (a)     Failure of the Debtors to make any payment to the Prepetition Agent or the

5    Secured Lenders as and when required by this Order;

6            (b)     Failure of the Debtors to (i) comply with the Budget or any other material

7    terms of this Order, (ii) maintain a cash balance as of any week covered by the Budget that is equal

8    to or greater than the amount for such week shown on the Budget under the line "Ending Balance",

9    (iii) make disbursements in any week for any line item on the Budget greater than the amount

10   indicated in the Budget for that week adjusted, on a line item by line item basis, for amounts not paid

11   the week prior, (iv) comply with any other covenant or agreement specified in this Order and such

12   failure to comply with any such other covenant or agreement shall continue unremedied for more

13   than three (3) business days after written notice thereof or (v) comply with any of the Reporting

14   Requirements and such failure shall continue unremedied for more than three (3) business days;

15           (c)     Any representation or warranty made in writing by the Debtors in the

16   Reporting Requirements (other than with respect to protected financial information) shall prove to

17   have been incorrect in any material respect when made;

18           (d)     The Chapter 11 Case shall be dismissed or converted to a Chapter 7 case;

19           (e)     This Court shall enter an order granting relief from the automatic stay to the

20   holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of

21   foreclosure or the like) on any assets of the Debtors which have an aggregate value in excess of

22   $50,000;

23           (f)     An order shall be entered reversing, amending, supplementing, staying for a

24   period in excess of three (3) business days, vacating or otherwise modifying this Order without the

25   consent of the Secured Lenders;

26           (g)     The Debtors shall create, incur or suffer to exist any postpetition liens or

27   security interests other than (i) those granted pursuant to the Order, (ii) carriers', mechanics',

28   warehousemen's, repairmen's or other similar liens arising in the ordinary course of business, (iii)

11

pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and (iv) deposits to secure the payment of any postpetition statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business; provided that the aggregate value of the liens, pledges or deposits referred to in clauses (iii) and (iv) above shall not exceed $100,000 at any one time;

(h)     Any other claim which is pari passu with or senior to the claims of the Prepetition Agent and the Secured Lenders shall be granted in the Chapter 11 Case;

(i)     Any judgment in excess of $500,000 as to any postpetition obligation not covered by insurance shall be rendered against the Debtors and the enforcement thereof shall not be stayed; or there shall be rendered against the Debtors a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have a material adverse effect on the property, business, condition (financial or otherwise) of the Debtors taken as a whole or the ability of the Debtors to perform its obligations under this Order;

(j)     The failure of the Debtors to comply with the following milestones for sale of the Prepetition Collateral;

(i)     On or before the date that is 10 Business Days after the Petition Date, the Debtors shall have obtained the approval of the Bankruptcy Court for a sale process for the sale of all or substantially all of their assets, under Section 363 of the Bankruptcy Code and otherwise acceptable to the Secured Lenders (the "Sale Process Order").

(ii)     On or before the date that is 20 calendar days after the Petition Date, the Debtors shall receive at least one letter of intent from a Person that is not an Affiliate of any Debtor (a "Bidder") containing a written proposal to acquire, directly or indirectly, all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code for cash consideration (a "Company Sale"), which proposal, in the reasonable opinion of the Prepetition Agent, is capable from a financial, legal and regulatory standpoint of being consummated.

12

1         (iii)   On or before the date that is 40 calendar days after the Petition Date,

2    the Debtors shall (i) execute a definitive agreement with a Bidder for a Company Sale

3    that in the reasonable discretion of the Prepetition Agent would reasonably be

4    expected to result in a sale closing and net proceeds in cash in an aggregate dollar

5    amount acceptable to the Prepetition Agent and (ii) file a motion in the Bankruptcy

6    Court seeking approval of such Company Sale;

7        (k)    A filing by the Debtor (or any of its affiliates, successor and assigns) of any

8  motion or application or adversary proceeding challenging the validity, enforceability, perfection or

9  priority of the liens securing the Prepetition Obligations or any cause of action against and/or with

10  respect to the Prepetition Obligations, the prepetition liens securing such Prepetition Obligations, the

11  Prepetition Agent or the Secured Lenders.

12       The Debtors shall promptly provide notice to the Prepetition Agent (with a copy to counsel

13  for any statutory committee appointed in the Chapter 11 Case and the United States Trustee) of the

14  occurrence of any Event of Default.

15       10.    On the Termination Date, upon written notice to the Debtors (with a copy to counsel

16  for any statutory committee appointed in the Chapter 11 Case and the United States Trustee) the

17  Debtors shall immediately segregate all of the Prepetition and Postpetition Collateral, including

18  without limitation Cash Collateral, and shall not be permitted to use such collateral absent the

19  Prepetition Agent's prior written consent or further order of this Court granting such use and the

20  Adequate Protection Obligations shall become immediately due and payable and the Secured

21  Lenders shall have no further obligation to approve further use of cash collateral and may file a

22  motion pursuant to Section 362 of the Bankruptcy Code to lift the stay to proceed with rights,

23  remedies and causes of action under the Prepetition Loan Documents, and this Final Order and

24  applicable law, and this motion will be heard on an expedited basis within five (5) business days of

25  the Termination Date or as soon thereafter as the Court can allow.  Notwithstanding the occurrence

26  of the Termination Date or anything herein, all of the rights, remedies, benefits and protections

27  provided to the Prepetition Agent and the Secured Lenders under this Order shall survive the

28  Termination Date.

PHDATA 3204854_1

1    11.    The provisions of this Order and any actions taken pursuant hereto shall survive entry

2    of any order which may be entered (a) confirming any plan of reorganization or plan of liquidation

3    in the Chapter 11 Case; (b) converting the Chapter 11 Case to a Chapter 7 case; or (c) dismissing the

4    Chapter 11 Case.  If an order dismissing the Chapter 11 Case under Section 1112 of the Bankruptcy

5    Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105

6    and 349 of the Bankruptcy Code) that (a) the Replacement Liens granted pursuant to this Order to

7    the Prepetition Agent and the Secured Lenders shall continue in full force and effect, shall remain

8    binding on all parties in interest notwithstanding such dismissal until the obligations secured thereby

9    shall have been paid and satisfied in full and (b) this Court shall retain jurisdiction, notwithstanding

10    such dismissal, for the limited purposes of enforcing such Replacement Liens.

11    12.    The acknowledgments and agreements contained in paragraphs E shall be binding

12    upon the Debtors in all circumstances, and shall be binding upon all other parties in interest,

13    including without limitation, any statutory committee appointed in the Chapter 11 Case, unless (a) a

14    party in interest (including any statutory committee appointed in the Chapter 11 Case) has properly

15    filed an adversary proceeding or contested matter (subject to the limitations set forth in paragraph

16    16) challenging the validity, enforceability or priority of the Prepetition Obligations or the

17    Prepetition Agent's liens on the Prepetition Collateral in respect thereof (*"Lien Determination"*), or

18    otherwise asserting any claims or causes of action against the Prepetition Agent or the Secured

19    Lenders on behalf of the Debtors' estate (*"Other Causes of Actions"*), no later than July 31, 2009 for

20    Lien Determination and July 31, 2009 to assert Other Causes of Actions provided the date solely as

21    to Other Causes of Actions can be extended by the Committee and the Agent by their mutual

22    agreement to a later date or the Committee may request additional time and this Court so enters any

23    Order to that effect, and (b) this Court rules in favor of the plaintiff in any such timely and properly

24    filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter

25    is commenced as of such date, the Prepetition Obligations shall constitute allowed claims, not

26    subject to subordination and otherwise unavoidable, for all purposes in the Chapter 11 Case or any

27    subsequent Chapter 7 case, the Prepetition Agent's liens on the Prepetition Collateral shall be

28    deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind,

14

1   subordination and otherwise unavoidable, and the Prepetition Agent, the Secured Lenders, the

2   Prepetition Obligations and the Prepetition Agent's liens on the Prepetition Collateral shall not be

3   subject to any other or further challenge by any party in interest seeking to exercise the rights of the

4   Debtors' estates, including without limitation, any successor thereto.  If any such adversary

5   proceeding or contested matter is timely commenced as of such date, the acknowledgements and

6   agreements contained in paragraphs E shall nonetheless remain binding and preclusive (as provided

7   in this paragraph) except to the extent that such acknowledgements and agreements were expressly

8   challenged in such adversary proceeding or contested matter.

9      13.    Entry of this Order shall be without prejudice to any and all rights, remedies, claims

10  and causes of action which the Prepetition Agent or the Secured Lenders may have against the

11  Debtors or any other parties, and without prejudice to the right of the Prepetition Agent and the

12  Secured Lenders to seek relief in the Chapter 11 Case, including without limitation, relief from the

13  automatic stay in effect pursuant to Bankruptcy Code Section 362 or conversion to Chapter 7 of the

14  Chapter 11 Case, and the right of the Debtors and any other party in interest to oppose any such

15  relief.  The provisions of this Order shall be binding upon and inure to the benefit of the Prepetition

16  Agent, the Secured Lenders, the Debtors, and their respective successors and assigns, including any

17  trustee or other fiduciary hereafter appointed in the Chapter 11 Case as a legal representative of the

18  Debtors or the Debtors' estate.

19     14.    (a)  In order to facilitate the processing of claims, to ease the burden upon this Court

20  and to reduce any unnecessary expense to the Debtors' estates, the Prepetition Agent is authorized to

21  file a master proof of claim on behalf of itself and the Secured Lenders on account of their claims

22  arising under the Prepetition Loan Documents and hereunder against the Debtors (the "Master Proof

23  of Claim"), and the Prepetition Agent shall not be required to file a verified statement pursuant to

24  Rule 2019 of the Federal Rules of Bankruptcy Procedure.

25     (b)   Upon the filing of the Master Proof of Claim against the Debtors, the

26  Prepetition Agent and each Secured Lender, and each of their respective successors and assigns,

27  shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in

28  respect of its claims against the Debtors arising under the Prepetition Loan Documents, and the

1   claim of the Prepetition Agent and each Secured Lender (and each of their respective successors and

2   assigns), named in the Master Proof of Claim shall be allowed or disallowed as if such entity had

3   filed a separate proof of claim in the Chapter 11 Case in the amount set forth opposite each name in

4   the Master Proof of Claim; provided that the Prepetition Agent may but shall not be required to

5   amend the Master Proof of Claim from time to time to, among other things, reflect a change in the

6   holders of claims set forth therein or a reallocation among such holders of the claims asserted therein

7   resulting from any transfer of any such claims.

8            (c)     The provisions set forth in this paragraph 13 and the Master Proof of Claim

9   are intended solely for the purpose of administrative convenience and, except to the extent set forth

10  herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect

11  the substantive rights of the Debtors, any statutory committee appointed in the Chapter 11 Case, the

12  Prepetition Agent or the Secured Lenders or any other party in interest or their respective successors

13  in interest including, without limitation, the right of each Secured Lender (or their successors in

14  interest) to vote separately on any plan of reorganization or plan of liquidation proposed in the

15  Chapter 11 Case.

16          15.     Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, the Prepetition Agent

17  and the Secured Lenders are hereby found to be entities that have acted in "good faith" in connection

18  with the negotiation and entry of this Order, and each is entitled to the protection provided to such

19  entities under Section 363(m) of the Bankruptcy Code.

20          16.     Except on the terms of this Order, the Debtors shall be prohibited from at any time

21  using the Cash Collateral. Notwithstanding any provision in other "first day" orders entered by this

22  Court authorizing the Debtors to make payments in respect of prepetition obligations, the provisions

23  in this Order and the Budget conditioning the payment of such amounts or limiting the amount of

24  such payments are controlling.

25          17.     Subject to entry of the Final Order, in consideration of the Secured Lenders' consent

26  to the use of the Cash Collateral, no expenses of administration of the Chapter 11 Case or any future

27  proceeding or case which may result therefrom, including without limitation, a case under Chapter 7,

28  shall be charged pursuant to Section 506(c) of the Bankruptcy Code against the Prepetition

PHDATA 3204854_1

1    Collateral or the Postpetition Collateral without the prior written consent of the Required Secured

2    Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the

3    Secured Lenders or otherwise.

4         18.    Notwithstanding anything herein to the contrary, the Cash Collateral may not be used

5    to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability

6    of the Prepetition Obligations or the liens of the Prepetition Agent or the Secured Lenders in the

7    Prepetition Collateral, or the liens or claims granted under this Order, (b) assert any claims,

8    counterclaims, defenses or causes of action against the Prepetition Agent or the Secured Lenders or

9    their respective affiliates, agents, representatives or professionals or (c) seek to modify or otherwise

10   alter any of the rights granted to the Prepetition Agent or the Secured Lenders hereunder or under the

11   Prepetition Loan Documents, in each of the foregoing cases without such parties' prior written

12   consent.

13        19.    *Immediate Effect of Order.*  Notwithstanding Bankruptcy Rule 7062, the terms and

14   conditions of this Final Order shall be: (a) immediately enforceable pursuant to Bankruptcy Rule

15   8005; and (b) not be stayed absent (1) an application by a party in interest for such stay in

16   conformance with such Bankruptcy Rule 8005, (2) a hearing upon notice to the Debtors and the

17   Prepetition Agent and (3) entry of an order granting such stay.

18        20.    *Survival of Liens and Priority.*  No rights, claims or liens of the Prepetition Agent or

19   the Secured Lenders granted hereunder shall be modified in any plan of reorganization or subsequent

20   filing.  The provisions of the Final Order and all obligations of the Debtors in the Final Order and

21   any actions taken pursuant hereto shall survive entry of any orders which may be entered confirming

22   any plan of reorganization or which may be entered converting these Chapter 11 Cases from Chapter

23   11 to Chapter 7 of the Bankruptcy Code; provided further that the terms and provisions of the Final

24   Order, as well as the liens, to secured the Adequate Protection Claim, shall continue in this or any

25   superseding case under the Bankruptcy Code and the Adequate Protection Claim shall maintain its

26   priority as provided by the Final Order until the Prepetition Obligations are satisfied in full.

27        21.    *Modification of Final Order.*  Nothing in this Final Order shall limit the Prepetition

28   Lenders' rights to seek modification of this Final Order.

17

1    22.    *Rights Against Third Parties.*  Nothing in this Final Order shall in any way prejudice

2  or compromise any rights of the Prepetition Lenders may have against parties other than the Debtors.

3    23.    *No Unintended Beneficiaries.*  The provisions of this Final Order shall be binding

4  upon and inure to the benefit of the Prepetition Agent, the Secured Lenders, the Debtors, the

5  Debtors' estates and their respective successors and assigns (including the Chapter 11 Trustee).

6  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of

7  any other party, creditor, equity holders or any other director, indirect or accidental beneficiary.

8    24.    *Continuing Jurisdiction.*  The Court retains exclusive jurisdiction over this Order and

9  the interpretation and enforcement of the provisions hereof, subject to any ruling of any appropriate

10  appellate court.

11             [The reminder of this page is intentionally left blank]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PHDATA 3204854_1

1   25.    The filing of the Motion in the SK Foods, L.P. chapter 11 case shall be deemed to

2   have been filed in both of the Debtors' chapter 11 cases.

    Dated:  June 22, 2009

3

4

5

                                                    *Robert Bardwil*

6                                              Robert S. Bardwil, Judge
                                               United States Bankruptcy Court
7   APPROVED AS TO FORM:

8   OFFICE OF THE UNITED STATES          SCHNADER HARRISON SEGAL & LEWIS
    TRUSTEE                              LLP

9

10  By:/s/ Judith Hotze                  By /s/ Gregory C. Nuti
       Judith Hotze                         Gregory C. Nuti
11                                          [Proposed] Attorneys for Bradley
                                            Sharp, Chapter 11 Trustee

12  CHAPMAN AND CUTLER, LLP              LEWIS AND ROCA, LLP

13

14  By:/s/ James Spiotto                 By: /s/Brent A Gardner
       James Spiotto                         Brent A. Gardner
15     Attorneys for Bank of Montreal        Attorneys for Chase Equipment

16  DOWNY BRAND SEYMOUR &
    ROHWER, LLP
17

18  By: /s/ Dale Ginter
       Dale Ginter
19     [Proposed] Attorneys for the
       Official Committee of Unsecured
20     Creditors

21

22

23

24

25

26

27

28

                                        19

PHDATA 3204854_1

# EXHIBIT A

**SK Foods**

*Weekly Cash Flow Analysis*
Consolidated Cash Flow Summary

| ($000s)<br>Week Ended Sunday | Wk 1<br>Actual<br>5/8 - 5/10 | Wk 2<br>Actual<br>5/17 | Wk 3<br>Actual<br>5/24 | Wk 4<br>Actual<br>5/31 | Wk 5<br>Actual<br>6/7 | Wk 6<br>Actual<br>6/14 | Wk 7<br>Forecast<br>6/21 | Wk 8<br>Forecast<br>6/28 |
|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | |
| Operating | | | | | | | | |
| Trade Receipts | 1,199 | 1,395 | 2,792 | 1,537 | 3,243 | 2,661 | 2,561 | 2,080 |
| Outstanding AR Catch-up | - | - | - | - | - | - | 2,250 | 2,250 |
| AR offsets | - | - | - | - | - | - | (500) | (500) |
| SAFF invoice | - | - | - | - | - | - | - | - |
| Total Cash Receipts | $1,199 | $1,395 | $2,792 | $1,537 | $3,243 | $2,661 | $4,311 | $3,830 |
| | | | | | | | | |
| **Cash Disbursements** | | | | | | | | |
| Personnel | | | | | | | | |
| Salaries & Wages | - | - | 850 | - | 790 | - | 1,128 | 175 |
| Benefits / Taxes | - | - | 52 | - | - | - | 218 | - |
| W/C & Life Insurance Premiums | - | - | - | - | - | - | - | - |
| Self Insurance - Health & Dental Claims | - | - | 35 | 81 | 33 | - | 50 | 50 |
| Vacation Buyouts | - | - | - | - | - | - | 33 | - |
| Other | - | - | - | - | - | - | 10 | 10 |
| | | | | | | | | |
| Operating | | | | | | | | |
| Production | - | 1,980 | 133 | 78 | 119 | 73 | 698 | 698 |
| Refund of Bin Deposits Collected Pre-Pet | - | - | - | - | - | - | 55 | 55 |
| Facilities and Equipment Leases | - | - | - | - | 234 | - | 2 | - |
| Waste Water Discharge Agreements | - | - | - | - | - | - | 50 | |
| Shipping (excluding CVS) | - | - | 24 | 1 | - | - | 200 | 200 |
| Central Valley Shippers | - | - | - | - | - | - | - | - |
| Utilities | - | - | - | 3 | 364 | 1 | 275 | 150 |
| Utilities Deposit | - | - | - | - | - | - | - | - |
| Capital Lease Payments | - | - | - | - | - | - | - | - |
| Repairs and Maintenance | - | - | 107 | 246 | 401 | 220 | 483 | 810 |
| DAX Equipment & Install Payments | - | - | - | - | - | - | 15 | 15 |
| Taxes and Insurance | - | - | - | - | - | - | - | - |
| *Reclamation Claims* | - | - | - | - | - | - | - | - |
| | | | | | | | | |
| Non-Operating | | | | | | | | |
| Other Sale Related Costs | - | - | - | - | - | - | - | - |
| Publication Fees | - | - | - | - | - | - | - | - |
| Bonus / Retention / KEIP | - | - | - | - | - | - | - | 1,100 |
| Tax Return Preparation | | | | | | | | 150 |
| Bank Adequate Protection | - | - | - | - | - | - | 2,000 | 2,000 |
| Total Corporate Disbursements | $0 | $1,980 | $1,201 | $410 | $1,940 | $295 | $5,217 | $5,414 |
| | | | | | | | | |
| Net Weekly Cash Increase/(Decrease) | $1,199 | ($585) | $1,591 | $1,127 | $1,303 | $2,366 | ($906) | ($1,584) |
| | | | | | | | | |
| Total Restructuring Disbursements | - | - | - | - | - | - | - | 2,361 |
| | | | | | | | | |
| Increase/(Decrease) in Cash - Total | 1,199 | (585) | 1,591 | 1,127 | 1,303 | 2,366 | (906) | (3,945) |
| | | | | | | | | |
| Cumulative Cash | 1,199 | 614 | 2,205 | 3,332 | 4,635 | 7,001 | 6,095 | 2,151 |
| | | | | | | | | |
| **Cash Rollforward:** | | | | | | | | |
| Beginning Cash | 13,867 | 15,066 | 14,481 | 16,072 | 17,199 | 18,502 | 20,868 | 19,963 |
| Change in Cash | 1,199 | (585) | 1,591 | 1,127 | 1,303 | 2,366 | (906) | (3,945) |
| Ending Cash Balance | $15,066 | $14,481 | $16,072 | $17,199 | $18,502 | $20,868 | $19,963 | $16,018 |

# EXHIBIT 2

FILED
November 17, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002226890

**8 PAGES**

1   Gregory C. Nuti (CSBN 151754)
2   Kevin W. Coleman (CSBN 168538)
    Melissa S. Lor (CSBN 245515)
3   SCHNADER HARRISON SEGAL & LEWIS LLP
    One Montgomery Street, Suite 2200
4   San Francisco, California  94104-5501
    Telephone: 415-364-6700
5   Facsimile: 415-364-6785
    gnuti@schnader.com
6   kcoleman@schnader.com
    mlor@schnader.com
7

8   Attorneys for Bradley D. Sharp,
    Chapter 11 Trustee
9

10            **UNITED STATES BANKRUPTCY COURT**

11             **EASTERN DISTRICT OF CALIFORNIA**

12                  **SACRAMENTO DIVISION**

13   In re:                                    )   **Case No. 09-29162-D-11**
                                               )
14   SK FOODS, L.P., a California limited      )   Chapter 11
     partnership,                              )
15                                             )   **DC No. SH-36**
                Debtor.                        )
16                                             )
     _____    )
     In re :                                   )   **Case No. 09-29161-D-11**
17                                             )
     RHM INDUSTRIAL/SPECIALTY                  )   Chapter 11
18   FOODS, INC., a California                 )
     Corporation, d/b/a Colusa County          )
19   Canning Co.,                              )   **DC No. SH-36**
                                               )
20              Debtor.                        )   **NOTICE OF MOTION AND MOTION**
                                               )   **TO APPROVE SALE OF REAL**
21                                             )   **PROPERTY COMMONLY KNOWN AS**
                                               )   **4000 WESTLAKE BLVD., UNIT #14,**
22                                             )   **HOMEWOOD, CALIFORNIA,  FREE**
                                               )   **AND CLEAR OF LIEN OF BANK OF**
23                                             )   **MONTREAL**
                                               )
24                                             )
                                               )   Date:   December 16, 2009
25                                             )   Time:   10:00 a.m.
                                               )   Place:  Courtroom 34
26                                             )           501 I Street, 6th Floor
                                               )           Sacramento, CA
27                                             )   Judge: Hon. Robert S. Bardwil
                                               )
28

PHDATA 3251428_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    **PLEASE TAKE NOTICE** that on **December 16, 2009 at 10:00 a.m., in the courtroom**

2    **of the Hon. Robert S. Bardwil, United States Bankruptcy Court, 501 I Street, 6th Floor,**

3    **Sacramento, California**, the Court will hear and consider the motion of Bradley D. Sharp (the

4    "Trustee"), the duly appointed and acting chapter 11 trustee for SK Foods, L.P., a California

5    limited partnership, and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a

6    Colusa County Canning Co. (collectively, the "Debtors"), for an order authorizing the Trustee to:

7            (a) sell real property commonly known as 4000 West Lake Boulevard, Unit #14,

8    Homewood, CA 96141 (the "Property") on an as-is, where-is basis, without any warranties or

9    representations, free and clear of all liens and interests, with such liens and interests to attach to

10   the net sale proceeds, to Michael F. Roizen and Nancy J. Roizen and/or Assignee (the "Buyers"),

11   for $2,960,000.00, or to any qualified overbidder who submits a higher acceptable bid at the

12   auction by telephone conducted by the Trustee at a pre-arranged date and time (the "sale").

13           (b) direct that the Bank of Montreal Lien attach to the net sale proceeds, subject

14   to the costs of sale delineated in the Motion, with the same force, effect, validity, and priority

15   that it has with respect to the Property;

16           (c) pay the costs of sale incurred in selling the Property, including the real estate

17   brokers' commission through escrow in the cumulative sum of 5% of the gross sale price; and

18           (d) execute any and all documents that may be necessary to consummate the sale

19   of the Property.

20   1.      This Motion is made on the grounds that: (a) the Property may be sold free and

21   clear of liens and interests, namely, the lien of the Bank of Montreal, who has consented to the

22   sale of the Property with its lien amount to attach to the net sale proceeds; (b) the purchase price

23   is fair and reasonable and the sale is compatible with the best interests of the creditors and the

24   estate; and (c) the payments of the costs of sale, brokers' commission, Homeowners Association

25   dues, escrow charges, and other closing costs are necessary to effect the sale.

26   2.      This Motion is based upon the Notice of Motion, the accompanying

27   Memorandum of Points and Authorities and the Declarations of Bradley D. Sharp, William

28   Friedman, and Anita Noble, all papers and pleadings on file herein, and such other evidence that

1  may be presented to the Court. The sale is to be "as is" and "where is", with no warranty or

2  recourse whatsoever. The Trustee may entertain higher and better bids at the pre-arranged date

3  and time of the auction by telephone, subject to Court approval.

4          3.      The Trustee proposes to sell the Property free and clear of all liens and interests

5  against the Property, including without limitation the following:

6                  (a)      a deed of trust against the Property in favor of SK Foods, L.P. to secure an

7  indebtedness of $1,350,000.00, dated August 21, 2008 and recorded in Placer County on

8  November 4, 2008, as no. 2008-0085788-00 of the official records ("SK Foods, L.P. Lien");

9                  (b)      another deed of trust against the Property in favor of SK Foods, L.P. to

10  secure an indebtedness of $1,360,000.00, dated August 21, 2008 and recorded in Placer County

11  on November 4, 2008, as no. 2008-0085790 of the official records ("SK Foods, L.P. Lien"); and

12                  (c)      a deed of trust against the Property in favor of the Bank of Montreal to

13  secure a line of credit in the amount of $125,000,000.00, dated March 24, 2009 and recorded in

14  Placer County on March 26, 2009 as no. 2009-0024080-00 of the official records ("Bank of

15  Montreal Lien").

16          4.      The Trustee, on behalf of the Debtors, will execute reconveyances of the two SK

17  Foods, L.P. Liens.

18          5.      As to the Bank of Montreal Lien, the Trustee proposes to sell the Property free

19  and clear of all liens and interests, with lien amount attaching to the net proceeds of sale, subject

20  to the costs of sale delineated in the Motion, with the same force, effect, validity, and priority

21  that it has with respect to the Property.

22          6.      The Trustee requests and recommends that the Court approve the following

23  procedure for overbids:

24                  (a)      Any party wishing to tender an overbid ("Qualified Overbidder") must

25  provide the Trustee no later than ten (10) days prior to the hearing date (i.e., December 6, 2009):

26  (a) a cashier's check in the sum of $91,500.00 payable to "Bradley D. Sharp, Chapter 11

27  Trustee" ("Deposit"); (b) proof satisfactory to the Trustee in his sole discretion of ability to close

28  escrow; and (c) a completed and executed overbid form, without changes or conditions, as set

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

3

NOTICE OF MOTION AND MOTION TO APPROVE SALE OF REAL PROPERTY OF ESTATE

1   forth in <u>Exhibit A</u> attached hereto and attached to the Declaration of Bradley Sharp.  Upon

2   receipt of an overbid, the Trustee will notify the Qualified Overbidder of the auction date and

3   time.  The Deposit shall be nonrefundable in the event that that party is the successful overbidder

4   but the party fails to close the sale timely as set forth in paragraph 9 of the Purchase and Sale

5   Agreement.

6       (b)     The minimum initial overbid shall be $2,985,000.00[1], with subsequent

7   overbids in increments of not less than $10,000.00.

8       (c)     The overbidding party will be bound by all of the terms set forth in the

9   Purchase and Sale Agreement set forth herein except as to price, without contingencies,

10  including no financing or physical inspection contingency, and shall close escrow no more than

11  fifteen (15) calendar days following entry of an order approving the sale and overbid procedures

12  set forth herein.

13      (d)     At the hearing on this Motion, the Trustee shall disclose the number and

14  identities of any Qualified Overbidders, if any.

15      (e)     The Trustee requests permission to conduct an auction by telephone

16  outside of the courtroom within two (2) business days of the Court's approval of the sale and

17  overbid procedures set forth herein with the Trustee holding sole discretion in accepting and

18  rejecting all overbids.

19      (f)     The Trustee also requests authority to confirm a back-up buyer so that, in

20  the event that the successful overbidder does not timely close escrow, the Trustee may sell the

21  Property to the back-up buyer for the amount of such back-up buyer's bid.

22      7.      The Trustee holds sole discretion in accepting and rejecting all overbids.  The

23  Trustee also seeks a Court ruling that the party to whom the Court confirms the sale and any

24  backup buyer are good faith purchasers for purposes of 11 U.S.C. § 363(m).

25      8.      The Trustee is also requesting the Court authorize him to pay the commissions of

26  the real estate brokers involved in the sale, including the Trustee's brokers, William Friedman of

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

27  ─────────────────────
    [1] $25,000.00 more than the "stalking horse" bid.

28

1 Coldwell Banker in the amount of 1.25% of the gross sale proceeds and Anita Noble of Keller

2 Williams in the amount of 1.25% of the gross sale proceeds, and that of the Buyer's Broker,

3 Bruce Ells of Coldwell Banker Northern California in the amount of 2.5% of the gross sale

4 proceeds, or such broker representing the successful overbidder, if applicable.

5      **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Rule 9014-1(f)(1) of the

6 Local Rules of Practice for the United States Bankruptcy Court for the Eastern District of

7 California, this Motion is filed twenty-eight (28) days prior to the hearing date. Opposition, if

8 any, shall be served and filed with the court at least fourteen (14) calendar days preceding the

9 hearing date (i.e., December 2, 2009). Opposition shall be accompanied by evidence

10 establishing its factual allegations. Without good cause, no party shall be heard in opposition to

11 the Motion at oral argument if written opposition to the Motion has not been timely filed.

12 Failure to timely file written opposition may be deemed a waiver of any opposition to the

13 granting of the Motion or may result in the imposition of sanctions. The moving party may, at

14 least seven (7) days prior to the date of hearing, serve and file with the Court a written reply to

15 any written opposition filed by a responding party. *See* Local Rule 9014(f)(1)(i)-(iii).

16

17 Dated: November 16, 2009            SCHNADER HARRISON SEGAL & LEWIS LLP

18

19                           /s/   *Melissa S. Lor*
                            Melissa S. Lor
                            Attorneys for Bradley D. Sharp, Chapter 11 Trustee

20

21

22

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

5

# Exhibit A

## BINDING OFFER TO PURCHASE REAL PROPERTY

The undersigned ("Offeror") hereby offers (the "Offer") to purchase from Bradley D. Sharp (the "Trustee"), solely in his capacity as the the chapter 11 trustee for the estate of SK Foods, L.P., a California limited partnership, and RHM Industry/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"), the real property commonly known as 4000 West Lake Boulevard, Unit #14, Homewood, CA 96141 (the "Property") on the identical terms as described in the *Motion of Chapter 11 Trustee to Approve Sale and Overbid Procedures for Real Property Commonly Known as 4000 West Lake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal* (the "Motion"), filed on November __, 2009, in the Debtor's pending bankruptcy case, except that the offer price for the Property shall be $_____ in cash.

There are no contingencies to this Offer whatsoever, including inspection, due diligence or financing contingencies. The sale is subject to acceptance by the Trustee, approval by the Bankruptcy Court of the sale and overbid procedures at the hearing on December 16, 2009 or as continued therefrom, in Courtroom 34 of Honorable Robert S. Bardwil, United States Bankruptcy Judge, located at 501 I Street, 6th Floor, Sacramento, California.

Offeror further understands that the sale is "as is" and "where is", with no warranty or recourse whatsoever. Offeror has completed all due diligence which Offeror believes to be required to purchase the Property and has not relied upon any statement or representation from the Trustee, his attorneys, his real estate brokers or other agents. Any necessary testing or repairs, including without limitation those for termite damage or retrofitting required by any governmental entity, shall be the sole responsibility of the Offeror, at Offeror's sole expense.

Offeror is providing herewith a cashiers check in the sum of $91,500.00 for the Property bid upon, made payable to "Bradley D. Sharp, Chapter 11 Trustee", which shall be credited to the sale price. The deposit shall be non-refundable in the event that the Court confirms the sale to the Offeror but Offeror breaches his obligations under this Offer, in which event the Trustee shall be free to sell the Property to another. Offeror's sole remedy in the event that the Trustee is unable to close the sale shall be a return of the deposit in full. If the Offeror performs in full under the terms of this Offer, but the Court confirms the sale of the Property to another, Offeror's deposit shall be refundable in full.

Offeror agrees to substitute into escrow no. 026660-AD at Nettie Becker Escrow, Inc. or enter into a new escrow upon identical terms and conditions except as to price. Offeror acknowledges having obtained a copy of the listing agreement, those escrow instructions and the Motion, all of which are incorporated herein by this reference, and understands all of their terms.

A commission of 2.5% of the sale price shall be payable to Offeror's real estate broker, subject to approval of the Bankruptcy Court, but only upon closing of the sale to Offeror.

[signature page attached]

Dated: _____        _____
                                        (Name of offeror)

                                        _____
                                        (street address)

                                        _____
                                        (city, state, zip code)

                                        _____
                                        (telephone number)

                                        _____
                                        (signature of authorized agent
                                        of offeror, if applicable)

                                        _____
                                        (name and title of agent of offeror,
                                        if applicable)

                                        _____
                                        (name of real estate brokerage
                                        of offeror)

                                        _____
                                        (name of real estate agent
                                        of offeror)

                                        _____
                                        (telephone no. of real estate
                                        agent of offeror)

2

FILED
November 17, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002226921

1    **54 PAGES**
Gregory C. Nuti (CSBN 151754)
2    Kevin W. Coleman (CSBN 168538)
Melissa S. Lor (CSBN 245515)
3    SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
4    San Francisco, California  94104-5501
Telephone: 415-364-6700
5    Facsimile: 415-364-6785
gnuti@schnader.com
6    kcoleman@schnader.com
mlor@schnader.com
7

8    Attorneys for Bradley D. Sharp,
Chapter 11 Trustee
9

10                    **UNITED STATES BANKRUPTCY COURT**

11                        **EASTERN DISTRICT OF CALIFORNIA**

12                            **SACRAMENTO DIVISION**

13   In re:                                    )    **Case No. 09-29162-D-11**
                                               )
14   SK FOODS, L.P., a California limited      )    Chapter 11
     partnership,                              )
15                                             )    **DC No. SH-36**
                    Debtor.                    )
16   _____          )
     In re :                                   )    **Case No. 09-29161-D-11**
17                                             )
     RHM INDUSTRIAL/SPECIALTY                  )    Chapter 11
18   FOODS, INC., a California                 )
     Corporation, d/b/a Colusa County          )
19   Canning Co.,                              )    **DC No. SH-36**
                                               )
20                  Debtor.                    )    **DECLARATION OF BRADLEY D.**
                                               )    **SHARP IN SUPPORT OF MOTION TO**
21                                             )    **APPROVE SALE OF REAL PROPERTY**
                                               )    **COMMONLY KNOWN AS 4000**
22                                             )    **WESTLAKE BLVD., UNIT #14,**
                                               )    **HOMEWOOD, CALIFORNIA, FREE**
23                                             )    **AND CLEAR OF LIEN OF BANK OF**
                                               )    **MONTREAL**
24                                             )
                                               )
25                                             )    Date:  December 16, 2009
                                               )    Time:  10:00 a.m.
26                                             )    Place: Courtroom 34
                                               )           501 I Street, 6th Floor
27                                             )           Sacramento, CA
                                               )    Judge: Hon. Robert Bardwil
28

I, Bradley D. Sharp, hereby declare:

1.    I am the duly appointed and acting chapter 11 trustee for SK Foods, L.P., a California limited partnership, and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"). I have personal knowledge of the facts of this declaration, and if called as a witness, I could and would testify competently to these facts.

2.    This declaration is being filed in support of the motion (the "Motion") filed herewith to approve the sale of real property commonly known as 4000 West Lake Boulevard, Unit #14, Homewood, CA 96141 (the "Property") on an as-is, where-is basis, without any warranties or representations, free and clear of all liens and interests, with such liens and interests to attach to the net sale proceeds, to Michael F. Roizen and Nancy J. Roizen and/or Assignee (the "Buyers"), for $2,960,000.00, or to any qualified overbidder (the "sale").

3.    Attached hereto as <u>Exhibit A</u> is a true and correct copy of the proposed counter-offer/purchase agreement and amendment (the "Purchase and Sale Agreement") for the Property to the Buyers, subject to Bankruptcy Court approval and overbid.

4.    After payment of brokers' commission, homeowners' association dues, escrow charges and other closing costs, I estimate net sale proceeds of $2,737,992.99 for the estate. Attached as <u>Exhibit B</u> is the estimate of net sale proceeds.

5.    Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Preliminary Title Report dated September 21, 2009.

6.    According to the Title Report, the liens and claims of record against the Property consist of the following items:

(a)    A deed of trust against the Property in favor of SK Foods, L.P. to secure an indebtedness of $1,350,000.00, dated August 21, 2008 and recorded in Placer County on November 4, 2008, as no. 2008-0085788-00 of the official records ("SK Foods, L.P. Lien");

(b)    Another deed of trust against the Property in favor of SK Foods, L.P. to secure an indebtedness of $1,360,000.00, dated August 21, 2008 and recorded in Placer County on November 4, 2008, as no. 2008-0085790 of the official records ("SK Foods, L.P. Lien"); and

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

2

(c)    A deed of trust against the Property in favor of the Bank of Montreal to secure a line of credit in the amount of $125,000,000.00, dated March 24, 2009 and recorded in Placer County on March 26, 2009 as no. 2009-0024080-00 of the official records ("Bank of Montreal Lien").

7.    On behalf of the Debtors, I will execute reconveyances of the two SK Foods, L.P. Liens.

8.    As to the Bank of Montreal Lien, I propose to sell the Property free and clear of all liens and interests, with lien amount attaching to the net proceeds of sale, subject to the costs of sale delineated in the Motion, with the same force, effect, validity, and priority that it has with respect to the Property.

9.    I have read the within Motion to sell the Property, which my counsel prepared on my behalf. I believe that sale of the Property for $2,960,000.00, subject to overbid, is a fair price based upon evaluation and advice from the real estate brokers..

10.    Attached hereto as Exhibit D is a true and correct copy of the overbid form for prospective overbidders to fill out and execute. A copy of the overbid form is also attached to the Notice.

11.    The Buyers were procured as a result of marketing efforts through my brokers, after arms-length negotiations.

12.    I have no independent knowledge or familiarity with the Buyers, and I am advised that the Buyers have no connection with the Debtors or anyone else associated with this estate or the administration of the estate.

13.    The $2,960,000.00 price is the highest and best offer I have received on the Property. Barring receipt of an overbid, I therefore believe in my business judgment that the proposed sale is in the best interests of the estate and its creditors, and should be approved.

///
///
///
///

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE 415-364-6700
FACSIMILE: 415-364-6785

3

1    I declare under the penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3    Executed this 16th day of November, 2009 at Los Angeles, California.

4                                           /s/    *Bradley D. Sharp*

5                                           Bradley D. Sharp

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

4

DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF MOTION TO APPROVE SALE OF REAL PROPERTY OF ESTATE

PHDATA 3251440_1

# Exhibit A

## COUNTER-OFFER

This agreement ("Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Michael F. Reizen and Nancy J. Reizen (the "Buyer") from Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P., a California limited partnership, et al., (the "Seller"), of the real property commonly known as 4000 W. Lake Blvd, Unit #14, Homewood, California (the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety the Residential Purchase Agreement and Joint Escrow Instructions dated August 29, 2009 and Counter-Offer #2 dated September 25, 2009 (the "Offer"), and any oral or written negotiations since then.

PURCHASE PRICE; DEPOSIT; ESCROW. The purchase price for the Property shall be $3,050,000 ("Purchase Price"). "Buyer shall make an initial deposit of $91,500 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable and delivered to Nettie Becker Escrow within two (2) business days of acceptance of this Counter-Offer by Buyer, Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.
Buyer shall deliver to the Trustee, within three (3) days of mutual agreement upon this Counter-Offer, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit; loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion. In the event that either (i) Buyer fails timely to provide any such proof, or (ii) the Trustee determines, in the Trustee's sole discretion, that any proof of funds provided to Trustee by Buyer is unacceptable, the Trustee shall have the right, at the Trustee's option, to provide written notice to Buyer that this Counter-Offer is terminated. In the event that the Trustee exercises such termination right, this Counter-Offer shall terminate effective as of the date of Trustee's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Trustee shall each be relieved of any further obligation hereunder.

Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions. Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale. Buyer shall be free to assign this Agreement to another person or entity ("Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in its sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.

1.    BUYER'S DUE DILIGENCE AND FINANCING; CANCELLATION RIGHT. Buyer shall have seventeen (17) calendar days from the date of execution hereof to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which the Buyer desires for this Sale of the Property, including, but not limited to, obtaining any required financing, and performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer. Buyer may, not later than the end of that

245416X

period, give Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of these matters ("Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation as within such period, all such contingencies shall be automatically removed as set forth in Paragraph 4 and Buyer's obligation to proceed shall be non-contingent except as provided herein for, (i) Buyer's review of a preliminary report and underlying documents respecting the title to the Property (as set forth in Paragraph 2), and (ii) Bankruptcy Court approval of this Agreement and the Sale (including as set forth in Paragraph 6 ).

2.      TITLE; TITLE INSURANCE.  Within three (3) business days after acceptance of this Counter Offer, Lawyers Title Company (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review. Buyer may, not later than the end of the period in Paragraph 2, or until three (3) days after receipt of the preliminary report and underlying documents, whichever occurs later, in which to give Seller written notice ("Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use of the Property for the purpose for which it is currently used or intended to be used.  Such notice must refer to the specific exception(s) in Schedule B of the preliminary report and the specific underlying document(s) which are the basis for Buyer's disapproval.  Within five (5) business days after receipt of such notice, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the sale shall proceed.  Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report or providing title insurance coverage by endorsement against such exception(s).  At the close of the sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary report, subject to any corrections as in this paragraph above, free and clear of all monetary liens, subject to the terms of the within contract.  Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

3.      REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.  If Buyer does not give Seller written Notice of Cancellation as and when provided in Paragraph 1, or Notice of Title Disapproval as and when provided in Paragraph 2, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale.  Seller shall then file a motion with the Bankruptcy Court to confirm this sale.  Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the sale, subject only to Bankruptcy Court confirmation as set forth below.  If the Bankruptcy Court confirms the sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the sale, but no later than the first business day after eleven (11) calendar days following the entry of such order unless a longer period is required on Seller's part in the course of bankruptcy administration; provided, however, in no event shall the Sale close, if at all, later than November 15, 2009.  The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located.  Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

4.      BANKRUPTCY SALE.  Buyer acknowledges that Seller is a Trustee appointed to

Page 2 of 9    subject only to the issuance of the CLTA
                Standard Owner's policy of title insurance
                as described in Section 2.

215416X

_____        _____        _____
Buyer's                Buyer's                Seller's
Initials               Initials               Initials

administer the above referenced bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and Brokers and agents have not and will not determine the condition or fitness for use of the Property for any particular purpose. The sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Brokers or agents herein. Transfer of the Property shall be by Quit Claim Deed. All parties acknowledge that Seller is a party to this Agreement solely in its capacity as Trustee of the above referenced bankruptcy estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against the Seller, Trustee or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of such estate.

5.    TAXES; PRORATIONS; COSTS OF SALE.  All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

6.    BANKRUPTCY COURT APPROVAL; OVERBIDDING.  The sale is subject to notice to creditors, approval by the Bankruptcy Court, and higher and better bids received by Seller through and including the Bankruptcy Court hearing to confirm the sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so.

7.    BROKERS.  Seller is represented Coldwell Banker and Keller Williams. Buyer is represented by Coldwell Banker Northern California. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property to the Brokers as follows: 1.25% to Coldwell Banker, 1.25% to Keller Williams and 2.5% to Coldwell Banker Northern California in connection with the closing of this sale. All such Brokers and agents are collectively referred to herein as the "Brokers." No commission or compensation shall be due or payable to Brokers in connection with this Agreement or sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder or other person entitled to any fee, commission or other compensation in connection with the Sale and Buyer shall indemnify, defend and protect and hold Seller and the related bankruptcy estate harmless of, from and against any claims, demands, actions, causes of action, losses, liabilities and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions or other compensation of

Page 3 of 9

245476X

any kind are hereafter asserted.

8. **MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (a) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the full Deposit shall be refunded to Buyer; or (b) make required repairs at the bankruptcy estate's expense; or (c) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the sale; or (d) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart 9(b), (c) or (d), Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property.

9. **REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Deposit (plus any increased thereof by Buyer). In the event Buyer fails to close the sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under Paragraphs 2 and 3, Buyer's Deposit (plus any increase, thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than three percent of the Purchase Price. This provision shall apply equally to the Deposit (and any increase, thereof by Buyer).

[Buyer's Initials]

10. **BANKRUPTCY COURT JURISDICTION.** The U.S. Bankruptcy Court for the Eastern District of California shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the United States of America including the Bankruptcy Code, Title 11, United States Code.

11. **"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.** Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Brokers and agents herein have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) value of the Property; (ii) income to be derived from the Property; (iii) suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) manner, quality, state of repair, or lack of repair of the

Page 4 of 9

245416X

Property; (vi) nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S. Code §§9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S. Code §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S. Code §§6901, et seq.), the Toxic Substance Control Act (15 U.S. Code §2601; et seq.), the Clean Water Act (33 U.S. Code §1251, et seq.), California Health and Safety Code §25117 or 25316), or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any Due Diligence materials or Preliminary Report regarding Title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter. Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Broker, has provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Broker shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

    12.    BROKERS.  Brokers and agents herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer.  In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Brokers or agents herein, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

    13.    OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.  Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property.  In

245416X

deciding to proceed with the sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller. Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor the Brokers and agents herein nor any other person has made or makes any representations as to the accuracy or completeness of such information. Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Brokers or agents from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation. NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER. Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

14.   PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.

A.   BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER. Seller and Brokers and agents herein strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

B.   Buyer shall select and employ, at Buyer's expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s) to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's

245416X

interests, in, on, or affecting the Property; and to approve or disapprove said inspection within the period and in the manner set forth in Paragraph 2.

C.      In the event Buyer is dissatisfied with the results of such inspection(s), Buyer may give written Notice of Cancellation to Seller strictly as and within the time provided in Paragraph 2. Buyer's failure to give such notice as and within the period specified therein shall conclusively be deemed Buyer's satisfaction and removal of such contingency and Buyer's election to proceed with the Sale.

15.     COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES. Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements or improvements except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

16.     WRITTEN AFFIRMATION OF SELLER REQUIRED. Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several Counter-Offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's Affirmation of Agreement attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, to negotiate or obtain financing, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

17.     ATTORNEYS' FEES. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

Page 7 of 9

245416X

18.   EXPIRATION OF COUNTER-OFFER.  This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller on or before close of business on October 1, 2009.  Such acceptance shall nevertheless be subject to Paragraph 16.


AGREED AND ACCEPTED:.

"BUYER"

Dated: 9/30/09

By:   Michael F. Rolzen and Nancy J. Rolzen

_Nancy J. Rolzen_

_(signature)_


"SELLER" (subject to Paragraph 16)

Dated: 9/29/2009

By: _(signature)_

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P. a California limited partnership, et al.

245416X

EXHIBIT "A"

### SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and rights any of overbidders. Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this agreement.

"SELLER"

Dated: 10 - 1 - 09

By: _____

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P., a California limited partnership, et al.

345416X

Addendum to contract for 4000 West Lake, FDL #14

1. During the inspection and due diligence period we have become aware of at least 2 very large additional assessments (apparently waiting until this unit is sold so they can collect the money from 22 rather than 21 or 20 owners) planned for repairs and necessary upkeep or structural necessities at FDL, and a third or fourth assessment that seems not be accounted for in the usual processes for nearby roof replacement and other repair necessities at FDL.

2. During the inspection period it was discovered that significant window hardware is missing for windows where the original manufacturer has ceased operations necessitating expensive customized parts be made to ensure seals and operation of the windows.

3. During Inspections significant additional resources and total replacement of some current systems and maybe much of duct work were deemed necessary to make heating, cooling and several other systems operational.

4. To account for these additional undisclosed costs, we will remove all contingencies but with a reduced sale price of $2.925 million, representing a reduction of a portion of anticipated immediate needs, costs, and imminent assessments.

Sincerely yours,   Michael F and Nancy J Roizen    October 23rd, 2009

Addendum to contract for 4000 West Lake FDL #14

1. During the inspection and due diligence period we have become aware of at least 2 very large additional assessments (apparently waiting until this unit is sold so they can collect the money from 22 rather than 21 or 20 owner's) planned for repairs and necessary upkeep or structural necessities at FDL and a third or fourth assessment that seems not be accounted for in the usual processes for nearby roof replacement and other repair necessities at FDL.

2. During the inspection period it was discovered that significant window hardware is missing for windows where the original manufacturer has ceased operations necessitating expensive customized parts be made to ensure seals and operation of the windows.

3. During Inspections significant additional resources and total replacement of some current systems and maybe much of duct work were deemed necessary to make heating, cooling and several other systems operational.

4. To account for these additional undisclosed costs, we will remove all contingencies but with a reduced sale price of $2.960 million, representing a reduction of a portion of anticipated immediate needs, costs, and imminent assessments.

Sincerely yours,   Michael F and Nancy J Roizen    October 23rd, 2009 with revision requested of October 28th, 2009

Antonia Delgado
Escrow Officer

Date: October 29, 2009
Escrow No.: 026660-AD

**AMENDED ESCROW INSTRUCTIONS**

Property Address:    4000 West Lake Boulevard Unit 14  Homewood, CA  96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS
FOLLOWS:

(1)    The parties are aware and acknowledge that the purchase price has been reduced from
$3,050,000.00 to $2,960,000.00, for subject property.  Escrow Holder is therefore authorized and
instructed to instruct **Lawyers Title Company** to issue a CLTA policy of title insurance with a
liability of $2,960,000.00 NOT $3,050,000.00 as previously instructed.

(2)    The Documentary Transfer Tax on the Quitclaim Deed is hereby amended to be in the amount of
$3,256.00, rather than $3,355.00 as previously stated, and same shall be paid at the close of
escrow from funds held in Seller's account.

(3)    Buyer hereby removes and approves all of Buyer's contingencies in this escrow.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

SELLERS:                                        BUYERS:

Bradley D. Sharp, solely in his capacity as Chapter    _____
11 Trustee for the Bankruptcy of SK Foods, L.P.    Michael F. Roizen

BY: _____        _____
      Bradley D. Sharp, solely in his capacity as        Nancy J. Roizen
      Chapter 11 Trustee



NETTIE BECKER
ESCROW INC.

301 North Canon Drive • Beverly Hills, CA 90210
Phone: (310) 275-4042 • Fax: (310) 275-1219

Antonia Delgado
Escrow Officer

Date: October 29, 2009
Escrow No.: 026860-AD

AMENDED ESCROW INSTRUCTIONS

Property Address:     4000 West Lake Boulevard Unit 14  Homewood, CA  96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

(1)     The parties are aware and acknowledge that the purchase price has been reduced from $3,050,000.00 to $2,960,000.00, for subject property.  Escrow Holder is therefore authorized and instructed to instruct Lawyers Title Company to issue a CLTA policy of title insurance with a liability of $2,960,000.00 NOT $3,050,000.00 as previously instructed.

(2)     The Documentary Transfer Tax on the Quitclaim Deed is hereby amended to be in the amount of $3,256.00, rather than $3,355.00 as previously stated, and same shall be paid at the close of escrow from funds held in Seller's account.

(3)     Buyer hereby removes and approves all of Buyer's contingencies in this escrow.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

**BUYERS:**

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for the Bankruptcy of SK Foods, L.P.

Michael F. Roizen

BY:

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee

Nancy J. Roizen



301 North Canon Drive • Beverly Hills, CA 90210
Phone:  (310) 275-4042 • Fax:  (310) 275-1219

Antonia Delgado
Escrow Officer

Date: October 14, 2009
Escrow No.: 026660-AD

AMENDED ESCROW INSTRUCTIONS

Property Address:     4000 West Lake Boulevard Unit 14 Homewood, CA 96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

The Buyer's Inspection Contingency date is hereby extended to October 24, 2009.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**                                         **BUYERS:**

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.        _____
                                                       Michael F. Roizen
BY: _____
     Bradley D. Sharp, solely in his capacity as       _____
     Chapter 11 Trustee                                Nancy J. Roizen



Antonia Delgado                                          Date: October 29, 2009
Escrow Officer                              Escrow No.:      026660-AD

Property Address:        4000 West Lake Boulevard Unit 14  Homewood, CA  96141

<u>REVISED</u> INSTRUCTIONS TO PAY COMMISSION
**THESE COMMISSION INSTRUCTIONS SUPERCEDE AND CANCEL COMMISSION INSTRUCTIONS
DATED OCTOBER 6, 2009.**

At the close of your above-numbered escrow, you are authorized and instructed to pay the following:

| | | |
|---|---|---|
| Pay Commission to | Coldwell Banker<br>5450 Lincoln Blvd.<br>Playa Vista, CA  90094<br>Agent: Bill Friedman | $37,000.00 |
| Pay Commission to | Keller Williams<br>10059 Palisades Drive, No. 1<br>Trucke, CA  96161<br>Agent: Anita Noble | $37,000.00 |
| Pay Commission to | Coldwell Banker Northern<br>California<br>PO Box 123<br>Tahoe City, CA  96145<br>Agent: Bruce Ells | $74,000.00 |

TOTAL COMMISSION                                           $148,000.00

This instruction irrevocably assigns the above stated commission to the above named Broker(s).  This
instruction may not be amended or revoked without the written consent of the Broker(s) hereinabove
named.

**SELLERS:**

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.

BY: _____
    Bradley D. Sharp, solely in his capacity as
    Chapter 11 Trustee



301 North Canon Drive • Beverly Hills, CA 90210
Phone: (310) 275-4042 • Fax: (310) 275-1219

**SALE ESCROW INSTRUCTIONS**                                    **Escrow No.: 026660-AD**
Antonia Delgado, Escrow Officer                                 · DATE: October 1, 2009

Buyer will hand NETTIE BECKER ESCROW, INC.
initial deposit in the amount of _____ 91,500.00
Buyer will WIRE TRANSFER or hand you a CASHIER'S CHECK Payable to
Nettie Becker Escrow, Inc. THREE BUSINESS DAYS PRIOR TO THE CLOSE OF
ESCROW DATE PLUS ANY CLOSING COSTS AND/OR ADJUSTMENTS _____ 2,958,500.00

_Total Consideration_____ **$3,050,000.00**

Close of escrow to be ELEVEN (11) DAYS AFTER THE ENTRY IN BANKRUPTCY COURT DOCKET, OF THE ORDER
CONFIRMING SALE BUT IN NO EVENT LATER THAN NOVEMBER 16, 2009 (or sooner, if mutually agreed in writing).

Buyer shall hand you or cause to be handed you $3,050,000.00, $91,500.00 of which has been deposited by Buyer. The
balance of funds due, plus any closing costs and/or prorations shall be deposited THREE (3) business days prior to close
of escrow in form of a locally clearing cashier's check or one business day prior to closing via federal wire transfer.

BUYER UNDERSTANDS AND AGREES THAT ANY AND ALL DEPOSITS MADE TO ESCROW, OTHER THAN VIA
CASHIER'S CHECK OR WIRE TRANSFER, REQUIRE THAT FUNDS HAVE CLEARED (I.E., A COPY OF THE
CANCELLED CHECK FRONT AND BACK AND/OR BANK STATEMENT). BUYER HEREBY AGREES TO FURNISH
SUCH PROOF PRIOR TO THE CLOSE OF ESCROW. ALL OTHER FUNDS SUCH AS PERSONAL, CORPORATE OR
PARTNERSHIP CHECKS AND DRAFTS ARE SUBJECT TO MANDATORY HOLDING PERIODS WHICH MAY CAUSE
MATERIAL DELAYS IN DISBURSEMENT OF FUNDS IN THIS ESCROW.  IN ORDER TO AVOID DELAYS, ALL
FUNDINGS SHOULD BE WIRE TRANSFERRED.  OUTGOING WIRE TRANSFERS WILL NOT BE AUTHORIZED
UNTIL CONFIRMATION OF THE RESPECTIVE INCOMING WIRE TRANSFER OR OF AVAILABILITY OF DEPOSITED
CHECKS.

Seller will hand you a QUITCLAIM DEED, and Buyer and Seller will deliver to you all additional funds and documents
required of them, respectively, to enable you to comply with these instructions, all of which you are authorized to use or
deliver provided all provisions and conditions of this escrow have been complied with before the date set forth above, and
you hold in this escrow money and documents deliverable under these instructions and can obtain a standard CLTA
Standard Owners policy of title insurance from Lawyers Title Company in the issuing title company's usual form and with
the title company's usual exceptions, with a liability of $3,050,000.00, covering real property in the City of Homewood in
the County of Placer, State of California, via:

LEGAL DESCRIPTION TO BE PROVIDED BY INSURING TITLE COMPANY. Seller's execution of the Quitclaim Deed
and Buyer's approval of the Preliminary Title Report shall constitute full approval thereof.

Buyer and Seller state that the property is commonly known as: 4000 W. Lake Blvd., Unit #14, Homewood, CA 96141
No verification of said address shall be required of Escrow Holder and Escrow Holder shall have no responsibility nor
liability regarding same.

SHOWING TITLE VESTED IN:  Michael F. Rolzen and Nancy J. Rolzen (exact vesting to be furnished in writing as soon
as possible to provide for the drawing of necessary documents)

SUBJECT ONLY TO:

(1)    All General and special Taxes for the fiscal year 2009 and 2010, including bonds, special assessments and
       personal property taxes, if any, assessed against former owner, and/or supplemental taxes assessed pursuant to
       the provisions of Chapter 498, Statutes of 1983 of the State of California. (Change of Ownership will affect the

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.          Michael F. Rolzen _____

BY: _____
       Bradley D. Sharp, solely in his capacity as Chapter 11   Nancy J. Rolzen
       Trustee



301 North Canon Drive • Beverly Hills, CA 90210
Phone: (310) 275-4042 • Fax: (310) 275-1219

Date: October 1, 2009                                                Escrow No.: 026660-AD

Page 2 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

taxes to be paid.   A Supplemental Tax Bill will be issued and BUYER accepts all responsibility for all additional taxes due because of said reassessment. TAX BILLS ISSUED AFTER THE CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYERS AND SELLERS.)

(2)     Covenants, conditions, restrictions, reservations, rights, rights of way, and easements, and any oil, gas, or mineral reservations now of record, if any.

THIS ESCROW IS ESTABLISHED FOR THE PURPOSE OF IMPLEMENTING THE TERMS AND PROVISIONS OF THAT CERTAIN NINE (9) PAGE COUNTER OFFER, dated as of SEPTEMBER 30, 2009 (hereinafter referred to as the "Agreement"), by and between Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for the Bankruptcy of SK Foods, L.P. as Seller (hereinafter "Seller"), and Michael F. Roizen and Nancy J. Roizen as Buyer (hereinafter "Buyer").  BUYER AND SELLER ACKNOWLEDGE THAT THE ACCEPTANCE DATE OF THIS ESCROW IS SEPTEMBER 30, 2009.  THE FOREGOING AGREEMENT TOGETHER WITH OTHER MUTUAL INSTRUCTIONS ARE MADE A PART HEREOF.

These escrow instructions are not intended to alter, modify or supersede the Agreement unless specifically stated herein and only to the extent necessary to conform to the practices and governing regulations of Escrow Holder. In the event of a conflict between these instructions as prepared by Escrow Holder and the Agreement, as to the rights, duties and obligations of the parties to this escrow, the Agreement shall prevail and control; however, as to the duties, rights and obligations of Escrow Holder, these escrow instructions shall be deemed to prevail and control.

Escrow Holder shall perform only those acts and duties which fall under the purview of escrow as practiced in this geographical area and as permitted under the rules and regulations of the California Department of Corporations governing their escrow licensees. Any provisions of the Agreement which consist primarily of agreements between Buyer and Seller regarding matters or occurrences that do not fall within the ordinary or customary duties or functions of an Escrow Holder, including but not limited to post-closing adjustments (if any), or which constitute warranties or representations from one party to another, shall not be considered to be a part of these Escrow Instructions and Escrow Holder shall not be concerned with nor liable for same in any way whatsoever, whether or not such provisions are specifically enumerated in the following instructions as matters of memorandum or matters with which Escrow Holder shall specifically not be concerned; these items include but are not limited to:

Seller is aware that interest on the existing loan(s) does not stop accruing at close of escrow, but continues until the actual day of receipt of the payoff by Lender. Seller is aware that interest will accrue through weekends and holidays. Seller is aware he/she/they are responsible for payment of all of such interest and will indemnify and hold Escrow Holder harmless in connection with the payment of such interest.

MAKE THE FOLLOWING PRORATIONS, ADJUSTMENTS AND CHARGES:  Prorate as of Close of Escrow
Real Property Taxes as of Close of Escrow. (See Item #16 of General Provisions)

(3)     Charge to Seller and pay from funds held for Seller's account in this escrow:

a.      Policy of title insurance.
b.      Documentary Transfer Tax in the amount of $3,355.00.
c.      Pay broker's commission, if any, as authorized by Seller by separate instructions attached hereto and made a part hereof.
d.      Regardless of consummation of this escrow, Seller agrees to pay on demand charges and expenses incurred by you for Seller, including offset statements and/or beneficiary statements and/or demands, filling in, notarizing and recording any documents necessary on Seller's part, transfer of the insurance if pro-rated, and Seller's portion of escrow fee as charged.
e.      The amount of any bond or assessment which is now a lien.
f.      Payments on Mello-roos and other Special Assessment bond and assessments which are now a lien shall be paid current by Seller; payments that are not yet due shall be assumed by Buyer without credit toward the purchase price.

(4)     Charge to Buyer and pay from funds held for Buyer's account in this escrow:

a.      Regardless of consummation of this escrow, Buyer agrees to pay on demand charges and expenses incurred by you for Buyer, including recording deed, mortgage clause on insurance, filling in, notarizing and recording Trust Deed and other documents necessary on Buyer's part, and Buyer's portion of escrow fee as charged.
b.      If the Seller is the beneficiary of any Note and Trust Deed created herein, you are instructed to order "H" type tax service for the terms of the loan and to record a Request for Notice in favor of Seller.
c.      Insurance premium on new policy to be obtained by Buyer if Buyer causes same to be deposited into escrow for payment.

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.                    _____
                                                                Michael F. Roizen

BY: _____                             _____
    Bradley D. Sharp, solely in his capacity as Chapter 11      Nancy J. Roizen
    Trustee

Date: October 1, 2009                                                      Escrow No.: 026680-AD

Page 3 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

**OTHER COSTS:**

    a.    SELLER shall pay for zone disclosure reports, if any to be issued by Property ID.

**ALL CONTINGENCIES IN THIS ESCROW SHALL BE REMOVED BY THE PASSIVE METHOD, WHICH SILENCE DEEMS APPROVAL.**

(5)    Buyer hereby acknowledges that compliance with all applicable city ordinances shall be handled <u>OUTSIDE OF ESCROW</u> and that Escrow Holder is hereby held free and harmless from any/all liability and/or responsibility in connection therewith. If local ordinance requires that the property be brought in compliance with minimum retrofitting standards including but not limited to energy conservation, smoke detectors, seismic automatic gas shut-off valve, water heater bracing and/or low-flush toilet standards as a condition of sale or transfer, Buyer shall comply with and pay for these requirements. Buyer hereby relieves Nettie Becker Escrow, Inc., Real Estate Brokers and their agents, and Seller of any and all liability in connection therewith.

(6)    Buyer waives the right to be presented with a report of Resident Property Records issued by the City of Homewood on the subject property at the close of escrow. Should Buyer request said Report it shall be buyer's responsibility to order said report <u>OUTSIDE OF ESCROW</u>. Further, it shall be buyer's responsibility to comply with any city ordinance regarding same as buyer is purchasing the property in AS IS condition. Buyer instructs Escrow Holder not to be concerned with said report and parties indemnify and holds Escrow Holder harmless with respect to same.

(7)    Buyer hereby waives the requirements of a professional termite inspection of the subject property. Buyer is aware that no termite inspection report or termite certificate of completion shall be provided through this escrow. Buyer acknowledge that there may be termite infestation in the property not known to or discovered by the Seller and Brokers and therefore not disclosed to Buyer, and/all of which might be discovered in a professional termite inspection. Buyer hereby indemnifies an holds harmless Seller, Brokers, and Escrow Holder, herein from any costs, expense, damage, or liability, including attorney's fees, incurred by Buyer as a result of not having a professional termite inspection of subject property and completing this transaction without said inspection report or completion certificate.

(8)    Buyer is aware that Seller states that Seller is exempt from completing any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding law, if required. Buyer hereby holds Seller, Brokers and their Agents, and Escrow Holder free and harmless from any and all liability and/or responsibility in connection therewith.

(9)    Buyer and Seller shall deliver these signed Escrow Instructions to Escrow Holder within five (5) business days from receipt of same.

**DEED WILL PROVIDE:** "After recordation, mail deed and tax statement to the following address: **address to be provided by Buyer through escrow.**

The parties herein are aware that prior to close of escrow and recordation of any documents, we must be able to confirm that any check deposited with us for closing has been paid by the issuing institution so that we can comply with the requirements of AB 512 and the Department of Corporations regulations prohibiting us from closing escrow and disbursing funds at closing to Sellers, Brokers, Lenders, Title Companies and others if any if those funds are "uncollected" at the time of closing, despite what your bank or savings institution may tell you, a stop payment may be placed on a Cashier's Check or Savings & Loan Check.

In the event this escrow does not record at 8:00 A.M., but does record during the same calendar day as a "Special Recording" at a later hour, the undersigned Seller acknowledges that funds may not be available for disbursement until the following business day, therefore, Seller will continue paying interest on such loans until they are so paid, unless Escrow Holder receives written instructions to the contrary, should recordation at 8:00 A.M. not be available. Escrow Holder shall proceed with the consummation and recordation of this transaction as such "Special Recording".

---

Bradley D. Sharp, solely in his capacity as Chapter 11          Michael F. Rolzen
Trustee for the Bankruptcy of SK Foods, L.P.          _____

BY:

    Bradley D. Sharp, solely in his capacity as Chapter 11          Nancy J. Rolzen
    Trustee

Date: October 1, 2009                                      Escrow No.: 026660-AD

Page 4 of 5: Additional Instructions made a part of previous pages as fully incorporated therein.

### GENERAL PROVISIONS

**YOU ARE FURTHER INSTRUCTED AS FOLLOWS:**

1. Time is of the essence with these and all additional amended instructions. If this escrow is not in condition to close on or before the date specified for the close of escrow, any party who has fully complied with his instructions may demand in writing the return of his money, documents and/or property provided said document is received subsequent to the date designated as close of escrow and prior to any transmission by you of irrevocable authority to record any instrument provided for herein. Upon receipt of such demand, you shall mail copies to all other parties at their respective addresses shown in the escrow instructions and the party receiving notice shall have five (5) days from mailing date within which to comply. Should the parties fail to comply, Escrow Holder is authorized to, at Escrow Holder's sole discretion, interplead all funds. If no such demand is made, you are to close the escrow as soon as the conditions (except as to time) have been met.

2. You shall make payments to or for, or deliver documents to or for any party only if in your exclusive judgement such payment or delivery may be made without you incurring any liability, and you shall have no obligation to pay any costs or charges for the account of any party hereto, except from funds deposited by the party to be charged. As a condition to close of escrow, you may require that all interested parties approve in writing the final documents and instruments to be delivered hereunder. All disbursements are to be made by your check, and you are to deliver all checks and documents to the parties entitled thereto. You may use regular mail to the parties' respective addresses shown herein. Recordation of any instrument delivered through this escrow, if necessary or proper in the issuance of the requested policy of title insurance, is authorized. Instruct the county recorder to mail recorded instruments to the parties entitled thereto.

3. Deposit all funds in connection with this transaction in an "Escrow Fund Account" with any local bank without liability for interest.

4. If any party to these instructions applies for a loan on the property which is the subject of this escrow, you are authorized to furnish the prospective lender any information it requests concerning this escrow.

5. Order title search immediately. Unless otherwise indicated, you are authorized to obtain a policy of title insurance through any title insurance company authorized to do business in the county in which the above described property is located.

6. Execute on behalf of the parties hereto assignments of interest in any insurance policy to be assigned to Buyer herein and forward said assignments upon close of escrow to either the agent or the insurance company, at your option, requesting the insurer to consent to such transfer, to make such other additions or corrections specifically required, if any, and to forward such policies to the parties entitled thereto. Execution and forwarding of such form assignments are your only responsibility in connection with any insurance policies called for in this escrow. Seller warrants, and you may assume, the premiums on any such policies being assigned herein have been paid in full, and that the policies have not been hypothecated and are assignable.

7. Seller authorizes you, out of the proceeds accruing to Seller, to pay, at the close of escrow, all brokers' commissions hereinafter authorized by Seller, as well as any encumbrances necessary to place title in condition called for in these instructions including any prepayment penalty charged.

8. The parties hereto, jointly and severally, agree to pay all costs, damages, judgements and expenses, including reasonable attorney's fees suffered or incurred by you in connection with or arising out of this escrow. You shall have a first lien on the property and papers held under this escrow for such compensation and expenses.

9. If conflicting demands are made or notices served upon you with respect to this escrow, the parties hereto agree that you shall be entitled to refuse to comply with any such claim or demand and to withhold and stop all further proceedings in and performance of this escrow so long as such disagreement shall continue. In doing, you shall not be or become liable for any damage or interest to the undersigned or any person. You shall be entitled to continue so to retain and refuse to act until:

   a. The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and/or the money, papers, and property involved herein or affected hereby; and/or

   b. All difference shall have been adjusted by mutual agreement, and you shall have been notified thereof in writing signed by all the persons interested.

10. You are authorized to deliver copies of all instructions and closing statements in this escrow to the real estate broker, any lender, lender's agent, FHA or VA, upon their request.

11. This escrow affords no protection against possible claims under conditional sales contracts, if any, affecting the property acquired or any fixtures or equipment in connection therewith.

12. Buyer and/or Seller authorize Escrow Holder to disclose information as required by State or federal law.

13. The parties to this escrow have satisfied themselves outside of escrow that the transaction covered by this escrow is not in violation of the Subdivision Map Act or any other law regulating land division or any State or Federal usury laws, and you as Escrow Holder, are relieved of all responsibility and/or liability in connection therewith, and are not to be concerned with the enforcement of said laws.

14. You act hereunder as a depository only and are not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with you hereunder, or with respect to form or execution of the same, or the identity, authority, or rights of any person executing or depositing the same. You are neither a party to, nor bound by, any agreement which may be deposited under, evidenced by, or arise out of this escrow.

15. You shall have no responsibility of notifying any of the parties to this escrow of any sale, resale, loan, exchange, or other transaction involving any property herein described or of any profit realized by any person, firm or corporation (broker, agent and parties to this and/or other escrow included) on connection therewith, regardless of the fact that such transaction(s) may be handled by you in this escrow or in any other escrow.

16. Buyer acknowledges that it is Buyers responsibility to obtain fire insurance on subject property. Escrow Holder shall have no obligation and/or liability in connection with the issuance of fire insurance.

17. In the event Buyer obtains new fire insurance and causes same to be deposited into escrow, Buyer instructs Escrow Holder to pay fire insurance premium to agent of insurance company at the close of escrow from funds handed you by said Buyer.

18. You are to cause no examination to be made of state, county or city taxes and/or assessments, either real or personal, but are to base the adjustment exclusively on the fiscal year amounts shown on the preliminary title report to be obtained herein, including all items shown except personal property taxes and taxes on property not conveyed through this escrow. Seller agrees to pay, outside of escrow and before delinquency, all taxes on personal and/or real property not conveyed through this escrow, which appear as a lien on the property affected hereby and you are not to be concerned therewith. In the event that the Buyer received a supplemental tax bill after close of escrow, covering a period of time when Seller owned subject property, Buyer and Seller will make any necessary adjustments outside of escrow.

19. These instructions may be executed in counterparts, each of which so executed shall be deemed an original, irrespective


Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.              Michael F. Rolzen

BY: _____
    Bradley D. Sharp, solely in his capacity as Chapter 11     Nancy J. Rolzen
    Trustee

Date: October 1, 2009                                    Escrow No.: 026660-AD

Page 5 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

of the date of its execution and delivery, and said counterparts together shall constitute one and the same instruments. Facsimile signatures shall be deemed original signatures.

    20.    All parties hereto understand and agree that these instructions, duly executed by the parties hereto, become effective only when they have been deposited with and accepted by you. You have the right to destroy these instructions and papers related to this escrow after five years from date of last activity.

    21.    No notice or demand shall be effective unless IN WRITING, no change of instructions shall be effective unless IN WRITING and SIGNED by all parties to this escrow. No such writings will be effective unless given to the escrow officer of Nettie Becker Escrow, Inc..

    22.    The opening date of escrow shall be deemed the date when Escrow Holder is in receipt of mutually executed escrow instructions.

    23.    CLOSE OF ESCROW MEANS THE DATE AND TIME THIS INSTRUMENT TO BE RECORDED HEREUNDER HAS BEEN RECORDED, MAKE ADJUSTMENTS ON THE BASIS OF A THIRTY DAY MONTH.

    24.    Escrow Holder is not responsible and/or liable for any omissions or irregularities in the escrow instructions, any amendments thereto and/or in the Purchase Contract or any other contract between the parties hereto.

    25.    In the event of the non-completion of this escrow for any reason whatsoever, including without limitation the cancellation or purported cancellation of the escrow by either party and notwithstanding the concurrence or non-concurrence by the other party with such cancellation, and the resultant obligation or advisability of the Escrow Holder to continue to hold undistributed the funds then on deposit in said escrow, then the Escrow Holder may at its option withdraw from said funds so held and pay to itself a holding fee of $25.00 for each calendar month, or fraction thereof, that said funds are retained in escrow, not exceeding, however, the whole of such withheld funds.

    26.    Nettie Becker Escrow, Inc. is licensed by the Department of Corporations, State of California: said license is dated March 15, 1979 and is numbered 9630802.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ, UNDERSTOOD AND AGREED TO THE TERMS, PROVISIONS AND CONDITIONS CONTAINED ABOVE AND ON THE LAST PAGE HEREOF.

SELLERS:                                                  BUYERS:

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.             Michael F. Rolzen

BY: _____                          _____
      Bradley D. Sharp, solely in his capacity as Chapter 11     Nancy J. Rolzen
      Trustee

# Exhibit B

**SELLER'S ESTIMATED NET PROCEEDS**

| | |
|---|---|
| **PROPERTY:** | 4000 West Lake Boulevard Unit 14 |
| | Homewood, CA 96141 |
| **SELLER:** | Bradley D. Sharp, solely in his capacity |
| | as Chapter 11 Trustee for the |
| | Bankruptcy of SK Foods, L.P. |

| | |
|---|---|
| **DATE:** | November 3, 2009 |
| **CLOSING DATE:** | |
| **ESCROW NO.:** | 026660-AD |

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 2,960,000.00 |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| Taxes at $16925.56/semi-annually from 11/13/2009 to 01/01/2010 | | 4,513.48 |
| HOA at $3800.00/monthly from 11/13/2009 to 12/01/2009 | | 2,280.00 |
| | | |
| **COMMISSION CHARGES** | | |
| Coldwell Banker | 37,000.00 | |
| Coldwell Banker Northern California | 74,000.00 | |
| Keller Williams | 37,000.00 | |
| | | |
| **H.O.A./MANAGEMENT** | | |
| Dues thru 11-30-09 to Fleur Du Lac Estates Association | 31,022.94 | |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Property I.D. Property Disclosure Report | 99.00 | |
| Archive IT! Escrow File Storage Fee | 25.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Lawyers Title Company** | | |
| Owners Title Policy Fee | 5,200.00 | |
| Sub Escrow Fee | 75.00 | |
| Title Company Wire Fee | 25.00 | |
| Miscellaneous Recording Fees | 100.00 | |
| Documentary Transfer Tax | 3,256.00 | |
| Delinquent Taxes | 19,123.53 | |
| 1st 1/2 Taxes 2009-10 | 16,925.56 | |
| Suppl 2008-09 Taxes | 358.46 | |
| | | |
| **ESCROW CHARGES - Nettie Becker Escrow, Inc.** | | |
| Escrow Fee | 4,440.00 | |
| Drawing Grant Deed | 75.00 | |
| Messenger Fee/FedEx Fee | 50.00 | |
| Wire Fee | 25.00 | |
| | | |
| Net Proceeds | 2,737,992.99 | |
| | | |
| **TOTAL** | $ 2,966,793.48 | $ 2,966,793.48 |

**THIS IS AN ESTIMATE ONLY AND FIGURES ARE SUBJECT TO CHANGE**

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.

BY: _____
    Bradley D. Sharp, solely in his capacity as
    Chapter 11 Trustee



# Exhibit C



**Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

NETTIE BECKER ESCROW
301 N CANNON DR
BEVERLY HILLS, CA 90210

Attn: ANTONIA DELGADO

Title Officer: Cindy Markovich/ Ralph Mason--(L)
email: TU05@ltic.com
Phone No.: (818) 252-6016
Fax No.: (818) 252-6018
File No.: 79050348

Your Reference No: 26660-ad

Property Address:    4000 West Lake Boulevard Unit 14, Homewood, California

---

# PRELIMINARY REPORT

Dated as of September 21, 2009  at 7:30 a.m.

In response to the above referenced application for a policy of title insurance, Lawyers Los Angeles hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the Policy forms should be read. They are available from the office which issued this report.

*Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.*

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

File No: 79050348

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

CLTA Homeowner's Policy of Title Insurance

The estate or interest in the land hereinafter described or referred to covered by this report is:

A CONDOMINIUM, as defined in Section 783 of the California Civil code, in fee

Title to said estate or interest at the date hereof is vested in:

SK Foods Limited Partnership, a California Limited partnership

The land referred to herein is situated in the County of Placer, State of California, and is described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

File No: 79050348

# EXHIBIT "A"

All that certain real property situated in the County of Placer, State of California, described as follows:

PARCEL ONE:

An undivided 1/22nd interest in and to Lot 1 of "Amended Tract No. 248, Fleur Du Lac Estates" as shown and designated on the Map recorded February 22, 1980, in Book "M" of Maps, at Page 68 Official Records of Placer County.

Excepting therefrom Units 1 through 22 as shown on the Condominium Plan recorded in Book 2503 at Page 426 of Official Records

PARCEL TWO:

Unit 14 as shown on the Condominium Plan referred to in Parcel One.

Assessor's Parcel No.:   085-400-027

Page 3

File No:  79050348

# SCHEDULE B – Section A

The following exceptions will appear in policies when providing standard coverage as outlined below:

1.  (a)   Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a)   Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

File No: 79050348

# SCHEDULE B – Section B

At the date hereof Exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

A.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, to be levied for the fiscal year 2009 – 2010 which are a lien not yet payable.

B.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, for the fiscal year 2009 - 2010.

| | |
|---|---|
| 1st Installment: | $16,925.56 This amount is valid until December 10, after which penalties apply |
| Penalty: | $1,692.55 Due with installment amount if paid after December 10 |
| 2nd Installment: | $16,925.56 This amount is valid until April 10, after which penalties apply |
| Penalty (including cost): | $1,712.55 Due with installment amount if paid after April 10 |
| Land Value | $1,240,000.00 |
| Improvement Value: | $1,860,000.00 |
| Exemption: | $0 |
| Code Area: | n/a |
| Assessment No.: | 085-400-027 |

C.  Supplemental taxes, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code, of the State of California, for the fiscal year 2008-2009.

| | |
|---|---|
| 1st Installment: | $179.23 |
| Penalty: | $17.92 |
| All due and payable | December 10, 2009, delinquent December 10, 2009 |
| 2nd Installment: | $179.23 |
| Penalty: | $27.92 |
| All due and payable | April 10, 2010, delinquent April 10, 2010 |
| Supplemental Bill No: | 085-400-027 |

D.  Said property has been declared Tax-Defaulted for non-payment of delinquent property taxes for the fiscal year 2008 - 2009.

Amount to redeem by October 31, 2009 for the above-stated year (and subsequent years, if any) is $18,879.72.

Amount to redeem by November 30, 2009 for the above-stated year (and subsequent years, if any) is $19,123.53.

E.  Supplemental or escaped assessments of property taxes, if any, assessed pursuant to the Revenue and Taxation Code of the State of California.

1.  Any taxes, assessments or charges levied by the following agency.   Amounts due, if any may be ascertained by contacting the agency.

| | |
|---|---|
| Tahoe-Truckee Sanitation Agency: | 530 587-2525 |
| Tahoe City Public Utility District: | 530 583-3796 |

2.  Claims or rights of the public, State of California and the United States of America to any portion of said land which is claimed to have been at the time below the highest water line of Lake Tahoe.

3.  Any change in the location the high water line of Lake Tahoe due to the right of the United States of America to raise and lower the level of Lake Tahoe.

4.  Any adverse claim based upon the assertion that:

    (a)   Said land or any part thereof is now or at any time has been below the highest of the high watermarks of the river hereinafter mentioned, in the event the boundary of said river has been artificially raised or is now or at any time has been below the high watermark, if said river is in its natural state.
    (b)   Some portion of said land has been created by artificial means or has accreted to such portion so created.
    (c)   Some portion of said land has been brought within the boundaries thereof by an avulsive movement of the river, or has been formed by accretion to any such portion.
    Name of Lake:                        Lake Tahoe

5.  Any rights in favor of the public which may exist on said land if said land or portions thereof were at any time used by the public.

6.  An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:                          Henry J. Kaiser Company
    Purpose:                             Light, Air, Unobstructed View
    Recorded:                            March 15, 1962, Book 911 Page 60 of Official Records
    Affects:                             as set forth in said document.

7.  All easements, offers and dedications as shown on the Official Map,

    Tract of:                            Amended Tract No. 248 – Fleur Declaration Lac Estates

8.  Covenants, conditions and restrictions as set forth in the document
    Recorded:                            March 27, 1981, Book 2371, Page 261 of Official Records

    This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

9.  Covenants, conditions and restrictions as set forth in the document
    Recorded:                            June 8, 1981, Book 2398, Page 155 of Official Records

    This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

10. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:                          Sierra Pacific Power Company
    Purpose:                             Electrical and communication facilities
    Recorded:                            February 17, 1983, Book 2565, Page 245 of Official Records
    Affects:                             common area

11. Easement, for ingress, egress, pipeline, or public utilities, and incidental purposes, as disclosed by instruments of record, affecting only the "Common Area."

12. The matters contained in a document entitled **"Encroachment Agreement "** recorded June 26, 1985, Book 2841 Page 535 of Official Records.

    Reference is made to said document for full particulars.

Page 6

File No: 79050348

13. A declaration of covenants, conditions and restrictions which, among other things, may contain or provide for easements; liens and the subordination thereof; and restrictions on partition and severability of component interest.
    Recorded:                  June 5, 2006, as Instrument No. 2006-0060218 of Official Records

    NOTE: This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

    Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

    Said instrument also provides for the levy of assessments, the liens of which are stated to be subordinate to the lien of a first mortgage or first deed of trust made in good faith and for value.

14. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

    | | |
    |---|---|
    | Amount: | $1,350,000.00 |
    | Dated: | August 21, 2008 |
    | Trustor: | Gerard Rose, trustee of the CGS 2007 Trust |
    | Trustee: | Stewart Title of Sacramento, a California Corporation |
    | Beneficiary: | SK Foods Limited Partnership, a California Limited Partnership |
    | Recorded: | November 4, 2008 as Instrument No. 2008-0085788-00 of Official Records |
    | Loan No.: | not set out |

    If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

15. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

    | | |
    |---|---|
    | Amount: | $1,360,000.00 |
    | Dated: | August 21, 2008 |
    | Trustor: | Gerard Rose, trustee of the SAS 2007 Trust |
    | Trustee: | Stewart Title of Sacramento, a California Corporation |
    | Beneficiary: | SK Foods, Limited Partnership a California Limited Partnership |
    | Recorded: | November 4, 2008 as Instrument No. 2008-0085790 of Official Records |
    | Loan No.: | not set out |

    If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

File No: 79050348

16. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

| | |
|---|---|
| Amount: | $125,000,000.00 |
| Dated: | March 24, 2009 |
| Trustor: | SK Foods Limited Partnership, a California Limited Partnership |
| Trustee: | First American Title Company, a California Corporation |
| Beneficiary: | Bank of Montreal, a Canadian chartered bank |
| Recorded: | March 26, 2009 as Instrument No. 2009-0024080-00 of Official Records |
| Loan No.: | not set out |

Said deed of trust recites that it secures a line of credit. If the line of credit is to be paid off in this transaction, this Company will require that the written demand for payment state that the line of credit has been frozen and that the demand is not subject to increase for any additional advances or draws. Accordingly, it is recommended that any request for a payoff demand statement advise the beneficiary of our requirement, and that the request be accompanied by: the borrower's written request to freeze the line of credit, the surrender of any unused checks or drafts, and anything else that may be required by the lender in order to issue an unconditional demand.

**END OF SCHEDULE B EXCEPTIONS**

**PLEASE REFER TO THE "NOTES AND REQUIREMENTS SECTION" WHICH FOLLOWS FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION**

File No: 79050348

# REQUIREMENTS SECTION:

Req. No. 1:    The Company will require a statement of information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matters which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

      Parties:       Buyers and/or Sellers

Req. No. 2:    The Company will require that it be provided with the following with respect to the California limited liability company named below:
      A.      A copy of its operating agreement and any amendments thereto;
      B.      A certified copy of its articles of organization (LLC-1), any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles or organization (LLC-10); and
      C.      A copy of the current Statement of Information form (LLC-12) filed with the Secretary of State.

      Limited Liability Company:      SK Foods Limited Partnership

Req. No. 3:    The Company will require that it be furnished a written statement from the Homeowners' Association of which said property owner is a member, which will provide that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

File No:  79050348

# INFORMATIONAL NOTES SECTION

Note No. 1:    The information on the attached plat is provided for your convenience as a guide to the general location of the subject property.  The accuracy of this plat is not guaranteed, nor is it a part of any policy, report or guarantee to which it may be attached.

Note No. 2:    California Insurance code section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement. Funds deposited with the company by wire transfer may be disbursed upon receipt. Funds deposited with the company via cashier's check or teller's check drawn on a California based bank may be disbursed on the next business day after the day of deposit. If funds are deposited with the company by other methods, recording and/or disbursement may be delayed.  All escrow and sub-escrow funds received by the company will be deposited with other escrow funds in one or more non-interest bearing escrow accounts of the company in a financial institution selected by the company. The company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with such financial institution, and the company shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by the company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the company or its parent company and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the company for its services in connection with the escrow or sub-escrow.

**WIRING INSTRUCTIONS FOR THIS OFFICE ARE:**

**Comerica Bank
2321 Rosecrans Ave, 5th floor
El Segundo, CA 90245-4903**

**ABA # 121137522
CREDIT TO:  Lawyers Los Angeles
ACCOUNT #: 1893992436**

**RE:    79050348**

**PLEASE INDICATE Lawyers Los Angeles TITLE ORDER NUMBER**

Note No. 3:    The charges which the company will make for next day messenger services (i.e. Federal Express, UPS, DHL, Airborne, Express mail, etc.) are $15.00 per letter, standard overnight service, and $25.00 for larger size packages and/or priority delivery services.  Such charges include the cost of such messenger service and the company's expenses for arranging such messenger service and its overhead and profit.  Special messenger services will be billed at the cost of such services.  There will be no additional charge for pick-up or delivery of packages via the company's regularly scheduled messenger runs.

Note No. 4:    None of the items shown in this report will cause the Company to decline to attach CLTA Endorsement Form 100 to an ALTA Loan Policy, when issued.

File No:  79050348

Note No. 5:    The following information will be included in the CLTA Form 116 or ALTA Form 22-06
Endorsement to be issued pursuant to this order:

There is located on said land:    a condominium
Known as: 4000 West Lake Boulevard Unit 14, Homewood, California

Note No. 6:    The only conveyances affecting said land, which recorded within 24 months of the
date of this report, are as follows

| | |
|---|---|
| Grantor: | SK Foods Limited Partnership, a California Limited Partnership |
| Grantee: | Gerard Rose, Trustee of the CGS 2007 Trust, an undivided 50% interest |
| Recorded: | November 4, 2008 as Instrument No. 2008-0085787 of Official Records |

Note No. 7:    The only conveyances affecting said land, which recorded within 24 months of the
date of this report, are as follows

| | |
|---|---|
| Grantor: | SK Foods Limited Partnership, a California Limited Partnership |
| Grantee: | Gerard Rose, Trustee of the SAS 2007 Trust an undivided 50% interest |
| Recorded: | November 4, 2008 as Instrument No. 2008-0085789-00 of Official Records |

Note No. 8:    The only conveyances affecting said land, which recorded within 24 months of the
date of this report, are as follows

| | |
|---|---|
| Grantor: | Gerard Rose, trustee of the SAS 2007 Trust and Gerard Rose, trustee of the CGS 2007 Trust |
| Grantee: | SK Foods Limited Partnership, a California Limited Partnership |
| Recorded: | March 5, 2009 as Instrument No. 2009-0017658-00 |

Note No. 9:    The charge for a policy of title insurance, when issued through this title order, will
be based on the short-term rate.

Note No. 10:    THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING.
If the demand is expired and a current demand cannot be obtained, our
requirements will be as follows:

(a)    If this Company accepts a verbal update on the demand, we may hold an
amount equal to one monthly mortgage payment.  This hold will be in addition to
the verbal hold the lender may have stipulated.

(b)    If this Company cannot obtain a verbal update on the demand, we will
either pay off the expired demand, or wait for the amended demand, at our
discretion.

(c)    All payoff figures are verified at closing. If the customer's last payment was
made within 15 days of closing, our Payoff Department may hold one month's
payment to insure check has cleared the bank (unless a copy of the cancelled check
is provided, in which case there will be no hold).

Processor:  sv
Date Typed: October 13, 2009

### Exhibit B (Revised 11-17-06)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of land on which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10/22/03)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on the Land
   e. Land division
   f. environmental protection
   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This

File No: 79050348

Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.
3. The right to take the Land by condemning it, unless:
   a.  a notice of exercising the right appears in the Public Records at the Policy Date; or
   b.  the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.
4. Risks:
   a.  that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b.  that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c.  that result in no loss to You; or
   d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a.  to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b.  in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

## LIMITATIONS ON COVERED RISKS

Your Insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
   • For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1% of Policy Amount or $2,500 (whichever is less) | $10,000 |
| Covered Risk 15: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 16: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 18: | 1% of Policy Amount or $2,500 (whichever is less) | $5,000 |

## AMERICAN LAND TITLE ASSOCIATION
## RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation.  This includes building and zoning ordinances and also laws and regulations concerning:
   • land use
   • improvements on the land
   • land division
   • environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   • a notice of exercising the right appears in the public records on the Policy Date
   • the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   • that are created, allowed, or agreed to by you
   • that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
   • that result in no loss to you
   • that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
4. Failure to pay value for your title.
5. Lack of a right:
   • to any land outside the area specifically described and referred to in Item 3 of Schedule A
       OR
   • in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

## AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
## WITH ALTA ENDORSEMENT-FORM 1 COVERAGE
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or

File No: 79050348

a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i)   the occupancy, use, or enjoyment of the Land;
      (ii)  the character, dimensions, or location of any improvement erected on the Land;
      (iii) the subdivision of land; or
      (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

File No:  79050348

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

## AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

**File No: 79050348**

    (a) to timely record the instrument of transfer; or
    (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)  the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii)  the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

File No: 79050348

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that s notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or

   (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.

6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.

7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.

8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:

   (a) The time of the advance; or

   (b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.

9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.



Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No.: 79050348

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Companies** | **FNF Underwriters** |
|---|---|
| CTC – Chicago Title Company | CTIC – Chicago Title Insurance Co. |
| CLTC – Commonwealth Land Title Company | CLTIC – Commonwealth Land Title Insurance Co. |
| FNTC – Fidelity National Title Company | FNTIC – Fidelity National Title Insurance Co. |
| FNTCCA – Fidelity National Title Company of California | SUTIC – Security Union Title Insurance Co. |
| LTC – Lawyers Title Company | LTIC – Lawyers Title Insurance Corp. |
| TTCC – Ticor Title Company of California | TTIC – Ticor Title Insurance Co. |
| | TTIFL – Ticor Title Insurance Co. of Florida |

## Available Discounts

**CREDIT FOR PRELIMINARY TITLE REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (CTIC, FNTIC, SUTIC, TTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 - 36 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**SENIOR CITIZENS RATE (SUTIC)**
Owner's or loan title insurance policies purchased by persons 55 years of age or older in connection with the financing, refinancing, sale or purchase of their primary residence may be charged at a rate of 90% of Basic Insurance Rate Table.

**FEE REDUCTION SETTLEMENT PROGRAM (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, TTCC, TTIC)**
Eligible customers shall receive a $20.00 reduction in their title and/or escrow fees charged by the Company for each eligible transaction in accordance with the terms of the Final Judgments entered in The People of the State of California.

**DISASTER LOANS (CTIC, CLTIC, FNTIC, LTIC, SUTIC, TTIC, TTIFL)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC, TTIC, TTIFL)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 32% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**CHURCHES OR CHARITABLE NON-PROFITABLE ORGANIZATIONS (SUTIC)**
Where established custom dictates that charges for owners and/or lenders insurance be paid for by churches, charitable or like eleemosynary non-profit organizations on property dedicated to church or charitable use, the following charge may be applied: 50% of the Basic Insurance Rate Table, applicable for the type of coverage requested.

**SHORT TERM RATE (SUTIC)**
Unless expressly excluded herein, the Short Term Rate applies on orders placed within sixty (60) months of the date of prior CLTA or ALTA policy. Short Term Rate is applicable to policies of title insurance only and not to any other charges contained herein. The Short Term Rate may be applied to increased liability charges provided the reissued policy is issued within sixty (60) months. The short term rate is 64% to 100% of the appropriate title insurance rate depending on the type of coverage selected.

**SHORT TERM RATE (CTIC, TTIC, TTIFL)**
The Short Term Rate is a reduction of the charges shown in the Insurance Tables which is allowable only when the current order is placed within 60 months from the date of issuance of a prior CLTA or ALTA Form of Policy of any qualified title insurer and provided further that the grantor, borrower, lender, lessor or assignor is insured by or under the terms of a prior policy, or is the vested owner of the interest insured by said policy. The short term rate is 64% to 92% of the appropriate title insurance rate depending on the type of coverage selected.

**SHORT TERM RATE (CLTIC, FNTIC, LTIC)**
If there is an insured owner and an order for title insurance is placed within 5 years following the effective date of any prior policy of any title insurer, the charge will be 80% of the appropriate title insurance rate.

**EMPLOYEE RATE (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, SUTIC, TTCC, TTIC)**
No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary or affiliated title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bonafide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.



**Lawyers Title Company**
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

---

## "Notice to Customers"
### (Involves Residential Real Property in California ONLY)

---

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount which is subject to other terms and conditions.

Name: _____

Address: _____

Telephone No: _____

 **Lawyers Title**
INSURANCE   CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

---

## "Notice to Customers"
### (Involves Residential Real Property in California ONLY)

---

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount which is subject to other terms and conditions.

Name: _____

Address: _____

Telephone No: _____





**Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

## LINE OF CREDIT LETTER TO LENDER

Date: _____

To: _____

_____

_____

Attention:    Payoff Department
Subject:      Account/Loan No.: _____

Order No.: _____

Dear Sir or Madam:

We hereby request that the above referenced credit line account be frozen as of this date. Please release payoff information to Lawyers Los Angeles because you will be receiving payment in full shortly, either through a sale or refinance of the secured property. We agree not to request any advances on this account on or after the date of this letter.

We, also agree to indemnify, hold harmless and reimburse Lawyers Los Angeles for any loss it may sustain by reason of not holding funds for Additional Advances on lines of credit.

Upon receipt of payoff, please close credit line account.

Sincerely,

_____

_____

*(All Owners/Sellers/Borrowers must sign)*

ESCROW NOTE: This letter must be sent to the lender directly at the time the demand is requested to insure that the account is frozen at the time of closing.

DT4A

# Exhibit D

## BINDING OFFER TO PURCHASE REAL PROPERTY

The undersigned ("Offeror") hereby offers (the "Offer") to purchase from Bradley D. Sharp (the "Trustee"), solely in his capacity as the the chapter 11 trustee for the estate of SK Foods, L.P., a California limited partnership, and RHM Industry/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"), the real property commonly known as 4000 West Lake Boulevard, Unit #14, Homewood, CA 96141 (the "Property") on the identical terms as described in the *Motion of Chapter 11 Trustee to Approve Sale and Overbid Procedures for Real Property Commonly Known as 4000 West Lake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal* (the "Motion"), filed on November ___, 2009, in the Debtor's pending bankruptcy case, except that the offer price for the Property shall be $_____ in cash.

There are no contingencies to this Offer whatsoever, including inspection, due diligence or financing contingencies. The sale is subject to acceptance by the Trustee, approval by the Bankruptcy Court of the sale and overbid procedures at the hearing on December 16, 2009 or as continued therefrom, in Courtroom 34 of Honorable Robert S. Bardwil, United States Bankruptcy Judge, located at 501 I Street, 6th Floor, Sacramento, California.

Offeror further understands that the sale is "as is" and "where is", with no warranty or recourse whatsoever. Offeror has completed all due diligence which Offeror believes to be required to purchase the Property and has not relied upon any statement or representation from the Trustee, his attorneys, his real estate brokers or other agents. Any necessary testing or repairs, including without limitation those for termite damage or retrofitting required by any governmental entity, shall be the sole responsibility of the Offeror, at Offeror's sole expense.

Offeror is providing herewith a cashiers check in the sum of $91,500.00 for the Property bid upon, made payable to "Bradley D. Sharp, Chapter 11 Trustee", which shall be credited to the sale price. The deposit shall be non-refundable in the event that the Court confirms the sale to the Offeror but Offeror breaches his obligations under this Offer, in which event the Trustee shall be free to sell the Property to another. Offeror's sole remedy in the event that the Trustee is unable to close the sale shall be a return of the deposit in full. If the Offeror performs in full under the terms of this Offer, but the Court confirms the sale of the Property to another, Offeror's deposit shall be refundable in full.

Offeror agrees to substitute into escrow no. 026660-AD at Nettie Becker Escrow, Inc. or enter into a new escrow upon identical terms and conditions except as to price. Offeror acknowledges having obtained a copy of the listing agreement, those escrow instructions and the Motion, all of which are incorporated herein by this reference, and understands all of their terms.

A commission of 2.5% of the sale price shall be payable to Offeror's real estate broker, subject to approval of the Bankruptcy Court, but only upon closing of the sale to Offeror.

[signature page attached]

Dated: _____    _____
                                (Name of offeror)

                                _____
                                (street address)

                                _____
                                (city, state, zip code)

                                _____
                                (telephone number)

                                _____
                                (signature of authorized agent
                                of offeror, if applicable)

                                _____
                                (name and title of agent of offeror,
                                if applicable)

                                _____
                                (name of real estate brokerage
                                of offeror)

                                _____
                                (name of real estate agent
                                of offeror)

                                _____
                                (telephone no. of real estate
                                agent of offeror)

2

# EXHIBIT 3



Lawyers Title
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

NETTIE BECKER ESCROW
301 N CANNON DR
BEVERLY HILLS, CA 90210

Attn: ANTONIA DELGADO

Title Officer: Cindy Markovich/ Ralph Mason--(L)
email: TU05@ltic.com
Phone No.: (818) 252-6016
Fax No.: (818) 252-6018
File No.: 79050348

Your Reference No: 26660-ad

Property Address:    4000 West Lake Boulevard Unit 14, Homewood, California

---

## PRELIMINARY REPORT

Dated as of September 21, 2009 at 7:30 a.m.

In response to the above referenced application for a policy of title insurance, Lawyers Los Angeles hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the Policy forms should be read. They are available from the office which issued this report.

*Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.*

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

File No: 79050348

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

CLTA Homeowner's Policy of Title Insurance

The estate or interest in the land hereinafter described or referred to covered by this report is:

A CONDOMINIUM, as defined in Section 783 of the California Civil code, in fee

Title to said estate or interest at the date hereof is vested in:

SK Foods Limited Partnership, a California Limited partnership

The land referred to herein is situated in the County of Placer, State of California, and is described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

File No: 79050348

# EXHIBIT "A"

All that certain real property situated in the County of Placer, State of California, described as follows:

PARCEL ONE:

An undivided 1/22nd interest in and to Lot 1 of "Amended Tract No. 248, Fleur Du Lac Estates" as shown and designated on the Map recorded February 22, 1980, in Book "M" of Maps, at Page 68 Official Records of Placer County.

Excepting therefrom Units 1 through 22 as shown on the Condominium Plan recorded in Book 2503 at Page 426 of Official Records

PARCEL TWO:

Unit 14 as shown on the Condominium Plan referred to in Parcel One.

Assessor's Parcel No.:   085-400-027

File No: 79050348

# SCHEDULE B – Section A

*The following exceptions will appear in policies when providing standard coverage as outlined below:*

1.  (a)   Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a)   Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

File No: 79050348

# SCHEDULE B – Section B

At the date hereof Exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

A.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, to be levied for the fiscal year 2009 – 2010 which are a lien not yet payable.

B.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, for the fiscal year 2009 - 2010.

| | |
|---|---|
| 1st Installment: | $16,925.56 This amount is valid until December 10, after which penalties apply |
| Penalty: | $1,692.55 Due with installment amount if paid after December 10 |
| 2nd Installment: | $16,925.56 This amount is valid until April 10, after which penalties apply |
| Penalty (including cost): | $1,712.55 Due with installment amount if paid after April 10 |
| Land Value | $1,240,000.00 |
| Improvement Value: | $1,860,000.00 |
| Exemption: | $0 |
| Code Area: | n/a |
| Assessment No.: | 085-400-027 |

C.  Supplemental taxes, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code, of the State of California, for the fiscal year 2008-2009.

| | |
|---|---|
| 1st Installment: | $179.23 |
| Penalty: | $17.92 |
| All due and payable | December 10, 2009, delinquent December 10, 2009 |
| 2nd Installment: | $179.23 |
| Penalty: | $27.92 |
| All due and payable | April 10, 2010, delinquent April 10, 2010 |
| Supplemental Bill No: | 085-400-027 |

D.  Said property has been declared Tax-Defaulted for non-payment of delinquent property taxes for the fiscal year 2008 - 2009.

Amount to redeem by October 31, 2009 for the above-stated year (and subsequent years, if any) is $18,879.72.

Amount to redeem by November 30, 2009 for the above-stated year (and subsequent years, if any) is $19,123.53.

E.  Supplemental or escaped assessments of property taxes, if any, assessed pursuant to the Revenue and Taxation Code of the State of California.

1.  Any taxes, assessments or charges levied by the following agency.   Amounts due, if any may be ascertained by contacting the agency.

| | |
|---|---|
| Tahoe-Truckee Sanitation Agency: | 530 587-2525 |
| Tahoe City Public Utility District: | 530 583-3796 |

2.  Claims or rights of the public, State of California and the United States of America to any portion of said land which is claimed to have been at the time below the highest water line of Lake Tahoe.

File No: 79050348

3.  Any change in the location the high water line of Lake Tahoe due to the right of the United States of America to raise and lower the level of Lake Tahoe.

4.  Any adverse claim based upon the assertion that:

    (a)    Said land or any part thereof is now or at any time has been below the highest of the high watermarks of the river hereinafter mentioned, in the event the boundary of said river has been artificially raised or is now or at any time has been below the high watermark, if said river is in its natural state.
    (b)    Some portion of said land has been created by artificial means or has accreted to such portion so created.
    (c)    Some portion of said land has been brought within the boundaries thereof by an avulsive movement of the river, or has been formed by accretion to any such portion.
    Name of Lake:                          Lake Tahoe

5.  Any rights in favor of the public which may exist on said land if said land or portions thereof were at any time used by the public.

6.  An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:                      Henry J. Kaiser Company
    Purpose:                         Light, Air, Unobstructed view
    Recorded:                        March 15, 1962, Book 911 Page 60 of Official Records
    Affects:                         as set forth in said document.

7.  All easements, offers and dedications as shown on the Official Map,

    Tract of:                        Amended Tract No. 248 – Fleur Declaration Lac Estates

8.  Covenants, conditions and restrictions as set forth in the document
    Recorded:                        March 27, 1981, Book 2371, Page 261 of Official Records

    This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

9.  Covenants, conditions and restrictions as set forth in the document
    Recorded:                        June 8, 1981, Book 2398, Page 155 of Official Records

    This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

10. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:                      Sierra Pacific Power Company
    Purpose:                         Electrical and communication facilities
    Recorded:                        February 17, 1983, Book 2565, Page 245 of Official Records
    Affects:                         common area

11. Easement, for ingress, egress, pipeline, or public utilities, and incidental purposes, as disclosed by instruments of record, affecting only the "Common Area."

12. The matters contained in a document entitled **"Encroachment Agreement "** recorded June 26, 1985, Book 2841 Page 535 of Official Records.

    Reference is made to said document for full particulars.

File No: 79050348

13. A declaration of covenants, conditions and restrictions which, among other things, may contain or provide for easements; liens and the subordination thereof; and restrictions on partition and severability of component interest.
   Recorded:                         June 5, 2006, as Instrument No. 2006-0060218 of Official Records

   NOTE: This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

   Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

   Said instrument also provides for the levy of assessments, the liens of which are stated to be subordinate to the lien of a first mortgage or first deed of trust made in good faith and for value.

14. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

   Amount:            $1,350,000.00
   Dated:             August 21, 2008
   Trustor:           Gerard Rose, trustee of the CGS 2007 Trust
   Trustee:           Stewart Title of Sacramento, a California Corporation
   Beneficiary:       SK Foods Limited Partnership, a California Limited Partnership
   Recorded:          November 4, 2008 as Instrument No. 2008-0085788-00 of Official Records
   Loan No.:          not set out

   If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

15. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

   Amount:            $1,360,000.00
   Dated:             August 21, 2008
   Trustor:           Gerard Rose, trustee of the SAS 2007 Trust
   Trustee:           Stewart Title of Sacramento, a California Corporation
   Beneficiary:       SK Foods, Limited Partnership a California Limited Partnership
   Recorded:          November 4, 2008 as Instrument No. 2008-0085790 of Official Records
   Loan No.:          not set out

   If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

Page 7

File No: 79050348

16. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

Amount:              $125,000,000.00
Dated:               March 24, 2009
Trustor:             SK Foods Limited Partnership, a California Limited Partnership
Trustee:             First American Title Company, a California Corporation
Beneficiary:         Bank of Montreal, a Canadian chartered bank
Recorded:            March 26, 2009 as Instrument No. 2009-0024080-00 of Official
                     Records
Loan No.:            not set out

Said deed of trust recites that it secures a line of credit. If the line of credit is to be paid off in this transaction, this Company will require that the written demand for payment state that the line of credit has been frozen and that the demand is not subject to increase for any additional advances or draws. Accordingly, it is recommended that any request for a payoff demand statement advise the beneficiary of our requirement, and that the request be accompanied by: the borrower's written request to freeze the line of credit, the surrender of any unused checks or drafts, and anything else that may be required by the lender in order to issue an unconditional demand.

**END OF SCHEDULE B EXCEPTIONS**

**PLEASE REFER TO THE "NOTES AND REQUIREMENTS SECTION" WHICH FOLLOWS FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION**

File No: 79050348

# REQUIREMENTS SECTION:

**Req. No. 1:**   The Company will require a statement of information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matters which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

   Parties:        Buyers and/or Sellers

**Req. No. 2:**   The Company will require that it be provided with the following with respect to the California limited liability company named below:

   A.        A copy of its operating agreement and any amendments thereto;

   B.        A certified copy of its articles of organization (LLC-1), any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles or organization (LLC-10); and

   C.        A copy of the current Statement of Information form (LLC-12) filed with the Secretary of State.

   Limited Liability Company:        SK Foods Limited Partnership

**Req. No. 3:**   The Company will require that it be furnished a written statement from the Homeowners' Association of which said property owner is a member, which will provide that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

File No: 79050348

# INFORMATIONAL NOTES SECTION

**Note No. 1:** The information on the attached plat is provided for your convenience as a guide to the general location of the subject property. The accuracy of this plat is not guaranteed, nor is it a part of any policy, report or guarantee to which it may be attached.

**Note No. 2:** California Insurance code section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement. Funds deposited with the company by wire transfer may be disbursed upon receipt. Funds deposited with the company via cashier's check or teller's check drawn on a California based bank may be disbursed on the next business day after the day of deposit. If funds are deposited with the company by other methods, recording and/or disbursement may be delayed. All escrow and sub-escrow funds received by the company will be deposited with other escrow funds in one or more non-interest bearing escrow accounts of the company in a financial institution selected by the company. The company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with such financial institution, and the company shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by the company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the company or its parent company and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the company for its services in connection with the escrow or sub-escrow.

**WIRING INSTRUCTIONS FOR THIS OFFICE ARE:**

Comerica Bank
2321 Rosecrans Ave, 5th floor
El Segundo, CA 90245-4903

ABA # 121137522
CREDIT TO: Lawyers Los Angeles
ACCOUNT #: 1893992436

RE:   79050348

**PLEASE INDICATE Lawyers Los Angeles TITLE ORDER NUMBER**

**Note No. 3:** The charges which the company will make for next day messenger services (i.e. Federal Express, UPS, DHL, Airborne, Express mail, etc.) are $15.00 per letter, standard overnight service, and $25.00 for larger size packages and/or priority delivery services. Such charges include the cost of such messenger service and the company's expenses for arranging such messenger service and its overhead and profit. Special messenger services will be billed at the cost of such services. There will be no additional charge for pick-up or delivery of packages via the company's regularly scheduled messenger runs.

**Note No. 4:** None of the items shown in this report will cause the Company to decline to attach CLTA Endorsement Form 100 to an ALTA Loan Policy, when issued.

File No: 79050348

Note No. 5:    The following information will be included in the CLTA Form 116 or ALTA Form 22-06 Endorsement to be issued pursuant to this order:

There is located on said land:   a condominium
Known as: 4000 West Lake Boulevard Unit 14, Homewood, California

Note No. 6:    The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows
Grantor:         SK Foods Limited Partnership, a California Limited Partnership
Grantee:         Gerard Rose, Trustee of the CGS 2007 Trust, an undivided 50% interest
Recorded:        November 4, 2008 as Instrument No. 2008-0085787 of Official Records

Note No. 7:    The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows
Grantor:         SK Foods Limited Partnership, a California Limited Partnership
Grantee:         Gerard Rose, Trustee of the SAS 2007 Trust an undivided 50% interest
Recorded:        November 4, 2008 as Instrument No. 2008-0085789-00 of Official Records

Note No. 8:    The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows
Grantor:         Gerard Rose, trustee of the SAS 2007 Trust and Gerard Rose, trustee of the CGS 2007 Trust
Grantee:         SK Foods Limited Partnership, a California Limited Partnership
Recorded:        March 5, 2009 as Instrument No. 2009-0017658-00

Note No. 9:    The charge for a policy of title insurance, when issued through this title order, will be based on the short-term rate.

Note No. 10:   THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING. If the demand is expired and a current demand cannot be obtained, our requirements will be as follows:

(a)      If this Company accepts a verbal update on the demand, we may hold an amount equal to one monthly mortgage payment.  This hold will be in addition to the verbal hold the lender may have stipulated.

(b)      If this Company cannot obtain a verbal update on the demand, we will either pay off the expired demand, or wait for the amended demand, at our discretion.

(c)      All payoff figures are verified at closing. If the customer's last payment was made within 15 days of closing, our Payoff Department may hold one month's payment to insure check has cleared the bank (unless a copy of the cancelled check is provided, in which case there will be no hold).

Processor: sv
Date Typed: October 13, 2009

**Exhibit B (Revised 11-17-06)**

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE POLICY – 1990**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10/22/03)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**

**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on the Land
   e. Land division
   f. environmental protection
   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This

File No: 79050348

Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.
3. The right to take the Land by condemning it, unless:
   a. a notice of exercising the right appears in the Public Records at the Policy Date; or
   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1% of Policy Amount or $2,500 (whichever is less) | $10,000 |
| Covered Risk 15: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 16: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 18: | 1% of Policy Amount or $2,500 (whichever is less) | $5,000 |

## AMERICAN LAND TITLE ASSOCIATION
## RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   • land use
   • improvements on the land
   • land division
   • environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   • a notice of exercising the right appears in the public records on the Policy Date
   • the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   • that are created, allowed, or agreed to by you
   • that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
   • that result in no loss to you
   • that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
4. Failure to pay value for your title.
5. Lack of a right:
   • to any land outside the area specifically described and referred to in Item 3 of Schedule A
     OR
   • in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

## AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
## WITH ALTA ENDORSEMENT-FORM 1 COVERAGE
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1.(a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or

**File No: 79050348**

a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or

   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

     (a) to timely record the instrument of transfer; or

     (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA LOAN POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

     (i) the occupancy, use, or enjoyment of the Land;

     (ii) the character, dimensions, or location of any improvement erected on the Land;

     (iii) the subdivision of land; or

     (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

File No: 79050348

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

## AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

**File No: 79050348**

    (a) to timely record the instrument of transfer; or
    (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
       (i)   the occupancy, use, or enjoyment of the Land;
       (ii)  the character, dimensions, or location of any improvement erected on the Land;
       (iii) the subdivision of land; or
       (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

File No: 79050348

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that s notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
   (b) Any governmental police power, not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
   (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.
5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.
6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.
7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.
8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:
   (a) The time of the advance; or
   (b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.
9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

 **Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No.: 79050348

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Companies**
CTC – Chicago Title Company
CLTC – Commonwealth Land Title Company
FNTC – Fidelity National Title Company
FNTCCA – Fidelity National Title Company of California
LTC – Lawyers Title Company
TTCC – Ticor Title Company of California

**FNF Underwriters**
CTIC – Chicago Title Insurance Co.
CLTIC – Commonwealth Land Title Insurance Co.
FNTIC – Fidelity National Title Insurance Co.
SUTIC – Security Union Title Insurance Co.
LTIC – Lawyers Title Insurance Corp.
TTIC – Ticor Title Insurance Co.
TTIFL – Ticor Title Insurance Co. of Florida

## Available Discounts

**CREDIT FOR PRELIMINARY TITLE REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (CTIC, FNTIC, SUTIC, TTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 - 36 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**SENIOR CITIZENS RATE (SUTIC)**
Owner's or loan title insurance policies purchased by persons 55 years of age or older in connection with the financing, refinancing, sale or purchase of their primary residence may be charged at a rate of 90% of Basic Insurance Rate Table.

**FEE REDUCTION SETTLEMENT PROGRAM (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, SUTIC, TTCC, TTIC)**
Eligible customers shall receive a $20.00 reduction in their title and/or escrow fees charged by the Company for each eligible transaction in accordance with the terms of the Final Judgments entered in The People of the State of California.

## DISASTER LOANS (CTIC, CLTIC, FNTIC, LTIC, SUTIC, TTIC, TTIFL)

The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

## CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC, TTIC, TTIFL)

On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 32% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

## CHURCHES OR CHARITABLE NON-PROFITABLE ORGANIZATIONS (SUTIC)

Where established custom dictates that charges for owners and/or lenders insurance are paid for by churches, charitable or like eleemosynary non-profit organizations on property dedicated to church or charitable use, the following charge may be applied: 50% of the Basic Insurance Rate Table, applicable for the type of coverage requested.

## SHORT TERM RATE (SUTIC)

Unless expressly excluded herein, the Short Term Rate applies on orders placed within sixty (60) months of the date of prior CLTA or ALTA policy. Short Term Rate is applicable to policies of title insurance only and not to any other charges contained herein. The Short Term Rate may be applied to increased liability charges provided the reissued policy is issued within sixty (60) months. The short term rate is 64% to 100% of the appropriate title insurance rate depending on the type of coverage selected.

## SHORT TERM RATE (CTIC, TTIC, TTIFL)

The Short Term Rate is a reduction of the charges shown in the Insurance Tables which is allowable only when the current order is placed within 60 months from the date of issuance of a prior CLTA or ALTA Form of Policy of any qualified title insurer and provided further that the grantor, borrower, lender, lessor or assignor is insured by or under the terms of a prior policy, or is the vested owner of the interest insured by said policy. The short term rate is 64% to 92% of the appropriate title insurance rate depending on the type of coverage selected.

## SHORT TERM RATE (CLTIC, FNTIC, LTIC)

If there is an insured owner and an order for title insurance is placed within 5 years following the effective date of any prior policy of any title insurer, the charge will be 80% of the appropriate title insurance rate.

## EMPLOYEE RATE (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, SUTIC, TTCC, TTIC)

No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary or affiliated title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bonafide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.



Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

---

## "Notice to Customers"
### (Involves Residential Real Property in California ONLY)

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you quality for a discount which is subject to other terms and conditions.

Name: _____

Address: _____

Telephone No: _____



Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

## "Notice to Customers"
### (Involves Residential Real Property in California ONLY)

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount which is subject to other terms and conditions.

Name: _____

Address: _____

Telephone No: _____





**Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

## LINE OF CREDIT LETTER TO LENDER

Date: _____

To: _____

_____

_____

Attention:    Payoff Department
Subject:      Account/Loan No.: _____

Order No.:    _____

Dear Sir or Madam:

We hereby request that the above referenced credit line account be frozen as of this date. Please release payoff information to Lawyers Los Angeles because you will be receiving payment in full shortly, either through a sale or refinance of the secured property. We agree not to request any advances on this account on or after the date of this letter.

We, also agree to indemnify, hold harmless and reimburse Lawyers Los Angeles for any loss it may sustain by reason of not holding funds for Additional Advances on lines of credit.

Upon receipt of payoff, please close credit line account.

Sincerely,

_____

_____

*(All Owners/Sellers/Borrowers must sign)*

ESCROW NOTE:  This letter must be sent to the lender directly at the time the demand is requested to insure that the account is frozen at the time of closing.

**DT4A**

# EXHIBIT 4

FILED

December 02, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002259947

1   LARRY J. LICHTENNEGER, State Bar No. 048206
2   LICHTENEGGER LAW OFFICE
    3850 Rio Road, Suite 58
3   Carmel, California 93923
    Telephone: (831) 626-2801
    Facsimile: (831) 620-1566
4   lawyer@mbay.net

5   Attorneys for Robert J. Pruett, trustee of the Stefanie Ann
    Salyer 2007 Trust and the Carolyn Gezelle Salyer 2007
6   Trust

7

8                   UNITED STATES BANKRUPTCY COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                       SACRAMENTO DIVISION

11  In re:                              CASE NO.: 09-29162-D-11
                                        Chapter 11
12  SK FOODS, L.P., a California
    limited partnership, et al.,        DCN: SH-36
13
                      Debtors.
14  In re:                              CASE NO.: 09-29161-D-11
                                        Chapter 11
15  RHM INDUSTRIAL/SPECIALTY
    FOODS, INC., a California            DCN: SH-36
16  Corporation, d/b/a Colusa County
    Canning Co.,                         Date:    December 16, 2009
17                                       Time:    10:00 a.m.
                      Debtor.            Place:   Courtroom 34
18                                       Judge:   Hon. Robert S. Bardwil

19     OBJECTION BY ROBERT J. PRUETT, TRUSTEE OF THE STEFANIE ANN SALYER
20   2007 TRUST AND THE CAROLYN GEZELLE SALYER 2007 TRUST TO MOTION TO
       APPROVE SALE AND OVERBID PROCEDURES FOR REAL PROPERTY
21      COMMONLY KNOWN AS 4000 WESTLAKE BLVD., UNIT #14, HOMEWOOD,
        CALIFORNIA, FREE AND CLEAR OF LIEN OF BANK OF MONTREAL
22

23         Robert J. Pruett, trustee of the Stefanie Ann Salyer 2007 Trust and the Carolyn Gezelle

24   Salyer 2007 Trust (the "SAS and CGS 2007 Trusts") hereby objects to the Motion to Approve

25   Sale and Overbid Procedures for Real Property Commonly Known as 4000 Westlake Blvd., Unit

26   #14, Homewood, California, Free and Clear of Lien of Bank of Montreal (the "Sale Motion")

27   based on the following:

28         1.    Until approximately March 5, 2009, the SAS and CGS 2007 Trusts were the

                                                        OBJECTION TO MOTION
                                                        TO APPROVE SALE OF
                          -1-                           WESTLAKE BLVD. PROPERTY

1  owners of 4000 Westlake Blvd., Unit #14, Homewood, California (the "Property"). At or about

2  that time, the SAS and CGS 2007 Trusts transferred the Property to the Debtor SK Foods under

3  duress and based on misrepresentations. Prior to the hearing on the Sale Motion, the SAS and

4  CGS 2007 Trusts will file a complaint to initiate an adversary action against the estate to quiet

5  title and for declaratory relief with respect to the transfer of the Property. The SAS and CGS

6  2007 Trusts are entitled to the Property and the Property cannot be sold.

7       2.    Where there is a dispute over whether the estate owns property to be sold, the

8  bankruptcy court should not authorize the sale. *In re Popp*, 323 B.R. 260, 268 (9th Cir. BAP

9  2005) citing *In re Rodeo Canon Dev. Corp.*, 362 F.3d 603, 608-609 (9th Cir. 2004) (withdrawn

10  based on stipulation of parties regarding facts); see also, *In re Claywell*, 341 B.R. 396, 398

11  (Bankr. Conn. 2006) and 3 Collier on Bankruptcy ¶ 363.02[1][c] (15th Ed.) (an objection to a sale

12  may be based on an adverse claim of ownership). Here, like in *Popp*, there will be an adversary

13  proceeding pending regarding the disputed ownership of the Property. Until that dispute is

14  resolved, the Court cannot authorize a sale.

15       3.    Remarkably, the Sale Motion does not discuss the fact that the deed of trust

16  granted to the Bank of Montreal on or about March 26, 2009, within 90 days of the petition date,

17  very likely is an avoidable preferential transfer. The Sale Motion also does not inform the Court

18  that the Chapter 11 Trustee imprudently gave away the estate's avoidance rights in connection

19  with the agreements relating to the use of cash collateral in this matter. See Final Order (I)

20  Authorizing Debtors to Use the Secured Lenders' Cash Collateral and (II) Granting Adequate

21  Protection to the Secured Lenders Pursuant to 11 U.S.C. §§361, 362 and 363, Docket No. 384

22  entered on June 22, 2009. While the Official Committee of Unsecured Creditors ("Creditors'

23  Committee") has obtained several extensions of any deadlines to object to the secured lenders'

24  claims or pursue any avoidance actions against the secured lenders, unfortunately the Creditors'

25  Committee's recent extension expires December 10, 2009, and it has done nothing to pursue such

26  claims.[1] This issue is not disclosed, discussed or analyzed in the Chapter 11 Trustee's Sale

27  _____

[1] The Creditors' Committee's response to the Sale Motion does alert the Court to the preference
28  issue, but to the best of the objecting parties' knowledge and as of the date of this Objection, the
Creditors' Committee has done nothing to assert the preference claim for the benefit of creditors.

1    Motion, yet the Sale Motion seeks authority to pay the proceeds to the Bank of Montreal without

2    further notice or order.

3        4.    It appears from the Chapter 11 Trustee's Sale Motion that there may be absolutely

4    no benefit to the estate from the sale of this Property.   Since the Chapter 11 Trustee has

5    imprudently given up the estate's rights to over $2.5 million of the sale proceeds by capitulating

6    to the pressure of the lenders, and the Creditors' Committee's rights expire before the hearing on

7    the Sale Motion with no clear action having been taken to date, the estate is likely to obtain

8    absolutely no benefit whatsoever from this sale.   Given the lenders' apparent control over the

9    Chapter 11 Trustee and the Creditors' Committee, financially or otherwise, the only reason for

10   the Chapter 11 Trustee to pursue this sale is to attempt to extinguish the rights of the SAS and

11   CGS 2007 Trusts.  The Sale Motion should be denied on that basis alone.

12       5.    At a minimum, the claims of the SAS and CGS 2007 Trusts must attach to the sale

13   proceeds and the sale proceeds should be held in a blocked interest-bearing account by the estate

14   pending further order of this Court.   Certainly, the sale proceeds should not be paid over to the

15   secured lenders as requested in the Sale Motion.

16       WHEREFORE, the SAS and CGS 2007 Trusts respectfully request that the Court enter an

17   order as follows:

18       1.    Denying the Sale Motion in its entirety because the SAS and CGS 2007 Trusts

19   hold equitable title to the Property and there is no demonstrated benefit to the estate;

20       2.    In the alternative, ordering that the claims of the SAS and CGS 2007 Trusts attach

21   to the sale proceeds and that the sale proceeds be held by the estate in an interest-bearing

22   segregated account until further order of the Court; and

23       3.    For such other and further relief as the Court deems just.

24   Dated: December 2, 2009

25                                   LICHTENEGGER LAW OFFICE

26                                   By: */s/ Larry J. Lichtenegger*
                                    Larry J. Lichtenegger

27                                       Attorneys for Robert J. Pruett, trustee of the Stefanie
                                    Ann Salyer 2007 Trust and the Carolyn Gezelle

28                                       Salyer 2007 Trust

# EXHIBIT 5

FILED
December 09, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002273662

1  LARRY J. LICHTENEGER, State Bar No. 048206
   LICHTENEGGER LAW OFFICE
2  3850 Rio Road, Suite 58
   Carmel, California  93923
3  Telephone:  (831) 626-2801
   Facsimile:  (831) 620-1566
4  lawyer@mbay.net

5  Attorneys for Robert J. Pruett, trustee of the Stefanie Ann
   Salyer 2007 Trust and the Carolyn Gezelle Salyer 2007
6  Trust

7

8              UNITED STATES BANKRUPTCY COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11  In re:                          CASE NO.: 09-29162-D-11
                                    Chapter 11
12  SK FOODS, L.P., a California
    limited partnership, et al.,    DCN:  SH-36
13
                Debtors.
14  In re:                          CASE NO.: 09-29161-D-11
                                    Chapter 11
15  RHM INDUSTRIAL/SPECIALTY
    FOODS, INC., a California       DCN:  SH-36
16  Corporation, d/b/a Colusa County
    Canning Co.,                    Date:     December 16, 2009
17                                  Time:     10:00 a.m.
                Debtor.             Place:    Courtroom 34
18                                  Judge:    Hon. Robert S. Bardwil

19      WITHDRAWAL OF OBJECTION BY ROBERT J. PRUETT, TRUSTEE OF THE
        STEFANIE ANN SALYER 2007 TRUST AND THE CAROLYN GEZELLE SALYER
20      2007 TRUST TO MOTION TO APPROVE SALE AND OVERBID PROCEDURES FOR
        REAL PROPERTY COMMONLY KNOWN AS 4000 WESTLAKE BLVD., UNIT #14,
21      HOMEWOOD, CALIFORNIA, FREE AND CLEAR OF LIEN OF BANK OF
                                MONTREAL
22

23      Robert J. Pruett, trustee of the Stefanie Ann Salyer 2007 Trust and the Carolyn Gezelle

24  Salyer 2007 Trust (the "SAS and CGS 2007 Trusts") hereby withdraw their objection to the

25  Motion to Approve Sale and Overbid Procedures for Real Property Commonly Known as 4000

26  ///

27  ///

28  ///

                                                    WITHDRAWAL OF OBJECTION TO MOTION
                                                          TO APPROVE SALE OF
                                                        WESTLAKE BLVD. PROPERTY

                            -1-

1   Westlake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal

2   filed December 2, 2009, at Docket No. 1114.  The SAS and CGS 2007 Trusts reserve all rights.

3   Dated:  December 9, 2009

4                              LICHTENEGGER LAW OFFICE

5

6                        By: */s/ Larry J. Lichtenegger*_____

7                            Larry J. Lichtenegger
                                Attorneys for Robert J. Pruett, trustee of the Stefanie

8                            Ann Salyer 2007 Trust and the Carolyn Gezelle
                            Salyer 2007 Trust

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 6

FILED

DEC 16 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

1  **5 PAGES**
Gregory C. Nuti (CSBN 151754)
2  Kevin W. Coleman (CSBN 168538)
Melissa S. Lor (CSBN 245515)
3  SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
4  San Francisco, California 94104-5501
Telephone: 415-364-6700
5  Facsimile: 415-364-6785
gnuti@schnader.com
6  kcoleman@schnader.com
mlor@schnader.com
7

8  Attorneys for Bradley D. Sharp,
Chapter 11 Trustee
9

10

11       **UNITED STATES BANKRUPTCY COURT**

12       **EASTERN DISTRICT OF CALIFORNIA**

         **SACRAMENTO DIVISION**

13
         In re:                                        )   Case No. 09-29162-D-11
14                                                      )
         SK FOODS, L.P., a California limited           )   Chapter 11
15       partnership,                                   )
                                                        )   DC No. SH-36
16                          Debtor.                     )
                                                        )
17       In re :                                        )   Case No. 09-29161-D-11
                                                        )
18       RHM INDUSTRIAL/SPECIALTY                       )   Chapter 11
         FOODS, INC., a California                      )
19       Corporation, d/b/a Colusa County              )
         Canning Co.,                                   )   DC No. SH-36
20                                                      )
                            Debtor.                     )   **ORDER APPROVING SALE AND**
21                                                      )   **OVERBID PROCEDURES FOR REAL**
                                                        )   **PROPERTY COMMONLY KNOWN AS**
22                                                      )   **4000 WESTLAKE BLVD., UNIT #14,**
                                                        )   **HOMEWOOD, CALIFORNIA, FREE**
23                                                      )   **AND CLEAR OF LIEN OF BANK OF**
                                                        )   **MONTREAL**
24                                                      )
                                                        )
25                                                      )   Date:  December 16, 2009
                                                        )   Time:  10:00 a.m.
26                                                      )   Place: Courtroom 34
                                                        )          501 I Street, 6th Floor
27                                                      )          Sacramento, CA
                                                        )   Judge: Hon. Robert Bardwil
28

ORDER APPROVING SALE OF REAL PROPERTY OF THE ESTATE

PHDATA 3251592.1

1228

1    At the date, time, and place set forth above, the Court considered the motion of Bradley

2  D. Sharp (the "Trustee"), the duly appointed and acting chapter 11 trustee for SK Foods, L.P., a

3  California limited partnership, and RHM Industrial/Specialty Foods, Inc., a California

4  corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"), for an order

5  authorizing the Trustee to sell real property commonly known as 4000 West Lake Boulevard,

6  Unit #14, Homewood, CA 96141, and legal described as set forth on attached **Exhibit A** (the

7  "Property"). Appearances were made orally on the record.

8    The Court has considered the Notice of Motion and Motion, the Memorandum of Points

9  and Authorities filed in support thereof, the Declarations of Bradley D. Sharp, William

10  Friedman, and Anita Noble filed in support thereof, and the statements of counsel and interested

11  parties at the hearing. Based upon the foregoing:

12    **IT IS ORDERED** that the Motion is granted. The Trustee is authorized to do the

13  following:

14    A.    Sell the Property to Michael F. Roizen and Nancy J. Roizen and/or Assignee (the

15  "Buyers"), for $2,960,000.00, or to any qualified overbidder who submits a higher acceptable bid

16  at the auction by telephone conducted by the Trustee at a pre-arranged date and time (the "Sale")

17  as set forth below ("Auction Procedures");

18    B.    The Auction Procedures shall be as follow:

19      1.    Any party wishing to tender an overbid ("Qualified Overbidder")

20      must provide the Trustee no later than ten (10) days prior to the hearing date (i.e.,

21      December 6, 2009): (a) a cashier's check in the sum of $91,500.00 payable to

22      "Bradley D. Sharp, Chapter 11 Trustee" ("Deposit"); (b) proof satisfactory to the

23      Trustee in his sole discretion of ability to close escrow; and (c) a completed and

24      executed overbid form, without changes or conditions, as set forth in Exhibit A

25      attached to the Motion. Upon receipt of an overbid, the Trustee will notify the

26      Qualified Overbidder of the auction date and time. The Deposit shall be

27      nonrefundable in the event that that party is the successful overbidder but the

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

2

ORDER APPROVING SALE OF REAL PROPERTY OF THE ESTATE

PHDATA 3251592 1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    party fails to close the sale timely as set forth in paragraph 9 of the Purchase and

2    Sale Agreement.

3       2.    The minimum initial overbid shall be $2,985,000.00[1], with

4    subsequent overbids in increments of not less than $10,000.00.

5       3.    The overbidding party will be bound by all of the terms set forth in

6    the Purchase and Sale Agreement set forth in the Motion except as to price,

7    without contingencies, including no financing or physical inspection contingency,

8    and shall close escrow no more than fifteen (15) calendar days following entry of

9    an order approving the Sale and Auction Procedures set forth herein.

10      4.    The Trustee shall conduct the auction by telephone outside of the

11   courtroom within two (2) business days of the Court's approval of the Auction

12   Procedures as set forth herein with the Trustee holding sole and absolute

13   discretion in accepting and rejecting all overbids.

14      5.    The Trustee is authorized to confirm a back-up buyer so that, in the

15   event that the successful overbidder does not timely close escrow, the Trustee

16   may sell the Property to the back-up buyer for the amount of such back-up

17   buyer's bid.

18   C.   The Sale of the Property is on an as-is, where is basis, without any warranties or

19   representations, free and clear of the following liens and interests, with such liens and interests to attach to

20   the net sale proceeds, including:

21      1.    a deed of trust against the Property in favor of SK Foods, L.P. to

22   secure an indebtedness of $1,350,000.00, dated August 21, 2008 and recorded in

23   Placer County on November 4, 2008, as no. 2008-0085788-00 of the official

24   records ("SK Foods, L.P. Lien One");

25      2.    a deed of trust of trust against the Property in favor of SK Foods,

26   L.P. to secure an indebtedness of $1,360,000.00, dated August 21, 2008 and

27   _____

28   [1] $25,000.00 more than the "stalking horse" bid.

3

ORDER APPROVING SALE OF REAL PROPERTY OF THE ESTATE

1   recorded in Placer County on November 4, 2008, as no. 2008-0085790 of the

2   official records ("SK Foods, L.P. Lien Two"); and

3               3.    a deed of trust against the Property in favor of the Bank of

4   Montreal to secure a line of credit in the amount of $125,000,000.00, dated March

5   24, 2009 and recorded in Placer County on March 26, 2009 as no. 2009-0024080-

6   00 of the official records ("Bank of Montreal Lien"); *4 Robert J. Pruett, trustee of the Stephanie Ann Salyer 2007 Trust and the Carolyn Gezelle Salyer 2007 Trust*

7   D.    The ~~Bank of Montreal~~ Lien and claims asserted by the ~~Creditors Committee~~ shall *above parties*

8   attach to the net sale proceeds, subject to the costs of sale authorized to be paid herein, with the

9   same force, effect, validity, and priority that it has with respect to the Property.

10  E.    The Trustee shall pay the costs of sale incurred in selling the Property, including

11  the real estate brokers' commission through escrow in the cumulative sum of no more than 5% of

12  the gross sale price;

13  F.    The Trustee shall pay taxes due to the Placer County Tax Collector from sale

14  proceeds upon close of escrow;;

15  G.    The Trustee shall pay the assessments due Tahoe-Truckee Sanitation Agency and

16  Tahoe City Public Utility District, if any, from the sale proceeds upon close of escrow;

17  H.    The Trustee ~~shall pay~~ the outstanding homeowners' association assessment of *is authorized, but not directed, to pay*

18  $35,467.70; *but if they are not paid, their interest attaches to the sale proceeds,*

19  I.    The Trustee shall hold the net proceeds subject to the applicable Cash Collateral

20  Order from the Sale until ~~receipt of joint instructions from the Creditors Committee and the Bank~~

21  ~~of Montreal or~~ further Order of this Court, *after notice to all parties asserting an interest therein.*

22  J.    The Trustee shall execute any and all documents that may be necessary to

23  consummate the sale of the Property.

24  **IT IS FURTHER ORDERED** that the successful bidder at the Sale and any backup

25  buyer are good faith purchasers for purposes of 11 U.S.C. § 363(m).

26  //

27  //

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

4

ORDER APPROVING SALE OF REAL PROPERTY OF THE ESTATE

1    **IT IS FURTHER ORDERED** that the ten (10) day stay of the effectiveness of the sale

2    order imposed pursuant to Federal Rule of Bankruptcy Procedure 6004(g) is waived so that sale

3    can close immediately following entry of this sale order.

4

5    Date: DEC 1 6 2009

6                                                    Robert S. Bardwil
                                                    United States Bankruptcy Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHRADER, HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE 415-364-6785

5

ORDER APPROVING SALE OF REAL PROPERTY OF THE ESTATE

PHDATA 3251592 1

File No:  79050348

# EXHIBIT "A"

All that certain real property situated in the County of Placer, State of California, described as follows:

PARCEL ONE:

An undivided 1/22nd interest in and to Lot 1 of "Amended Tract No. 248, Fleur Du Lac Estates" as shown and designated on the Map recorded February 22, 1980, in Book "M" of Maps, at Page 68 Official Records of Placer County.

Excepting therefrom Units 1 through 22 as shown on the Condominium Plan recorded in Book 2503 at Page 426 of Official Records

PARCEL TWO:

Unit 14 as shown on the Condominium Plan referred to in Parcel One.

Assessor's Parcel No.:   085-400-027

Page 3

# EXHIBIT 7

FILED
September 29, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002964466

**6 PAGES**

1

Gregory C. Nuti (CSBN 151754)

2 Kevin W. Coleman (CSBN 168538)
Melissa S. Lor (CSBN 245515)

3 SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200

4 San Francisco, California 94104-5501
Telephone: 415-364-6700

5 Facsimile: 415-364-6785
gnuti@schnader.com

6 kcoleman@schnader.com
mlor@schnader.com

7

8 Attorneys for Bradley D. Sharp,
Chapter 11 Trustee

9

10

11

12

13

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

14 In re:

15 SK FOODS, L.P., a California limited
partnership,

16                            Debtor.

17 In re :

18 RHM INDUSTRIAL/SPECIALTY
FOODS, INC., a California

19 Corporation, d/b/a Colusa County
Canning Co.,

20                            Debtor.

21

22

23

24

25

26

27

28

Case No. 09-29162-D-11

Chapter 11

DC No. SH-76

Case No. 09-29161-D-11

Chapter 11

**MOTION TO APPROVE
COMPROMISE BETWEEN TRUSTEE
AND BANK OF MONTREAL AS
AGENT FOR SECURED LENDERS
PURSUANT TO FEDERAL RULE OF
BANKRUPTCY 9019**

Date:   October 27, 2010
Time:   10:00 a.m.
Place:  Courtroom 34
        501 I Street, 6th Floor
        Sacramento, CA 95814
Judge: Hon. Robert S. Bardwil

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3331133_1

1        Bradley D. Sharp (the "Trustee"), the duly appointed and acting chapter 11 trustee for

2 substantively consolidated debtors SK Foods, L.P., a California limited partnership ("SK

3 Foods"), and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa

4 County Canning Co. ("RHM" and collectively with SK Foods, the "Debtors"), moves this Court

5 for an order approving a compromise, pursuant to Federal Rule of Bankruptcy Procedure 9019,

6 between the Trustee and BMO as Agent[1] and the BMO Secured Lenders (collectively "BMO").

7 The terms of the compromise are fully set forth in the agreement attached as **Exhibit A** to the

8 declaration of Bradley D. Sharp filed herewith ("Settlement Agreement").  In support hereof, the

9 Trustee respectfully states as follows:

10    1.    On May 5, 2009 ("Petition Date") BMO and others commenced the above-

11 referenced bankruptcy case by filing a involuntary petitions for relief under Chapter 11 of Title

12 11 of the United States Code against the Debtors.  On May 18, 2009, the Court entered an order

13 appointing Bradley D. Sharp as the Chapter 11 Trustee for the Debtors, and since that time, he

14 has assumed control over the Debtors' property and affairs pursuant to Section 1104 of the

15 Bankruptcy Code.

16    2.    The Trustee and the Bank have entered into a Settlement Agreement that

17 compromises, liquidates and provides payment provisions on account of the Bank's Super

18 Priority Claim and Prepetition Secured Claim; provides a mechanism for determining the final

19 amount of the Bank's unsecured deficiency claim; and provides an agreement on the Trustee's

20 use of the Bank's Cash Collateral on a going forward basis through Plan Confirmation.  The

21 settlement contemplated herein in essence gives effect to, and for the most part preserves the

22 economics of[2] the settlement proposed within the context of the proposed plan described in the

23 Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for S.K. Foods, L.P.

24 filed on June 23, 2010 (Docket No. 1970) ("Amended Disclosure Statement").

25 [1] Terms not otherwise defined herein shall have the definitions as set forth in the Settlement

26      Agreement.

27 [2]Unlike the proposed Plan however, the Settlement Agreement does not address the payment of
     BMO's unsecured deficiency claim.  That claim will be treated in the plan along with all

28      other unsecured claims.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

2

MOTION TO APPROVE COMPROMISE

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

3.    A summary[3] of the economic terms of the Settlement Agreement is as follows:

(a)    BMO asserts three separate claims against the Estate:

(i)    BMO Secured Claim on account of BMO's pre-petition security interest in the Prepetition Collateral pursuant to 11 U.S.C. § 506(a) in an amount in excess of $200 million;

(ii)    Super Priority Claim on account of the post petition diminution in value of BMO's Prepetition Collateral, including the use of Cash Collateral to pay administrative costs of the Estate, pursuant to 11 U.S.C. § 503(b)(1), 507(a) and 507(b) in an amount in excess of $27,660,000.00; and

(iii)    BMO Allowed Unsecured Claim based on the total aggregate amount due and owing under the Credit Agreement after applying all payments received by BMO and applied to the Prepetition Secured Claim and the Super Priority Claim. The Trustee has agreed to abandon and otherwise turn over to BMO in full satisfaction of the BMO Secured Claim the following assets which the Trustee does not contest as being subject to BMO's prepetition security interest:

(1)    Accounts Receivable and Trade Receivables and the related Accounts Receivable litigation;

(2)    Trade Receivables from the Australia Entities and New Zealand Entities

(3)    50% of the proceeds from the sale of the Hawaii Property;[4]

(4)    The equipment related to the Drum Line Litigation and the proceeds recovery and right to recovery from the sale or resolution of that controversy, including any sanctions;[5]

---

[3] This is only a summary of the major economic terms of the Settlement Agreement. The terms of the Settlement Agreement shall control over any descriptions set for herein. *See* Declaration of Bradley D. Sharp ("Sharp Decl."), Exhibit A, filed herewith. The terms of the Settlement Agreement are hereby incorporated herein by reference.

[4] This amount represents a compromise of the Estate' claim that BMO's prepetition security interest in the Hawaii property is an avoidable preference.

3

MOTION TO APPROVE COMPROMISE

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1             (5)   Tax Refunds;[6]

2             (6)   Rights and Claims of BMO as to Cash Collateral Proceeds

3                     or proceeds of the BMO Secured Claim and Final Cash

4                     Collateral Order and against any person pursuant to the

5                     Credit Agreement, any subordination agreement, guarantee

6                     or borrowing thereunder or related pre-petition or post-

7                     petition security interest or lien of BMO except for use of

8                     Cash Collateral as approved by BMO in the Settlement

9                     Agreement;

10            (7)   Refunds from Split Dollar Life Receipts;

11            (8)   All rights, claims, interests, causes of action, recoveries and

12                     equity interests of the Debtors related to Westland

13                     Insurance and Cash Collateral or proceeds of collateral of

14                     BMO used to fund Westland Insurance and worker

15                     compensation claims and insurance (*"Westland Insurance*

16                     *Claims"*);

17            (9)   Tahoe Sales Proceeds;

18           (10)   Kraft Reserve;[7]

19           (11)   Letter of Credit Reserve;[8] and

20

21

22

---

23 *Continued from previous page*
[5] Any sanctions awarded on this proceedings will be credited against BMO's Super Priority
24      Claim as set forth below.

25 [6] The IRS and State Tax Avoidance Actions will be credited against BMO's Super Priority
26      Claim as set forth below.

[7] Subject to the conditions set forth in the Settlement Agreement.
27

[8] Subject to the conditions set forth in the Settlement Agreement.
28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1          (12)    Reimbursement to Harris from the Letter of Credit Reserve
2                  for any payments made by Harris or draws on the Letter of
3                  Credit (collectively, the *"BMO Distribution"*).

4          (b)     The Trustee has agreed to abandon and otherwise turn over to BMO in
5   partial satisfaction of the BMO's Super Priority Claim the following assets and claims not
6   previously subject to BMO's prepetition security interest: the Salyer Breach of Fiduciary Duty
7   Litigation, Claims Against Accountants; any sanctions awarded in the Drum Line Litigation; IRS
8   and State Tax Avoidance Actions and the New Zealand Claims. Further, BMO and the Trustee
9   have agreed that the total value of these assets to be applied against the Super Priority Claim
10  shall be $1,660,000 regardless of BMO's ultimate collection on account of these claims, if any.[9]
11  Therefore, BMO has agreed that its remaining Super Priority Claim shall be $26 million.[10]

12         (c)     On account of its remaining Super Priority Claim, BMO shall receive
13  payment of $2,335,800.00 from all net realizations or collections from Estate Assets and
14  thereafter 80% of all such net[11] realizations or collections until the Super Priority Claim has been
15  paid in full.

16         (d)     The amount of the BMO Allowed Unsecured Claim will be determined
17  upon payment in full of the Super Priority Claim based on the total aggregate amount due and
18  owing at that time under the Credit Agreement, after applying all payments received by BMO on
19  account of the Super Priority Claim and the BMO Distribution. Thereafter, the BMO Allowed
20  Unsecured Claim shall be paid its pro-rata share of funds available to unsecured non-priority
21  creditors of the Estate.

22         (e)     The Trustee and the Estate shall release BMO from any claims
23  challenging the validity, enforceability or priority of BMO's Prepetition Secured Claim,
24

---

[9] The parties cannot disclose the individual value of these litigation assets and claims for obvious
25    reasons.

26  [10] This amount may be adjusted to the extent BMO authorizes the use of additional cash collateral
        above and beyond what has been agreed to in the Settlement Agreement.
27

28  [11] Net realizations are after the payment of administrative costs of the Estate.

1 including but not limited to claims that its liens against the Hawaii and Tahoe properties are

2 preferential transfers, or to otherwise assert any claims or causes of action against BMO on

3 behalf of the Debtors' estate.

4          (f)    Finally, implementation of the Settlement Agreement will be contingent

5 upon the Trustee obtaining approval of a settlement agreement with the so-called 3c claimants on

6 terms substantially similar to those set forth in the Amended Disclosure Statement.    In this

7 regard, the Trustee has been in negotiations with the 3c claimants and hopes to finalize the

8 settlement prior to the hearing on this matter.

9     4.    For reasons discussed more fully in the memorandum of points and authorities

10 filed herewith, the Trustee believes that the proposed settlement is fair and equitable and in the

11 best-interests of the estate under the standards articulated in *In re A&C Properties,* 784 F.2d

12 1377, 1381 (9th Cir. 1986).

13     WHEREFORE, the Trustee respectfully prays for entry of an order:

14     1.    Determining that, under the circumstances, parties in interest have received

15 adequate notice and an opportunity to be heard;

16     2.    Approving the Settlement Agreement in the form as attached to the Declaration

17 of Bradley D. Sharp, filed herewith; and

18     3.    Granting such other or further relief as the Court deems just and proper.

19

20 Dated:  September 29, 2010                SCHNADER HARRISON SEGAL & LEWIS LLP

21                                           /s/  *Gregory C. Nuti*
                                                 Gregory C. Nuti
22                                               Attorneys for Bradley D. Sharp,
                                                 Chapter 11 Trustee
23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

# EXHIBIT 8

FILED
September 29, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002964470

1  16 Pages

2  MARC A. LEVINSON (SBN 57613)
ORRICK, HERRINGTON & SUTCLIFFE LLP
3  400 Capitol Mall, Suite 3000
Sacramento, CA 95814
4  Telephone:    (916) 447-9200
Facsimile:    (916) 329-4900
5  malevinson@orrick.com

6
JAMES E. SPIOTTO (Pro hac vice)
7  CHAPMAN AND CUTLER LLP
111 West Monroe Street
8  Chicago, IL 60603
Telephone:    (312) 845-3000
9  Facsimile:    (312) 516-1900
spiotto@chapman.com
10  Attorneys for Bank of Montreal

11              UNITED STATES BANKRUPTCY COURT

12              EASTERN DISTRICT OF CALIFORNIA

13                    SACRAMENTO DIVISION

14  In re:                              Case No.  09-29162-D-11

15  SK FOODS, L.P., et al

16       Debtors.                       Chapter 11

17                                      DC No. SH-76

18                                      DECLARATION    OF    STAN
                                        SPEER IN SUPPORT OF THE
19                                      MOTION  FOR  APPROVAL  OF
                                        SETTLEMENT  BETWEEN  THE
20                                      CHAPTER  11  TRUSTEE  AND
                                        THE AGENT
21

22          Under 28 U.S.C. §1746, I, Stan Speer, declare as follows:

23
            1.      I am a resident of the State of California.  If called upon to testify, I could
24
competently testify to the following facts upon personal knowledge.  Capitalized terms not
25

26  3331115_1.DOCX

defined herein shall have the same meaning ascribed to them in the Credit Agreement and Final Cash Collateral Order (as defined below) unless the context shall otherwise dictate.

2.     I am a Managing Director of Alvarez & Marsal North America LLC(*"A&M"*), a financial consulting firm. I have been retained by the Bank of Montreal as Pre-Petition Agent (*"Agent"*) for the Secured Lenders (the *"BMO Secured Lenders"* or *"Secured Lenders"*) pursuant to the Amended and Restated Credit Agreement dated as of September 27, 2008 (as heretofore amended, the *"Credit Agreement"*) among the Debtor, the Agent and the BMO Secured Lenders.

3.     I am a Managing Director with A&M in Los Angeles in the firm's Turnaround and Restructuring practice. I have extensive expertise in financial advisory and have worked with clients across a wide range of industries, including agriculture, mining, technology, manufacturing, retail, real estate and media and entertainment.

4.     With more than 25 years of experience, I have advised boards of directors, debtors-in-possession, investors, lenders and creditor committees in numerous situations. I have also served in senior management positions at public companies, and have provided business, financial and accounting advisory services to both debtors and creditors, including formulating and evaluating business plans, performance improvement, turnaround strategies, cost reduction initiatives, capital structures and plans of reorganization.

5.     Prior to joining A&M, I spent 10 years as CFO for publicly held Cadiz Inc, a real estate and water resource management company and its subsidiary, Sun World International, a fully-integrated agricultural company specializing in fresh fruit and vegetables. I managed Sun

World through a Chapter 11 restructuring and successful sale process.   I also have served as the Chief Restructuring Officer for Hecla Mining Company, the largest producer of silver in the US.

6.      Prior to joining Cadiz, I was a Partner in-Charge of the Los Angeles Restructuring practice of a Big Four firm.   I have a bachelor's degree in accounting from the University of Southern California and hold certifications as a Certified Public Accountant (CPA) (inactive) and a Certified Insolvency and Restructuring Advisor (CIRA).   I am a member of the Financial Executives Institute, American Bankruptcy Institute, Turnaround Management Association and am a past board member of the Association of Insolvency and Restructuring Advisors.

7.      A&M is a leading global professional services firm with expertise in guiding companies and public sector entities through complex financial, operational and organizational challenges.   Employing a unique hands-on approach, the firm works closely with clients to improve performance, identify and resolve problems and unlock value for stakeholders.

8.      Founded in 1983, A&M draws on a strong operational heritage in providing services including turnaround management consulting, crisis and interim management, performance improvement, creditor advisory, financial advisory, dispute analysis and forensics, tax advisory, real estate advisory and business consulting.   A network of experienced professionals in locations across the US, Europe, Asia and Latin America, enables the firm to deliver on its proven reputation for leadership, problem solving and value creation.

9.      On May 7, 2009 (the *"Petition Date"*), the Debtors filed petitions for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the *"Chapter 11 Case"*).

10. The Debtor, upon Motion dated May 8, 2009 in the above-captioned bankruptcy actions, filed a Motion for Use of Cash Collateral pursuant to which, after notice and hearing, the Court entered a Final Order (I) Authorizing the Debtors to Use the Secured Lenders' Cash Collateral and (II) Granting Adequate Protection to the Secured Lenders Pursuant to 11 U.S.C. §§361, 362 and 363 entered on June 22, 2009 by the Bankruptcy Court (*"Final Cash Collateral Order"*).

11. Pursuant to the Final Cash Collateral Order, the Court granted Adequate Protection Obligations (as defined therein) for the amount of any diminution in the value of the Secured Lenders' interest in Pre-Petition Collateral resulting from (i) the use of cash collateral pursuant to §363(c) of the Bankruptcy Code, (ii) the use, sale, lease or other diminution of Pre-Petition Collateral (other than cash collateral) pursuant to §363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to §362(a) of the Bankruptcy Code and to secure Adequate Protection Obligations a Replacement Lien was placed on all pre-petition and post-petition assets and properties of the Debtors as described in the Final Cash Collateral Order.

12. A&M, as financial advisors to the Agent, have analyzed the use by the Debtors of the Cash Collateral of the BMO Secured Lenders, both within 90 days of the Petition Date and use of Cash Collateral post-petition as well as the diminution of value of BMO Secured Lenders' interest in Pre-Petition Collateral based upon the Adequate Protection Obligations which are secured by the Replacement Liens, including a Super-Priority Administrative Expense Claim under Sections 501(b)(1), 507(a) and 507(b) of the Bankruptcy Code.

13. The Debtor, through its advisors, FTI Consulting, Inc. (*"FTI"*) and Duff & Phelps/Chanin Partners (*"Chanin"*), prepared an analysis in early April 2009 which they

4

presented to the Agent and the BMO Secured Lenders regarding the values that would be

realized under a sale scenario and under a liquidation scenario and recommended on behalf of

the Debtors to the Agent and the BMO Secured Lenders that they continue to fund a sale

scenario and sell the assets of the Debtors through a §363 sale transaction in a bankruptcy

proceeding.

14.     A&M reviewed the analysis presented by Chanin in conjunction with FTI and

believed that the analysis and related valuation of the sum of the parts under a §363 sale scenario

in a bankruptcy proceeding was reasonable.  The BMO Secured Lenders agreed to move forward

with a sales process anticipating a §363 sale in a bankruptcy proceeding on an expedited timeline

which was geared to benefit employees, vendors and customers of the Debtors by continued

uninterrupted operation of the Debtors' business.  The issue presented to the Debtors and to the

BMO Secured Lenders, creditors and vendors and customers of the Debtors was that as of spring

2009, there were various growers of tomatoes dependent upon SK Foods to take their tomatoes

for the tomato packing season which ordinarily commences on or around July 1st and typically

lasts through September ("*2009 PACK*") and there were various customers that were relying

upon SK Foods to provide the product to them from the 2009 PACK.  Given the seasonality of

cash flow, inventory and receivables, the Debtors would require significant use of the Cash

Collateral of the BMO Secured Lenders in the period of 60-90 days prior to the 2009 PACK in

order to prepare for the 2009 PACK, ensure sufficient employees were on hand to process the

products and provide an operating processing facility and equipment for the processing of the

growers' crop and resulting product for distribution to its customers.  During the period of 60-90

days prior to the Petition Date, the BMO Secured Lenders, based upon the Debtors' estimation of

sale value in a §363 sale as presented by Chanin in conjunction with FTI, and agreed to move

5

forward with providing the use of its cash collateral in an effort to facilitate a §363 sales process on an expedited timeline which was intended to keep employees employed, allow growers a facility to process their product and allow customers a source of purchasing product as they all had anticipated they would. However, to allow that process to occur for the §363 sale at the same time as maintaining sufficient operational readiness and employees to process the product for the 2009 PACK, the Debtors required the use of significant proceeds of the collateral of the Agent and the BMO Secured Lenders both pre-petition and post-petition.

15.    Chanin presented in their report regarding a §363 sales transaction that such sale could be completed on or about June 15, 2009. The June 15th date was considered significant because it would allow any Purchaser sufficiently timed to participate in the 2009 PACK and benefit from the profits earned through the 2009 PACK. Chanin advised the Debtors, the Agent and the BMO Secured Lenders that the value of the Debtors' assets would be substantially less if the sale was delayed past June 15, 2009. Chanin estimated that the total value of assets, if sold on or about June 15, 2009, in anticipation of the 2009 PACK, would bring value for the fixed assets in the range of approximately $60 to $80 million. In addition, there would be value from the liquidation of accounts receivable and inventory, which was estimated by A&M to be in the range of $48 to $55 million as of the petition date, for a combined value of approximately $108 to $135 million (See Exhibit A which is incorporated herein - Analysis of Diminution of Value of BMO Secured Lenders Collateral Post-Petition and Items "Fixed Asset", "Accounts Receivable" and "Inventory").

16.    Accordingly, if the §363 sale process of the Debtors' assets was completed as anticipated by the Debtors' financial advisors, FTI and Chanin, the Agent and the BMO Secured

Lenders were expected to receive the net value of collateral on the Petition Date of Accounts Receivable, Inventory, Fixed Assets in a range of $102 to $129 million as shown on Exhibit A. Unfortunately, given the needs of the Debtors' operation and the Debtors' difficulty in efficiently proceeding with a sale (as well as controversies and clouds relating to the operations and its ability to continue to function raised by the equity interest attempting to sell what they claim were other related assets purportedly held outside of the Debtors), the actual value received was far less.  In fact due to the difficulties and delays encountered in the sales effort, the BMO Secured Lenders after the Petition Date have received $67 million in distributions for the value of its collateral to date and anticipate receiving an estimated additional $3 to $13 million in value (for a total recovery range of $70 to $80 million) after giving effect to the settlement which Brad Sharp as the Chapter 11 Trustee has proposed to the Agent and Lenders.  Accordingly, there is a diminution in value between what the Collateral was worth at the Petition Date, in the range of $102 to $129 million, versus the estimate value of the recoveries on collateral to BMO as Agent under the proposed settlement of $70 to $80 million primarily due to the delayed and troubled sales effort.  Accordingly, the diminution in value caused by the delays and unfortunate need to use cash collateral due to the delay of the sale process and because of controversies created by others, including the old equity interests and related parties, the BMO Secured Lenders have a claim for Adequate Protection Obligations against the Estate in the range of $22 to $59 million.

17.      While there are a number of contributing factors to the unfortunate cost and expense incurred in the bankruptcy process and the delays suffered which all caused erosion to the value of the assets post-petition, there are some identifiable causes as indicated in the Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for SK Foods, L.P. (*"Disclosure Statement"*), filed with the Bankruptcy Court on June 23, 2010 (Docket No. 1970).

As noted in the Disclosure Statement, Mr. Salyer and his advisors took numerous steps that had the effect of attempting to and in fact causing the delay in the sales process, increasing the cost of the sale to the Estate and diminishing the value of the Collateral by statements, charges and demands which cast a cloud on the ability to successfully operate the assets and to maximize the value from the sale process. As noted in the Disclosure Statement, Mr. Salyer, his related parties and advisors, knew that Mr. Salyer remained in control of the Debtors until the appointment of a Chapter 11 Trustee and understood the time restrains facing the Debtors, the necessity of a smooth issue-free sale process to maximize value and knew that delaying the sale process would have a significant negative impact on the value realized from the sale of the Debtors' assets. As set forth in the Disclosure Statement, Mr. Salyer, through his various representatives and operatives, caused assets which were claimed to be necessary to the Debtors' operation that were nominally owned by non-Debtor affiliates, including the wastewater land, a rail line, bins, drum line and computer software to be an issue and a potential obstacle to an effective sale process. Chanin stated that potential Buyers in the sale process had indicated they did not want anything to do with Mr. Salyer on a going forward basis, so the inclusion of these items by Mr. Salyer and his surrogates not only confused but chilled the potential bids during the sale process.

18.     As set forth in the Declaration of Lawrence A. Mizera of BMO as Agent filed with the Bankruptcy Court on May 20, 2009 (Docket #38) (*"Mizera Declaration"*), the efforts of Mr. Salyer to attempt to obtain personal gain at the expense of the Debtor and its creditors was evident even pre-petition in that on April 14, 2009, Mr. Salyer had an in-person meeting with the Agent where he reiterated demands that the BMO Secured Lenders take millions of dollars of their Cash Collateral and make it available to pay his criminal defense costs as well as release of Guaranties by the Secured Lenders for his personal benefit. As set forth in the Mizera

8

Declaration, he indicated that in exchange he would consent to sell the Debtors through a §363 sale, arrange for their continued ability to discharge the wastewater on land nominally owned by affiliates he controlled. Without the ability to discharge the wastewater on these lands, the Debtors' processing plants would purportedly be unable to operate. As set forth in the Mizera Declaration, the BMO Secured Lenders were unable to agree to his demands since payment to him for his criminal defense or other purposes as an equity interest would be inappropriate under applicable law, including the provisions of the Bankruptcy Code. As set forth in the Mizera Declaration, they also informed him that the lease agreements under which the Debtors' discharged wastewater could be transferred in bankruptcy over his objection to the new purchaser. The Chapter 11 Trustee has alleged that these various assets were actually funded directly or indirectly by the Debtors and the BMO Secured Lenders Cash Collateral and should be substantially consolidated.

19.     As evidenced by the Trustee's pleadings in connection with the §363 sale, Mr. Salyer purportedly engaged counsel to complicate the assignment of the wastewater leases and the sale process since his demands were not met. Those intended actions were the actions that played out and continue to play out in the pending bankruptcy case, all of which has caused the Estate to bear a significant cost and expense and a significant diminution in value.

20.     As indicated by Exhibit A, an analysis of the diminution in value was prepared based upon comparing the value of the assets on hand at the Petition Date, using the Debtors' advisors presented ranges of recovery, to actual recovery to date and estimating the remaining recovery on the collateral of the Agent and BMO Secured Lenders.

21.    The most extreme range of diminution in value on Exhibit A was from approximately $22 million to $59 million. (The high projected collateral value of $129 million less the low actual recovery of $70 million equals a high of $59 million and the low projected collateral value of $102 million less the high actual recovery of $80 million equals $22 million.) This information has been presented to the Chapter 11 Trustee for consideration in connection with the settlement. Based upon that consideration, the Chapter 11 Trustee has recognized that a diminution in value claim, Adequate Protection Obligations of at least $27.66 million (which is in the low end of the range) would be realized in any litigation on this issue. Accordingly, the parties have reached an agreement to set the diminution in value at $27.66 million.

22.    As had been indicated in the Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for SK Foods, L.P., and is indicated on Exhibit B hereto, the Agent and BMO Secured Lenders, in order to provide sufficient cash for the Debtors to continue to operate even though an Event of Default existed and there was no obligation to allow the Debtors to use cash collateral or to advance any funds, there was over $28 million provided in the 90 day period prior to the filing of the Petition in order for the Debtors to continue its operation and to prepare for an appropriate sale of its assets as recommended by the Debtors' financial advisors. (See Exhibit B hereto which is incorporated herein)

23.    Exhibit B also indicates that from the Petition Date, approximately $26 million of post-petition use of cash collateral by the Estate has occurred or is budgeted to occur which is the same amount indicated as the cash collateral use post-petition in the Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for SK Foods, L.P. A&M has received the terms of the settlement proposed by the Chapter 11 Trustee Brad Sharp, and, in particular, the

1  resolution of the diminution in value claim, and believes that the proposed settlement, including

2  the determination of the diminution value claim at $27.66 million is reasonable and fair under the

3  circumstances of this case to the Estate and its creditors and to the BMO Secured Lenders.

4  While it can clearly be argued that there was more significant diminution in value than that

5  amount of the $27.66 million it is equally clear that $27.66 million is within the range of

6  reasonableness and it is at the low end of the range of what is estimated to be the diminution in

7  value.

8

9

10

11

12                                   [*Signature on next page*]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1   I declare that under penalty of perjury under the laws of the United States of America and

2   the State of California that the foregoing is true and correct.

3   Executed this 29th day of September 2010 at Westlake Village, CA.

4

5   *Stanley Speer*
    Stanley Speer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

12

# EXHIBIT A

**SK FOODS L.P.**
Diminution of Value of BMO Secured Lenders Collateral - Post Petition
($ in 000s)

| | Petition Date Book Value (b) | Estimated Recovery % (a) | | Estimated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Accounts Receivable | 23,663 | 75% | 85% | 17,747 | 20,114 |
| Inventory (excludes packaging & bill & hold) | 50,508 | 60% | 70% | 30,305 | 35,356 |
| Net change in A/R and Inventory | | | | 48,052 | 55,469 |
| Fixed Assets (a) | | | | 60,178 | 80,178 |
| Total | | | | 108,230 | 135,647 |
| Less: Value of Fixed Assets – Other Parties | | | | (5,970) | (5,970) |
| Net Value of Collateral @ Petition Date | | | | 102,260 | 129,677 |
| BMO Secured Lender Recoveries: | | | | | |
| Distributions to Date | | | | 67,269 | 67,269 |
| Net Cash to BMO as Agent under Settlement Proposal | | | | 1,008 | 8,237 |
| Estimated Value of Assets to BMO as Agent under Settlement Proposal | | | | 2,130 | 4,573 |
| | | | | 70,407 | 80,079 |
| Diminution in Value of Collateral - BMO Secured Lenders | | | | $ 31,853 | $ 49,598 |

Notes
(a) - Source:  Chanin Capital Partners "Sum of the Parts" - Fund to Going Concern Sale Analysis Summary from Presentation to BMO Secured Lenders on April 8, 2009
(b) - Source:  SK Foods reported balances as of Petition Date

EXHIBIT A

# EXHIBIT B

**SK FOODS L.P.**
**($ in 000s)**

| | |
|---|---:|
| ***New Value Provided on Pre-Petition Basis*** | **2/8/09 to 5/7/09** |
| | |
| Cash Disbursements Funded by the Lender Group: | |
| Operating | (11,166) |
| Non-Operating | (2,391) |
| Subtotal - Disbursements Funded 2/8/09 to 3/22/09 | (13,557) |
| | |
| Cash Disbursements Funded by the Lender Group: | |
| Operating | (11,218) |
| Non-Operating | (3,390) |
| Subtotal - Disbursements Funded 3/23/09 to 5/7/09 | (14,608) |
| | |
| **New Value Provided - Pre-Petition** | **$       28,165** |
| | |
| ***Diminution of Value on Post Petition Basis*** | **5/8/09 onward** |
| | |
| Cash Disbursements Funded by the Lender Group pre-sale to Olam (5/8/09 to 7/12/09): | |
| Operating (5/8/09 to 7/12/09) | (11,218) |
| Non-Operating (5/08/09 to 7/12/09) | - |
| Subtotal - Disbursements Funded 5/8/09 to 7/12/09 | (11,218) |
| | |
| Cash Disbursements Funded by the Lender Group post-sale to Olam (7/12/09 to 3/7/10): | |
| Winddown expenses | (821) |
| A/R collection and inventory disposition costs | (310) |
| Runoff Costs from operations | (1,364) |
| Professional Fees | (5,229) |
| Subtotal - Disbursements Funded 7/12/09 to 3/7/10 | (7,723) |
| | |
| PACA Claims (estimated) | (2,000) |
| | |
| Anticipated Cash Disbursements To Be Funded by the Lender Group for expenses post 3/7/10 in cash collateral use budget exhibit in Settlement Agreement: | |
| Professional expenses | (3,730) |
| Other expenses | (1,496) |
| Subtotal - Disbursements post 3/7/10 To Be Funded under Settlement Agreement | (5,226) |
| | |
| **Post Petition Use of Cash Collateral** | **$       26,167** |

Source:
 Disbursements funded information obtained from ongoing collateral monitoring and monthly operating reports prepared by Company and its advisors.
 Anticipated cash disbursements data from cash collateral budget in settlement agreement

**EXHIBIT B**

# EXHIBIT 9

FILED

DEC 1 3 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., | Docket Control No. SH-76 |
| Debtor. | Date:  December 6, 2010 |
| | Time:  9:30 a.m. |
| | Dept:  D |

**ORDER**

The court having issued a Memorandum Decision in the matter of the Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019, filed by chapter 11 trustee Bradley D. Sharp, Docket Control No. SH-76 (the "Motion"), and good cause appearing,

IT IS HEREBY ORDERED that the Motion is granted and the compromise is approved.

Dated: Dec. 13      , 2010

ROBERT S. BARDWIL
United States Bankruptcy Judge

1

## CERTIFICATE OF MAILING

2      I, Andrea Lovgren, in the performance of my duties as Deputy
Clerk to the Honorable Robert S. Bardwil, mailed by ordinary mail
3 a true copy of the attached document to each of the parties
listed below:

4

Gregory Nuti                          Bank of Montreal
5 Schnader Harrison Segal & Lewis      c/o James Spiotto
One Montgomery Street, Ste. 2200      Chapman and Cutler
6 San Francisco, CA 94104- 5501        111 W Monroe Street
                                       Chicago, IL 60603
7 Jaime Dreher
Downey Brand, LLP
8 621 Capitol Mall, 18th Floor          Robert Greenfield
Sacramento, CA 95814-4731             Stutman Treister & Glatt
9                                       1901 Avenue of the Stars, 12th Fl
Malcolm Segal                         Los Angeles, CA 90067
10 Segal & Kirby, LLP
770 L Street, 1440
11 Sacramento, CA 95814                  Erik Martin
                                       Haynes and Boone, LLP
12 Andrea Miller                         201 Main Street, Suite 2200
Nageley Meredith & Miller             Fort Worth, TX 76102
13 8001 Folsom Blvd., Suite 100
Sacramento, CA 95826                  Kristin Madigan
14                                       Quinn Emanuel Urquhart &
Paul Pascuzzi                         Sullivan
15 Felderstein Fitzgerald               50 California Street, 22nd Floor
   Willoughby & Pascuzzi               San Francisco, CA 94111
16 400 Capitol Mall, Suite 1450
Sacramento, CA 95814
17

18 Marc Levinson
Orrick Herrington & Sutcliffe
19 400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
20

Robert Gebhard
21 1 Market Plz Steuart Twr., 8th Fl
San Francisco, CA 94105
22

23

24

25 DATE: December 13, 2010

26                                    _____
                                     Deputy Clerk
27

28

FILED

June 24, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003588452

1  **3 PAGES**
Gregory C. Nuti (CSBN 151754)
2    gnuti@schnader.com
Kevin W. Coleman (CSBN 168538)
3    kcoleman@schnader.com
Melissa S. Lor (CSBN 245515)
4    mlor@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
5  One Montgomery Street, Suite 2200
San Francisco, California  94104-5501
6  Telephone: 415-364-6700
Facsimile: 415-364-6785
7
Attorneys for Chapter 11 Trustee, Bradley D. Sharp
8

9                UNITED STATES BANKRUPTCY COURT

10                EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12
In re:                                    ) Case No. 09-29162-D-11
13                                         )
SK FOODS, L.P., a California limited       ) Chapter 11
14 partnership,                            )
                                           ) **DCN: SH-112**
15            Debtor.                       )
                                           ) **CERTIFICATE OF SERVICE RE**
16                                         ) **MOTION AUTHORIZING TURNOVER**
                                           ) **OF PROCEEDS OF SALE OF CERTAIN**
17                                         ) **REAL PROPERTY LOCATED AT 4000**
                                           ) **WESTLAKE BOULEVARD, #14,**
18                                         ) **HOMEWOOD, CALIFORNIA 96141**
                                           ) **FREE AND CLEAR OF ANY CLAIMS**
19                                         ) **OR INTERESTS OF THE SALYER**
                                           ) **DAUGHTER'S TRUSTS**
20                                         )
                                           ) Date:  July 27, 2011
21                                         ) Time:  10:00 a.m.
                                           ) Place: Courtroom 34
22                                         )        501 I Street, 6th Floor
                                           )        Sacramento, CA  95814
23                                         ) Judge: Hon. Robert S. Bardwil
24
25
26
27
28

PHDATA 3403518_1

CERTIFICATE OF SERVICE

# CERTIFICATE OF SERVICE BY MAIL

I declare under penalty of perjury under the laws of the State of California that the following is true and correct:

I am employed in the City and County of San Francisco, State of California, in the office of a member of the bar of this court, at whose direction the service was made. I am a citizen of the United States, over the age of eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee of Schnader Harrison Segal & Lewis LLP, and my business address is One Montgomery Street, 22nd Floor, San Francisco, California 94104.

I served the following document(s):

➢ **NOTICE OF MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTER'S TRUSTS;**

➢ **MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTER'S TRUSTS;**

➢ **DECLARATION OF JAMES HEISER IN SUPPORT OF MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTER'S TRUSTS; and**

➢ **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION AUTHORIZING TURNOVER OF PROCEEDS OF SALE OF CERTAIN REAL PROPERTY LOCATED AT 4000 WESTLAKE BOULEVARD, #14, HOMEWOOD, CALIFORNIA 96141 FREE AND CLEAR OF ANY CLAIMS OR INTERESTS OF THE SALYER DAUGHTER'S TRUSTS.**

I enclosed a true and correct copy of said document in an envelope and placed it for collection and mailing with the United States Postal Service on, on June 24, 2011, following the ordinary business practice; addressed as follows:

| U.S. Trustee Counsel<br>Judith C. Hotze<br>501 I Street #7-500<br>Sacramento, CA 95814 | Counsel for Stefanie A. Salyer, Caroline G. Salyer, the SAS 1999 Trust, the CGS 1999 Trust, the SAS 2007 Trust, the CGS 2007 Trust and Robert Pruett in his capacity as Trustee for the SAS 1999 Trust and the CGS 1999 Trust<br><br>Richard S. E. Johns, Esq.<br>57 Post Street, Suite 604<br>San Francisco, CA 94104 |
|---|---|
|  | Larry J. Lichtennegger<br>3850 Rio Rd #58<br>Carmel, CA 93923 |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

PHDATA 3403518_1

- 1 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA, 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

| | |
|---|---|
| Caroline G. Salyer<br>1515-3 NW 12th Street<br>Bend, OR 97701 | Stefanie A. Salyer<br>1312 E. 8th Street<br>Davis, CA 95616 |
| **Counsel to Creditors Committee**<br>Dale Ginter<br>Jamie Dreher<br>Downey Brand<br>621 Capitol Mall, 18th Floor<br>Sacramento, CA 95814 | **Chair of the Creditor's Committee**<br>Nicole DeRosa<br>Financial Services Manager<br>Silgan White Cap LLC<br>1140 – 31st<br>Downers Grove, IL 60515 |
| **Co-Counsel for Bank of Montreal**<br>Marc A. Levinson<br>Jefferey D. Hermann<br>Stacy E. Don<br>Orrick, Herrington & Sutcliffe LLP<br>400 Capitol Mall<br>Sacramento, CA 95814-4497 | **Attorneys for the Bank of Montreal**<br>James Spiotto<br>Chapman & Cutler<br>111 W. Monroe St.<br>Chicago, IL 60603 |

I am readily familiar with my firm's practice for collection and processing of correspondence for delivery in the manner indicated above, to wit, that correspondence will be deposited for collection in the above-described manner this same day in the ordinary course of business.

Executed on June 24, 2011, San Francisco, California.

*/s/ Wendy E. Reinig*
Wendy E. Reinig

PHDATA 3403518_1

- 2 –

CERTIFICATE OF SERVICE